JODI LINKER, Bar No. 230273
Federal Public Defender
Northern District of California
VARELL FULLER, Bar No. 202680
Assistant Federal Public Defender
8th Floor - Suite 820
55 South Market Street
San Jose, CA 95113
Telephone:   (408) 291-7753
Facsimile:    (408) 291-7399
Email:       Varell_Fuller@fd.org

Counsel for Defendant Agnihotri

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 23–00354 PCP |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| RAJIV  AGNIHOTRI, | **Court:**        Courtroom 8, 4th  Floor |
| Defendant. | **Hearing Date:**  November 12, 2025 |
| | **Hearing Time:**  10:00 a.m. |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

DEFENSE SENTENCING RECOMMENDATION ...................................................... 2

BACKGROUND ........................................................................................................ 3

ARGUMENT ............................................................................................................. 6

I.      Tapentadol is significantly less potent than Morphine, and under USSG § 2D1.1 cmt. n.6(C), the Court must adjust the converted drug weight to a 1:200 morphine ratio, resulting in a CDW of 41.20 kilograms and base offense level 18 ................................... 6

II.      The Two-Level Mass-Marketing Enhancement Under U.S.S.G. § 2D1.1(b)(7) Does Not Apply ................................................................................................................. 11

III.      The Two-Level Enhancement Under U.S.S.G. § 2D1.1(b)(12) for Maintaining a Drug Premises Does Not Apply .................................................................................... 12

IV.      Mr. Agnihotri Qualifies for a Minor-Role Adjustment Under U.S.S.G. §§ 3B1.2 and 2D1.1(e)(2)(B)(ii) under the 2025 Sentencing Guidelines ............................. 13

V.      The Obstruction of Justice Enhancement Under § 3C1.1 Does Not Apply .................... 14

VI.      Mr. Agnihotri is safety valve eligible in accordance with 18 U.S.C. § 3553(f) and USSG § 5C1.2 .................................................................................................... 17

VII.      A sentence of 12 months and 1 day is sufficient, but not greater than necessary to achieve the goals of sentencing ......................................................................... 19

     A.      The nature and circumstances of the offense ...................................................... 20

     B.      Mr. Agnihotri's personal history and characteristics ........................................ 21

         1.      Mr. Anihotri's severe childhood trauma ................................................ 22

         2.      Mr. Agnihotri's mental health condition supports a variance ................. 23

         3.      The need to avoid an unwarranted sentencing disparity 18 U.S.C. § 3553(a)(6) ......................................................................................... 24

CONCLUSION ...................................................................................................... 27

1

# TABLE OF AUTHORITIES

2

## CASES

3

*Landrigan v. Schriro,*
4
    441 F.3d 638 (9th Cir. 2006) ........................................................................................... 22

5

*Penry v. Lynaugh,*
    492 U.S. 302 (1989) ...................................................................................................... 22

6

*Pepper v. United States,*
7
    562 U.S. 476 (2011) ...................................................................................................... 20

8

*Santosky v. Kramer,*
    455 U.S. 745 (1982) ...................................................................................................... 22

9

*United States v. Ameline,*
10
    409 F.3d 1073 (9th Cir. 2007) ...................................................................................... 23

11

*United States v. Bateman,*
    19-CR-00126-GWC (D. Vt. April 19, 2024) .................................................................. 9
12

13

*United States v. Cantu,*
    12 F.3d 1506 (9th Cir. 1993) ........................................................................................ 23

14

*United States v. Carty,*
15
    520 F.3d 984 (9th Cir. 2008) (en banc) .................................................................. 19, 20

16

*United States v. Floyd,*
    945 F.2d 1096 (9th Cir. 1991) ...................................................................................... 22

17

*United States v. Job,*
18
    871 F.3d 852 (9th Cir. 2017) ........................................................................................ 12

19

*United States v. Jordan,*
    256 F.3d 922 (9th Cir. 2001) ........................................................................................ 12
20

*United States v. Kowarski,*
21
    13-CR-00071-NBF (W.D. Pa. May 9, 2014) .................................................................. 9

22

*United States v. Kirilyuk,*
    29 F.4th 1128 (9th Cir. 2022) ........................................................................................ 8
23

24

*United States v. Martre,*
    13-CR-20537-DLG (S.D. Fla. January 7, 2014), aff'd, 586 F. App'x 574 (11th Cir. 2014) ........... 9

25

*United States v. McCarthy,*
26
    2011 WL 1991146 (S.D.N.Y. 2011) ............................................................................. 8

27

*United States v. McGovern,*
    329 F.3d 247 (1st Cir. 2003) ........................................................................................ 16

28

*United States v. Mejia-Pimental*,
    477 F.3d 1100 (9th Cir. 2007) ........................................................ 17, 18

*United States v. Qayyem*,
    2012 WL 92287 (S.D.N.Y. 2012) ........................................................ 8

*United States v. Real-Hernandez*,
    90 F.3d 356 (9th Cir. 1996) ........................................................ 18

*United States v. Salazar*,
    61 F.4th 723 (9th Cir. 2023) ........................................................ 18

*United States v. Sepling*,
    944 F.3d 138 (3d Cir. 2019) ........................................................ 9

*United States v. Shrestha*,
    86 F.3d 935 (9th Cir. 1996) ........................................................ 18

*United States v. Chritensen*,
    18 F.3d 882 (9th Cir. 1994) ........................................................ 23

**STATUTES**

18 U.S.C. § 3146 ........................................................ 15

18 U.S.C. § 3147 ........................................................ 15

18 U.S.C. § 3553 ........................................................ *passim*

21 U.S.C. § 841 ........................................................ 1

21 U.S.C. § 846 ........................................................ 1

21 U.S.C. § 952 ........................................................ 1, 25

21 U.S.C. § 960 ........................................................ 1, 25

21 U.S.C. § 963 ........................................................ 1

**UNITED STATES SENTENCING GUIDELINES**

USSG § 1B1.3 ........................................................ 11, 14

USSG § 1B1.11 ........................................................ 2

USSG § 2D1.1 ........................................................ *passim*

USSG § 2J1.6 ........................................................ 15

USSG § 3B1.2 ........................................................ *passim*

USSG § 3C1.1 ........................................................ *passim*

USSG § 5C1.2 ........................................................ 2, 17, 19

USSG § 5H1.3 ........................................................ 24

USSG § 5H1.4 ........................................................ 24

**INTRODUCTION**

Defendant Rajiv Agnihotri respectfully submits this memorandum to assist the Court in determining an appropriate sentence. He has pled guilty to narcotics offenses arising from conduct between August and October 2022; specifically, conspiracy to distribute and import controlled substances, importation and attempted importation of prescription medications, and distribution and possession with intent to distribute Schedule II and IV substances, in violation of 21 U.S.C. §§ 841, 846, 952, 960, and 963. The number of counts overstates the seriousness of the offense, reflecting the government's decision to charge multiple aspects of a single course of conduct separately. This is Mr. Agnihotri's first felony conviction, and he has never served a term of imprisonment.

Mr. Agnihotri worked as a reshipper mailing prescription medications ordered by U.S. customers from the Durgapura Pharmacy in India. Acting at the direction of overseas handlers, he received shipments and forwarded them to individual purchasers, earning about twenty dollars per package. This case is atypical from the generic "drug trafficking" case involving street narcotics: it involved prescription drugs ordered by Americans seeking lower-cost medicine. His conduct reflects the broader problem of limited access to affordable medication rather than a conventional drug enterprise. Mr. Agnihotri is deeply remorseful and accepts full responsibility for his actions.

Probation has calculated an adjusted offense level of 23, with a Criminal History Category of II, resulting in an advisory guidelines range of 51 to 63 months. *See* Presentence Report ("PSR") at ¶ 106. Probation recommends a downward variance to 42 months. *See* PSR Sentencing Recommendation at 1.

Mr. Agnihotri respectfully disagrees with the Probation Office's guideline calculation and sentencing recommendation because a 42-month prison term is excessive and is premised on an incorrect guideline calculation. The advisory range is incorrect because it treats Tapentadol as equivalent to Morphine, the closest listed comparator in the Drug Equivalency Tables, even though that ratio conflicts with established scientific principles because Tapentadol is significantly less potent. Probation and the government contend that the Court may not adjust the ratio down for Morphine to account for Tapendadol's clearly lower potency. They are incorrect. Courts have routinely done so for other substance and should do so here. To do otherwise would lead to an absurd

result of Mr. Agnihotri being sentenced for a controlled substance he did not possess. Probation

acknowledges that its approach, as well as the government's, necessarily produces an artificially

inflated guideline range because Tapentadol is less potent. It further recognizes that the Court may

wish to consider a downward variance to account for this disparity.[1] Adjusting for that difference

alone, Mr. Agnihotri's guideline range should be four levels lower -- offense level 19 (33 to 41

months). Mr. Agnihotri did not distribute Morphine, and he should not be sentenced as though he did

simply because Tapentadol is omitted from the § 2D1.1 Drug Equivalency Tables.

Mr. Agnihotri agrees with Probation that a variance is warranted. However, Mr. Agnihotri also

respectfully disagrees with Probation's guideline calculation in several other respects, because its

recommendation fails to give adequate weight to key mitigating factors, including Mr. Agnihotri's

severe alcoholism, which contributed to both the offense and his limited criminal history; his

documented mental health conditions and cognitive impairment; his eligibility for the two-level

safety-valve reduction under §§ 2D1.1(b)(18) and 5C1.2; and the need to avoid unwarranted disparity

under 18 U.S.C. § 3553(a)(6).

## DEFENSE SENTENCING RECOMMENDATION

Mr. Agnihotri respectfully requests that the Court impose a sentence of no more than 12

months and 1 day, followed by a three-year term of supervised release. In support, the defense asks

the Court to consider the following: (1) base offense level is correctly calculated at 18, not 22, based

on a Converted Drug Weight of 41.20 kilograms, because USSG § 2D1.1, comment. (n.6(C))

requires the Court to adjust the converted drug weight to account for Tapentadol's lower potency

relative to Morphine, or to grant a variance on this basis; (2) § 2D1.1(b)(7) mass-marketing

enhancement does not apply; (3) § 3C1.1 obstruction-of-justice enhancement does not apply; (4) a

USSG § 3B1.2 mitigating-role reduction, in accord with the 2025 Guidelines at § 2D1.1(e)(2)(B)(ii),

is warranted[2] (5) § 2D1.1(b)(12) "maintaining a premises" enhancement does not apply; (6) Mr.

---

[1] *See* Probation Response to Defense Objection at ¶7.
[2] The Presentence Investigation Report applies the 2024 edition of the United States Sentencing Guidelines. However, because Mr. Agnihotri will be sentenced after the November 1, 2025, effective date of the amended Guidelines, which are more favorable to the defendant, the 2025 Guidelines must be applied pursuant to U.S.S.G. § 1B1.11(a).

DEFENDANT'S SENTENCING MEMORANDUM
*AGNIHOTRI*, CR 23–00354 PCP

Agnihotri is safety-valve eligible; (7) the nature and circumstances of the offense support a downward variance; (8) Mr. Agnihotri's personal history and characteristics, including his severe alcohol use disorder during the offense, his mental health and cognitive impairments, and his post-offense rehabilitation and sobriety; and (9) the need to avoid unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6).

The defense submits that the guideline range is correctly calculated as follows: base offense level 18 under USSG § 2D1.1(a)(5) and (c)(11) (applying a conversion of 1 gm of Tapentadol to 200 gm CDW under § 2D1.1, cmt. n.6(C)), minus three levels for acceptance of responsibility, two levels for safety-valve eligibility, and two levels for a mitigating role, resulting in an adjusted offense level of 11. With a Criminal History Category II, the advisory guideline range is 10 to 16 months.

The parties and Probation disagree about the applicability of several sentencing enhancements. However, even assuming *arguendo* that the Court finds the government has met its burden to apply § 2D1.1(b)(12) ("maintaining a premises"), the resulting adjusted offense level would be 13, yielding a guideline range of 12 to 18 months within Zone C, which permits a split sentence. Accordingly, for the reasons discussed below, Mr. Agnihotri respectfully requests a sentence of no more than 12 months and 1 day.

## BACKGROUND

Mr. Rajiv Agnihotri, 44, is married and the father of two teenagers who live in the United States, along with his sister in Sunnyvale, California. PSR ¶¶ 81–82. He was born in a rural village in Punjab, India, with a population of about 2,000. He came of age in the 1980s, amid political violence and communal unrest between Sikh groups and the Indian government. Raised in what he describes as a middle-class family by rural standards, his father worked in real estate, and his mother was a homemaker. PSR ¶ 82. Mr. Agnihotri's father was a violent alcoholic who routinely assaulted his wife and children. He witnessed his mother's repeated beatings and suffered frequent physical abuse himself, including an assault that ruptured his eardrum and left him permanently deaf in his right ear. At twelve, he broke his collarbone while fleeing a beating, one of several untreated injuries from his childhood. He was also raised alongside a mentally ill uncle who once stabbed his mother with a kitchen knife. PSR ¶ 84.

He attended a private school run by a family friend, where tuition was often unpaid, and began drinking potent homemade alcohol around age twelve. PSR ¶ 97; *See* Mental Health Evaluation of Dr. Michael Dinh, MD, Report at pg. 3, attached hereto as Def. Exb. A. ("Dinh. Rpt"). His early alcohol use led to poor grades, and he left school by fourteen. Dinh Rpt. 3. As a young man, he was stabbed in the abdomen for supporting an opposition party, leaving a lasting scar. Dinh Rpt. 4. He later opened a small clothing shop in his hometown. At twenty-three, he fled to the United Kingdom seeking safety. He later returned to India, married Neetu Agnihotri in an arranged marriage, and they had two children. In 2010, he immigrated to the United States through Mexico and across the Darién Gap, a deadly jungle corridor between Panama and Colombia. He describes that journey as the most traumatic experience of his life. Dinh Rpt. 4. After entering the United States, he applied for asylum, and his wife and children later joined him. Since his arrival, Mr. Agnihotri has worked primarily as a chef and delivery driver, steadily supporting his family through restaurant and service work.

*Offense Conduct*

Mr. Agnihotri became involved in the offense after a coworker at the restaurant where he worked offered him an opportunity to earn extra money by receiving and forwarding prescription medications. After being terminated from his job because of his severe alcoholism, he agreed to participate. Between September 13, 2022, and September 29, 2022, Homeland Security Investigations (HSI) and U.S. Customs and Border Protection (CBP) intercepted several international mail parcels addressed to Mr. Agnihotri or to fictitious names later associated with him. PSR ¶¶ 8 & 13. The first parcel, seized on September 13, 2022, was falsely declared as "Indian Sweet Snacks" but contained approximately 30,000 Alprazolam tablets, the generic form of Xanax, a Schedule IV anti-anxiety medication. *Id.* A second group of shipments, intercepted on September 27, 2022, was declared to contain "sweet cookies, chocolates, snacks, and herbal toothpaste," but actually contained 30,000 Zolpidem tablets, the generic form of Ambien, a Schedule IV sleep aid. *Id.*

On September 29, 2022, agents conducted a controlled delivery of three DHL packages at Mr. Agnihotri's residence and executed a search warrant. PSR ¶ 15. They recovered shipping labels, envelopes, and postal receipts, but found no narcotics, cash proceeds, or pill stock. The following day, September 30, investigators went to the Cupertino Safe Storage unit that Mr. Agnihotri had

1  rented in his true name. PSR ¶ 24. The PSR inaccurately states that "the manager showed agents

2  surveillance images of Agnihotri there on September 30, 2022, driving the Murano and emptying out

3  the storage unit." PSR ¶ 24. In fact, consistent with the actual images, the HSI report merely notes

4  that "surveillance images depict Agnihotri driving his 2015 Nissan Murano, license plate 7MUW457,

5  into the complex on September 30, 2022, at 8:30 a.m." and nothing more. *See* Def. Ex. B. Cupertino

6  Safe Storage records show the facility was entered at 8:33 a.m. and exited at 8:40 a.m., a seven-

7  minute visit, after which the lease was ended. *Id.* Investigators never searched the Cupertino Safe

8  Storage unit, and no drugs were seized from that or any other location.

9        Additional parcels intercepted in October 2022 contained small quantities of the following

10  prescription drugs: Tapentadol (generic Nucynta), Tramadol (generic Ultram), Lorazepam (generic

11  Ativan), and Pregabalin (generic Lyrica), in blister packs, PSR ¶¶ 30–47, 54. Across all seizures from

12  September 13 through October 19, 2022, approximately 66,479 tablets were recovered and lab-tested.

13  The higher quantity estimates and speculative CDW calculations in ¶ 53 are based largely on

14  uncorroborated WhatsApp chat messages rather than on seized, lab-tested pills PSR ¶¶ 18, 52–53.

15  While the chats may suggest that deliveries were requested and mailed out, they provide no reliable

16  information about the weight, composition, or identity of any controlled substance. Because no drugs

17  were seized or analyzed, the converted drug weight attributed to Mr. Agnihotri cannot be verified

18  through laboratory testing. Under USSG § 2D1.1, Application Note 5, any CDW calculation must

19  rest on reliable evidence establishing both the weight, type, and quantity of the drug through lab

20  confirmation. The 4,533.96-kilogram CDW attributed to Mr. Agnihotri in ¶ 53 is unsupported by

21  such evidence and represents conjecture rather than confirmed analysis and, accordingly, should be

22  given little weight to sentence Mr Agnihotri. Based on the table in ¶ 54, the pill-count distribution for

23  the seized and lab-tested drugs is as follows:

24       Table 1. Summary of Seized Prescription Medications

| Substance | Common / Generic Name | Schedule | Date(s) Seized | No. of Pills | % of Total Pills | Drug Type / Effect |
|-----------|----------------------|----------|----------------|--------------|------------------|--------------------|
| Alprazolam | Xanax | IV | 9/13/22 & 10/19/22 | 30,450 | 45.8% | Benzodiazepine – anti-anxiety |

| Zolpidem | Ambien / Belbien | IV | 9/27/22 & 10/9/22 | 35,000 | 52.6% | Sedative-hypnotic – sleep aid |
| Tapentadol[3] | Nucynta | II | 10/11/22 & 10/19/22 | 490 | 0.7% | Opioid analgesic – pain reliever |
| Lorazepam | Ativan | IV | 10/19/22 | 179 | 0.3% | Benzodiazepine – anti-anxiety |
| Tramadol | Ultram | IV | 10/19/22 | 360 | 0.5% | Opioid-like analgesic |
| Pregabalin | Lyrica | V | 10/13/22 & 10/14/22 | 80 | 0.1% | Anti-seizure / neuropathic pain |
| Total Pills Seized | | | | 66,479 | 100% | |

On October 16, 2023, Mr. Agnihotri was arrested without incident and made his initial appearance. PSR ¶ 5. On July 3, 2024, he entered a guilty plea to Counts One through Fifteen of the indictment.

## ARGUMENT

**I.    Tapentadol is significantly less potent than Morphine, and under USSG § 2D1.1 cmt. n.6(C), the Court must adjust the converted drug weight to a 1:200 morphine ratio, resulting in a CDW of 41.20 kilograms and base offense level 18[4]**

Mr. Agnihotri's offense involved the receipt and shipment of Schedule II, IV, and V controlled substances. Under the Sentencing Guidelines, Schedule IV substances are converted by multiplying the number of doses by 0.0625 grams per dose, with a total converted drug weight capped at 9.99 kilograms. *See* USSG § 2D1.1 cmt. n.8(D). Schedule V substances are converted at an even lower rate of 0.00625 grams per dose and are capped at 2.49 kilograms. *Id.* Accordingly, the Guidelines provide that the base offense level for offenses involving only Schedule IV or V controlled substances cannot exceed level 14, regardless of the quantity possessed. *Id.* The Schedule IV and V

---

[3] The § 2D1.1 converted drug weight (CDW) calculation is driven almost entirely by the quantity of Tapentadol attributed to Mr. Agnihotri.

[4] The defense respectfully submits its guideline calculation for how it arrived at a base offense level of 18. *See* Def. Exb. C, Defense Guideline Calculation Produced to U.S. Probation

medications in this case, therefore, have a negligible impact on the overall guideline calculation, which is driven almost entirely by the 490 Tapentadol pills seized, a Schedule II substance. Under USSG § 2D1.1, Application Note 6, because Tapentadol does not appear in the Guidelines, the Court must "determine the base offense level using the converted drug weight of the most closely related controlled substance referenced in this guideline." § 2D1.1, n.6. Where a controlled substance is not specifically referenced in the Guidelines, courts look to chemical structure, effect, and potency to select the most closely related substance. *See* USSG § 2D1.1 cmt. n.6.

First, with respect to its structure, Tapentadol is a novel, chemically designed analgesic that contains two components: an opioid receptor agonist and a noradrenaline reuptake inhibitor, which work synergistically to provide analgesia with a much lower risk profile than an opioid alone.[5] Accordingly, its structure is not substantially similar to any controlled substance referenced in the guideline. § 2D1.1, n.6(A). Second, with respect to its effect, it has a depressant effect on the central nervous system that is similar that of Morphine (an opioid receptor agonist) but is nearly three times weaker. *Id*., n.6(B). Third, and as a result, a much greater quantity of Tapentadol is needed to produce a substantially similar effect on the central nervous system as Morphine. *Id*., n.6(C). In Tapentadol, it is the combination of a weaker opioid agonist with the inhibition of neuronal reuptake of noradrenaline that makes the drug an effective analgesic, while posing much lower risk of adverse effects than much stronger opioids like Morphine. *See* n.1.

Based on these factors, Morphine is the closest comparator. There is no factual dispute that Tapentadol is much less potent than Morphine. The government, in its submission to Probation, itself cites a study showing that approximately 2.5 grams of Tapentadol are required to approximate the effect of 1 gram of Morphine.[6] The government and Probation argue that because defendants in two similar cases, *United States v. Oppenheimer*, No. 3:24-cr-00170 JD, and *United States v. Segovia*, No. 5:24-cr-00459, accepted a 1:500 ratio, they control this Court's determination. The two cases

---

[5] Raffa, Robert, et al, *Does "Strong Analgesic" Equal "Strong Opioid"? Tapentadol and the Concept of "u-Load,"* Advances in Therapy (Sept. 11, 2018), Vol. 35, at 1471-84 https://pmc.ncbi.nlm.nih.gov/articles/PMC6182641/.

[6] *See* https://fpm.ac.uk/opioids-aware-structured-approach-opioid-prescribing/doseequivalents-and-changing-opioids (cited in Gov't Letter to Probation dated September 12, 2024, at 37).

1    relied on are irrelevant to the question of whether that ratio is correct from a scientific perspective, or

2    whether a sentencing court has the authority to adjust the ratio here in light of scientific evidence,

3    because those issues do not appear to have been litigated. *Compare United States v. Kirilyuk*, 29

4    F.4th 1128, 1134 (9th Cir. 2022) (noting that cases do not stand for propositions not considered).  In

5    fact, as the government's own research demonstrates, Tapentadol is nearly three times less potent

6    than Morphine.[7]

7          The government and Probation suggest that once a comparable controlled substance is selected,

8    the Court is bound to apply the corresponding ratio without further analysis. But that interpretation

9    disregards the plain language of USSG § 2D1.1, comment. (n.6(C)), which expressly requires the

10   Court to determine "whether a lesser or greater quantity of the controlled substance not referenced in

11   the guideline is needed to produce a substantially similar effect on the central nervous system as a

12   controlled substance referenced in the guideline." The guideline thus mandates an individualized,

13   evidence-based determination, rather than the mechanical adoption of a prior case's ratio. Given the

14   limited controlled substances referenced in the tables, Morphine may be the "winner by default," but

15   that does not end the inquiry, as Probation and the government incorrectly suggest.

16         When a sentencing court is assigned the task of determining the appropriate Converted Drug

17   Weight for a drug not listed in the guidelines, it has the authority to adjust the ratio for a listed drug to

18   better reflect the amount needed to produce a substantially similar effect on the central nervous

19   system. U.S.S.G. § 2D1.1, Application Note 6(C). Relying on scientific or other relevant evidence,

20   many courts have adopted this approach across various drugs, including Tapentadol. *See United*

21   *States v. McCarthy*, 2011 WL 1991146 (S.D.N.Y. 2011) (using a 1:200 conversion for MDMA

22   despite a higher comparator ratio because of potency differences); *United States v. Qayyem*, 2012

23   WL 92287 (S.D.N.Y. 2012) (same);  *United States v. Bateman*, No. 5:19-cr-00126-GWC (D. Vt.

24   April 19, 2024) (using 1:200 ratio for Tapentadol to hydromorphone).

25         The PSR's suggestion to adopt a ratio known to overstate the severity of Tapentadol conflicts

26   with reason and prior DOJ precedent. In fact, adjusting for potency has been DOJ practice for a range

27   _____

28   [7] *See* n.6.

1  of substances. For example, in sentencing calculations for methylone, DOJ/DEA policy has been to

2  use MDMA as the most closely related comparator but to halve the MDMA ratio because methylone

3  is roughly 50 percent as potent. *See, e.g., United States v. Martre*, No. 1:13-cr-20537-DLG (S.D. Fla.

4  January 7, 2014), aff'd, 586 F. App'x 574 (11th Cir. 2014); *United States v. Kowarski*, No. 2:13-cr-

5  00071-NBF (W.D. Pa. May 9, 2014). This practice is not limited to methylone. Courts have routinely

6  adjusted conversion ratios under USSG § 2D1.1, cmt. n.6, to reflect potency differences between the

7  unlisted substance and the chosen analogue. *See, e.g.*, *United States v. Sepling*, 944 F.3d 138, 142–44

8  (3d Cir. 2019) (holding that sentencing courts may adopt reduced drug-equivalency ratios for non-

9  referenced substances, such as methylone, when expert evidence establishes lower potency)

10       Most tellingly, DOJ used an adjusted ratio for Tapentadol in *United States v. Bateman,* No.

11  5:19-cr-00126-GWC (D. Vt. April 19, 2024). There, the government used hydromorphone as the

12  most closely related comparator to Tapentadol, but recognized that hydromorphone is 12.5 times as

13  potent as Tapentadol; the government therefore adjusted the conversion factor by 12.5, resulting in

14  the same 1:200 ratio the defense proposes here. But the converted drug weight for 1 gram of

15  hydromorphone is 2.5 kilograms. *See* USSG § 2D1.1 cmt. n.8(D). That is five times the 1:500

16  morphine ratio. Under the government's conflicting approaches, 1 gram of Tapentadol could be

17  treated as either 2.5 kg CDW or 500 g CDW, resulting in a patently unworkable result. The Court

18  must adjust the potency ratio as provided for in § 2D1.1 cmt. n.6(C), as the district court did in

19  *Bateman*.[8]  While hydromorphone, Morphine, and Tapentadol are all opioids, and in the right

20  ballpark, it does not justify treating Tapentadol as Morphine for CDW. The U.S. Sentencing

21  Commission's materials likewise summarize widespread district practice of downward adjustments

22  where potency differs from the analogue. *See* Def. Exb D. Notably, even the Probation Officers

23  Advisory Group has expressly supported this approach, recognizing that failing to adjust the ratio

24  when the analog is less potent would overstate the offense level and distort sentencing outcomes. *Id.*

---

[8] The government's factual agreement in that case constitutes an evidentiary admission in this case. *See, e.g.*, 30B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 7026 (Kenneth W. Graham, Jr. & Michael H. Graham eds., 4th ed. 2014)  (stating that evidentiary admissions include "pleadings in another case, superseded or withdrawn pleadings in the same case, [and] judicial admissions in another case").

DEFENDANT'S SENTENCING MEMORANDUM
*AGNIHOTRI*, CR 23–00354 PCP

9

There is clear authority for the Court to adjust CDW ratios to account for potency, and the Court should do so here.

On September 12, 2024, the government produced the Rule 16 Summary of Expert Opinion of Theresa Carbonaro, Ph.D**.** Dr. Carbonaro, in support of its 1:500 ratio, and her opinion that, under USSG § 2D1.1, cmt. n.6(C), which asks whether a lesser or greater quantity of a non-listed substance is needed to produce a substantially similar CNS effect as a listed substance, "a similar amount of Tapentadol is needed to produce a substantially similar depressant effect as that of morphine." That conclusion is demonstrably inaccurate and contradicted by the study the government itself cites, which reports that Tapentadol is approximately two-and-a-half to three times less potent than Morphine (*i.e.*, requiring a higher dose to achieve a comparable effect).[9]   The defense retained Dr. Timur S. Durrani, M.D., M.P.H., who reviewed the Rule 16 Summary of Expert Opinion and Bases of Dr. Theresa Carbonaro, dated November 17, 2023. *See* Def. Exb. E, Dr. Durrani Report. He found several portions of her analysis incomplete or incorrect, particularly regarding Tapentadol's pharmacology and potency. Dr. Durrani explains that clinicians use Morphine Milligram Equivalents (MME) to compare opioid potencies and that, according to the CDC conversion table, Tapentadol is only 40% as potent as Morphine. Using this conversion, 1 gram of Tapentadol equals 200 grams of Morphine, not 500 grams as assumed under the Sentencing Guidelines' Drug Equivalency Table. Dr. Durrani cites USSG § 2D1.1, Application Note 6(C), which governs how to determine equivalency for unlisted substances. In his expert opinion, Tapentadol should be compared to Morphine because it is pharmacologically similar but significantly less potent, requiring larger amounts to produce the same central nervous system effects.

Dr. Durrani further disputed Dr. Carbonaro's statement that Tapentadol produces "substantially similar" depressant effects to Morphine, noting that FDA data show Tapentadol is 18 times less potent in receptor binding and 2–3 times less potent in analgesia than Morphine. He also highlighted research (Vosburg 2020; Stephenson 2024) showing lower rates of abuse, diversion, and overdose compared to other opioids. Dr. Durrani concludes that Dr. Carbonaro's analysis overstated

---

[9] *See* Faculty of Pain Medicine, Opioids Aware: Dose Equivalents and Changing Opioids (published study).

Tapentadol's potency and abuse potential, and that guideline conversions based on morphine equivalence should be adjusted downward to accurately reflect its lower potency to a ratio of 1 gram of Tapentadol do 200. Accordingly, the Court should use a CDW of 1 gram of Tapentadol = 200 grams CDW to arrive at a converted drug weight of 41.20kg to arrive at base offense level 18.

## II.    The Two-Level Mass-Marketing Enhancement Under U.S.S.G. § 2D1.1(b)(7) Does Not Apply

Probation correctly notes that the two-level enhancement under USSG § 2D1.1(b)(7) does not apply because the Durgarpura network's marketing of the drugs to U.S. citizens falls outside the scope of Mr. Agnihotri's agreement and is therefore not relevant conduct under USSG § 1B1.3(a)(1)(B), as to him. As clarified in Application Note 3(B), a defendant is accountable for the acts of others in a jointly undertaken criminal activity only if those acts were (1) within the scope of the defendant's agreement, (2) in furtherance of the jointly undertaken activity, and (3) reasonably foreseeable to the defendant. Acts that were not within the scope of the defendant's agreement, even if foreseeable, are not relevant conduct under § 1B1.3(a)(1)(B).

Even assuming Mr. Agnihotri knew or could have foreseen that others were advertising the drugs online, there is no evidence that he participated in, directed, or agreed to such marketing. To apply the enhancement, the government must show that he was personally accountable for online advertisements originating abroad, specifically from India, but the record contains no such evidence. For offenses involving contraband, Application Note 3(B) instructs courts to determine whether the offense constitutes one jointly undertaken criminal activity or a series of distinct activities. Here, the evidence reflects three different activities: (1) the online marketing and sale of medication, (2) the unlawful importation of prescription drugs, and (3) the domestic distribution of those drugs. The scope of Mr. Agnihotri's agreement encompassed importation and distribution, not the marketing or online advertisement of the drugs. There is no evidence that Mr. Agnihotri engaged in or directed any online marketing efforts, nor that such conduct was part of his agreed-upon role in the criminal activity. As such, those acts fall outside the scope of relevant conduct attributable to him. Because there is no evidence that his role encompassed marketing or solicitation, the enhancement cannot apply.

Application Note 13 to § 2D1.1(b)(7) further confirms this interpretation. It provides that the enhancement applies to a defendant who "operated a website to promote the sale" of a controlled substance, but "would not apply to co-conspirators who use an interactive computer service only to communicate with one another in furtherance of the offense." PSR ¶ 63, cmt. n.13. Mr. Agnihotri neither operated nor participated in the operation of any website, and his limited role was receiving and mailing parcels. Accordingly, his conduct falls far outside the conduct contemplated by the enhancement.

### III. The Two-Level Enhancement Under U.S.S.G. § 2D1.1(b)(12) for Maintaining a Drug Premises Does Not Apply

A § 2D1.1(b)(12) enhancement for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance" applies only where the government proves, by a preponderance of the evidence, that the defendant maintained a premises for the *primary* purpose of manufacturing or distributing a controlled substance. The government has not met that burden here. Under Application Note 17, drug activity must be one of the defendant's primary or principal uses for the premises, "rather than one of the defendant's incidental or collateral uses." In making that determination, the Court must consider how frequently the premises were used for unlawful purposes and how frequently they were used for lawful ones. *Id.* The enhancement applies only where the government proves that drug trafficking was a primary or principal use of the premises, rather than an incidental or collateral one. *See United States v. Job*, 871 F.3d 852, 873 (9th Cir. 2017); § 2D1.1(b)(12). Mr. Agnihotri is under no obligation to prove that the storage units were used for a lawful or alternative purpose, as to do so would improperly shift the burden to the defendant. *See United States v. Jordan*, 256 F.3d 922, 927 (9th Cir. 2001) ("[T]he government bears the burden to prove facts supporting an enhancement.") The offense occurred between August 8 and October 2022. Mr. Agnihotri did not rent the Cupertino Storage unit until August 27, nearly three weeks after the initial date. *See* PSR ¶ 24. The defense acknowledges that there is clear evidence Mr. Agnihotri periodically traveled from his home to the storage unit and then to the post office. However, there is no evidence that drug activity was the unit's primary use. Accordingly, the defense submits that the enhancement does not apply.

**IV.    Mr. Agnihotri Qualifies for a Minor-Role Adjustment Under U.S.S.G. §§ 3B1.2 and 2D1.1(e)(2)(B)(ii) under the 2025 Sentencing Guidelines**

The 2025 Sentencing Guidelines Manual applies here because Mr. Agnihotri is being sentenced after November 1, 2025. The amended provisions of § 2D1.1 now expressly provide for a mitigating role adjustment under § 2D1.1(e)(2)(B)(ii). Under this amended provision, the Court generally should apply a lesser offense level under the aggravating/mitigating role adjustment of USSG § 3B1.2 when the defendant's primary function in the offense was performing a low-level trafficking function (such as courier or package handler), rather than leadership or organizer roles. This amended provision clearly applies to Mr. Agnihotri. This amendment reflects the Sentencing Commission's determination that such participants typically exercise little authority, have limited knowledge of the overall scheme, and receive modest financial benefit relative to the larger organization. *See* USSG § 2D1.1(e)(2)(B)(ii) (effective November 1, 2025). Under § 2D1.1(e)(2)(B)(ii), defendants whose conduct mirrors this limited, subordinate role "generally should" receive a mitigating-role adjustment under § 3B1.2.

For purposes of § 2D1.1(e)(2)(B)(ii), the Court is to consider § 3B1.2 in determining whether a mitigating role is warranted. Critically, § 2D1.1(e)(2)(B)(ii) applies regardless of whether the offense involved other participants and without requiring a comparative finding that the defendant was "substantially less culpable than the average participant." The focus is now on the nature of the defendant's function, not on the presence of co-defendants or hierarchical comparisons. The fact that his role was "essential" also does not preclude a reduction. §3B1.2, n.3(C). Turning to § 3B1.2, it provides for downward role adjustments of 2, 3, or 4 levels, depending on whether the defendant was a "minor" participant, a "minimal" participant, or had an intermediate role between those levels. Here, a 2-level adjustment is appropriate. Notably, the application notes make clear that individuals such as Mr. Agnihotri should be considered for a minor role adjustment. Under Note 3(A), "a defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the quantity of drugs the defendant personally transported or stored may receive an adjustment under this guideline." § 3B1.2 n.3(A). The Court's task is to determine the defendant's role "based on the totality of the circumstances," which is "heavily dependent upon the facts of the particular case." *See* USSG §

3B1.2 cmt. n.3(C). In so doing, the Guidelines direct the Court to consider: the defendant's understanding of the scope and structure of the criminal activity; the extent of participation in planning or organizing; the degree of decision-making authority or influence; the nature and extent of the acts performed and the discretion exercised; and the degree to which the defendant stood to benefit from the activity. *Id.*

Here, considering the Sentencing Commission's express intent to broaden the availability of the minor role adjustment to individuals like Mr. Agnihotri, and applying the text of the Application Note as well as this non-exhaustive list of factors, Mr. Agnihotri clearly had a minor role. First, there is no evidence that he understood the broader scope or structure of the criminal activity. *Id.* n.3(C)(i). Second, he did not plan or organize the activity. *Id.* n.3(C)(ii). Third, he did not exercise or influence any decision-making authority. *Id.* n.3(C)(iii). He did what he was told. Fourth, his role was limited to receiving bulk shipments of pills from a supplier, receiving orders for specific types of pills forwarded to him via text, and packaging and mailing the pills to customers to fulfill the orders. *Id.* n.3(C)(iv). He exercised little to no discretion. Fifth, the benefit to him was extremely limited and was directly tied to the specific orders he filled. *Id.* n.3(C)(v).  Mr. Agnihotri fits squarely within the class of offenders the new provision is meant to address. His task was to receive and mail parcels as instructed by the Durgapura network. He did not finance, organize, or supervise any part of the operation and received only modest payments. The government's own evidence confirms his low-level, logistical role, and at least a two-level mitigating role adjustment is warranted.

**V.    The Obstruction of Justice Enhancement Under § 3C1.1 Does Not Apply**

The PSR asserts that a two-level obstruction enhancement under USSG § 3C1.1 applies because Mr. Agnihotri visited the Cupertino Safe Storage unit after his residence was searched, and contends that evidence was presumably destroyed. This theory presumes both that material evidence was present on September 30, and that Mr. Agnihotri destroyed it. Unless the government can identify the specific evidence it claims was present and then destroyed, and can prove its materiality, § 3C1.1 plainly does not apply.

Additionally, the final PSR, for the first time, finds that the obstruction enhancement is justified because Mr. Agnihotri failed to appear in December 2024. This is legally erroneous. Probation

apparently conflates a potential "failure to appear" allegation with the obstruction-of-justice enhancement under USSG § 3C1.1. These are separate issues. Section 3C1.1 applies only when the defendant intentionally obstructs or impedes justice during the investigation, prosecution, or sentencing of the current offense. Application Note 4 provides examples, such as perjury, destruction of evidence, or threats to witnesses. Simply failing to appear, without evidence of intent to obstruct, is not sufficient.

The Guidelines separately address failures to appear under 18 U.S.C. § 3146 and USSG § 2J1.6. When a defendant fails to appear as required by court order, that conduct is treated as a distinct offense rather than as an obstruction adjustment. *See* § 2J1.6 cmt. n.3[10] The same principle is reflected in § 3C1.3, which governs offenses committed while on release under 18 U.S.C. § 3147 and provides a separate three-level enhancement where the statutory elements are proven.

Furthermore, U.S. Magistrate Judge DeMarchi did not find that Mr. Agnihotri willfully failed to appear. *See* Dkt. No. 51. His failure to appear was related to a mental health crisis stemming from a relapse and binge drinking, as documented in Dr. Dinh's evaluation and corroborated by records from Santa Rita Jail. These records show that when he voluntarily returned to custody on January 13, 2025, Mr. Agnihotri was experiencing auditory and visual hallucinations, severe anxiety, and paranoid delusions. Medical staff at Santa Rita later prescribed antipsychotic medication. These facts clearly demonstrate that his absence was not willful or intended to obstruct the administration of justice. He was in crisis. Accordingly, there is no factual or legal basis for applying an obstruction-of-justice enhancement under § 3C1.1 based on Mr. Agnihotri's failure to appear.

Additionally, there is no factual support to applying an obstruction-of-justice enhancement based on Mr. Agnihotri's brief visit to the Cupertino Safe Storage facility the morning after the search of his residence and the subsequent closing of the unit. The record lacks any evidence that controlled substances were present on September 30, 2022, let alone destroyed on that date. Section 3C1.1 applies only when a defendant willfully obstructs or impedes the administration of justice. The enhancement requires specific findings of intent, meaning the defendant consciously acted with the

---

[10] ("Do not apply this guideline in conjunction with § 3C1.1 unless the obstructive conduct is distinct from the failure to appear.").

1  purpose of obstructing justice. Application Note 4(D) describes conduct such as "destroying or

2  concealing … evidence that is material to an official investigation or judicial proceeding," but it only

3  applies when the act is done with knowledge of the investigation and for the purpose of impede it.

4  *See United States v. McGovern*, 329 F.3d 247, 251–52 (1st Cir. 2003) (upholding enhancement where

5  the defendant deleted files after receiving a grand jury subpoena). In *McGovern*, there was clear proof

6  that evidence was intentionally destroyed after the defendant learned of the investigation and that the

7  destruction materially hindered law enforcement efforts. At a minimum, the government must

8  identify specific evidence that Mr. Agnihotri purportedly destroyed before this enhancement can even

9  be considered. The government has not met its burden. The enhancement cannot be based on

10  speculation, or a hunch, about what might have happened inside a storage unit during a brief visit.

11  Without proof that Mr. Agnihotri destroyed or concealed identifiable, material evidence, and that he

12  did so willfully with the intent to obstruct the investigation, the requirements of § 3C1.1 are not

13  satisfied. Mere speculation about possible destruction is insufficient to support the adjustment. *See*

14  USSG § 3C1.1 and commentary note 4(D).

15      Here, access logs show that the unit was entered for approximately seven minutes, from 8:33

16  a.m. to 8:40 a.m., before being vacated. From these limited facts, the government asks the Court to

17  infer, without a single piece of corroborating evidence, that the unit contained drugs and that Mr.

18  Agnihotri destroyed them on September 30, 2022. Moreover, the guideline includes a materiality

19  requirement: the alleged destruction or concealment must involve evidence that "would tend to

20  influence or affect the issue under determination." *See* USSG § 3C1.1 commentary note 6. There is

21  no such showing here. There is no proof of what, if anything, was removed, and no narcotics,

22  packaging, ledgers, or any other indicia of drug activity were recovered. The government seeks a §

23  3C1.1 enhancement on a speculative theory that Mr. Agnihotri destroyed drugs at a facility that was

24  never searched and from which no contraband was ever seized. Such conjecture cannot satisfy the

25  government's burden under § 3C1.1. Without evidence that Mr. Agnihotri intentionally destroyed or

26  concealed specific, material items relevant to the investigation, the government's theory amounts to

27  speculation rather than proof of obstruction. Accordingly, Section 3C1.1 does not apply.

28

**VI.    Mr. Agnihotri is safety valve eligible in accordance with 18 U.S.C. § 3553(f) and USSG § 5C1.2.**

Mr. Agnihotri is eligible for relief under the statutory safety valve, 18 U.S.C. § 3553(f), and its guideline counterpart, USSG § 5C1.2. These provisions permit the Court to impose a sentence "without regard to any statutory minimum sentence" when five criteria are met. Mr. Agnihotri satisfies each of them and has met his burden. With respect to the first four criteria, he has a limited criminal history; no violence, threats, or weapons were involved; the offense caused no injury or death; and he did not act as an organizer, leader, manager, or supervisor. His role was limited to receiving and mailing packages at the direction of others.

The fifth criterion requires that the defendant truthfully provide to the government all information and evidence he possesses concerning the offense or related conduct. *See* § 3553(f)(5). In *United States v. Mejia-Pimental*, 477 F.3d 1100, 1104–05 (9th Cir. 2007), the Ninth Circuit held that a defendant may satisfy this requirement through a written proffer rather than an in-person debriefing, so long as the statement is complete and truthful. The Court emphasized that "the district judge, not the prosecutor, determines whether the safety valve applies." *Id.* at 1105–06.

On October 20, 2025, Mr. Agnihotri provided a thorough and detailed written proffer describing his involvement and role in the offense. *See* Def. Exb. F., Rajiv Agnihotri Proffer, October 20, 2021, Proffer Letter, submitted *under seal*. In that proffer, he identified other individuals involved, explained how he became involved in the scheme, and provided information previously unknown to the government, including how much he earned and his motive for participating. The defense has produced this written proffer to both the government and Probation. The government has declined to credit the written submission and has instead demanded that Mr. Agnihotri submit to in-person questioning. However, nothing in the statute, the guideline, or Ninth Circuit precedent authorizes the government to veto safety-valve eligibility on that basis. The Court has independent authority to determine whether the defendant qualifies for safety-valve relief, and may grant that relief even over the government's objection. The statute vests this determination with the Court, not the prosecution. *See Mejia-Pimental,* 477 F.3d at 1105–06; *United States v. Shrestha*, 86 F.3d 935, 940 (9th Cir. 1996) (the district court, not the government, to determines whether the defendant has truthfully provided all information and evidence concerning the offense under § 3553(f)(5)). *Shrestha*

is instructive. There, the Ninth Circuit affirmed the district court's grant of safety-valve relief over the government's objection, finding that the defendant had disclosed all the information he knew. *Id.* at 939–40. Here, as in *Shrestha*, Mr. Agnihotri has fully cooperated and provided all information within his knowledge regarding his conduct of the offense. The government's disagreement, or its desire to personally test whether Mr. Agnihotri recalls additional details, does not preclude relief so long as the Court finds, by a preponderance of the evidence, that the defendant has truthfully provided all information concerning the offense as required under 18 U.S.C. § 3553(f)(5). *See United States v. Real-Hernandez*, 90 F.3d 356, 362 (9th Cir. 1996). Moreover, Ninth Circuit law makes clear that a safety-valve proffer may be made either in writing or orally, as "the safety valve allows any provision of information in any context to suffice, so long as the defendant is truthful and complete." *United States v. Salazar*, 61 F.4th 723, 728 (9th Cir. 2023) (quoting *Mejia-Pimental*, 477 F.3d at 1107 n.12).

Mr. Agnihotri's ability to recall events has also been affected by his documented mental-health conditions, which include memory deficits and cognitive impairments, as well as his heavy alcohol use during the offense period. These factors have understandably limited his ability to remember fine details of conduct that occurred approximately three years ago. Nevertheless, his written proffer reflects a complete and truthful account of his knowledge, consistent with his mental and linguistic limitations.

Courts have cautioned that the government must act in good faith in administering the safety valve and may not withhold relief arbitrarily. *See Shrestha,* 86 F.3d at 940; *Mejia-Pimental*, 477 F.3d at 1106. The purpose of § 3553(f) is to reward truthfulness and candor from low-level, nonviolent offenders, not to impose procedural hurdles unrelated to that purpose. The defense has proceeded in good faith to address any deficiencies the government may have identified in Mr. Agnihotri's safety-valve proffer. In response, the government has rejected Mr. Agnihotri's proffer out of hand, without identifying any specific deficiencies or allowing the defense an opportunity to cure them. *See* Def. Exb. G. Declaration of Varell L. Fuller. Having declined to engage in that process, the government should be precluded at sentencing from asserting alleged deficiencies in the proffer that it refused to raise or clarify before the hearing, in an effort to deny Mr. Agnihotri the safety valve.

Mr. Agnihotri has met his burden of demonstrating by a preponderance of the evidence that he has truthfully provided all information within his knowledge concerning the offense. The Court should therefore find him eligible for safety-valve relief under § 3553(f) and § 5C1.2 and sentence him accordingly.

## VII. A sentence of 12 months and 1 day is sufficient, but not greater than necessary to achieve the goals of sentencing.

While the sentencing court must respectfully consider the applicable guideline range, it is only one factor that should not be given greater weight than any other. *See United States v. Carty,* 520 F.3d 984, 991 (9th Cir. 2008) (en banc). For this reason, even if the Court adopts Probation's sentencing guidelines calculation, it does not follow that a sentence in or near that range is appropriate.

Here, the Court may also wish to consider the following mitigating factors in support of the defense sentencing recommendation: (1) the nature and circumstances of the offense; (2) Mr. Agnihotri's personal history and characteristics, which include a terribly traumatic childhood, severe alcoholism that contributed to the offense, and his history of mental health issues; (3) a longer sentence is not needed to promote respect for the law and deterrence; and (4) the need to avoid an unwarranted sentencing disparity.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011). In determining the appropriate sentence in a particular case, the "overarching statutory charge for the district court" under 18 U.S.C. § 3553(a) is to impose a sentence that is "'sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.'" *Carty*, 520 F.3d at 991 (citing 18 U.S.C. § 3553(a) and (a)(2)). While every sentencing proceeding must "begin by determining the applicable Guidelines range," the district court is not permitted to presume that the Guidelines range is reasonable. *Id.*

(citing *Rita v. United States*, 551 U.S. 338, 351 (2007)). "Nor should the Guidelines factor be given more or less weight than any other. While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence." *Id.* (citing *Kimbrough v. United States*, 552 U.S. 85, 101 (2007), and *Gall v. United States*, 552 U.S. 38, 50 (2007)).

## A.    The nature and circumstances of the offense

In sentencing Mr. Agnihotri, § 3553 directs the Court to consider "the nature and circumstances of the offense" and the need to impose a "just punishment." 18 U.S.C. § 3553(a)(1). Mr. Agnihotri's offense involved his receipt of prescription medication manufactured in India, which he delivered to customers in the United States who had ordered the medication online, not street drugs. *See* Def. Exb. H., Photos of Seized Medication. Customers based in the United States often purchase prescription medications from overseas because they are frequently cheaper.[11] In 2016, it was estimated that, as drug prices have increased, "tens of millions" of Americans have bought prescription medications from outside the United States and imported them. India is a major supplier because it is a global hub for generic drug manufacturing, exporting to over 200 countries. Americans sometimes illegally purchase prescription drugs from overseas pharmacies for several reasons, including: (1) the high cost of medications in the United States and lack of adequate insurance coverage; (2) significantly lower prices offered by foreign sellers; and (3) the fact that many of these online pharmacies do not require a valid prescription. Notwithstanding this backdrop, Mr. Agnihotri accepts full responsibility for his conduct and appreciates its seriousness. The offense involved roughly 700 United States–based customers who illegally purchased prescription medications, as well as unidentified co-conspirators in India who marketed and coordinated sales to American buyers. *See* PSR ¶ 51. Despite the scope of the scheme, Mr. Agnihotri and Segovia, discussed below, are the only individuals who have been charged and convicted. His role was plainly minimal. A significant consideration here is the actual dosage involved. Under the Guidelines, the total weight of the controlled substance determines the base offense level. *See* USSG § 2D1.1, cmt. n.(A). That calculation assumes each pill

---

[11] *See* Looking for Bargains, Many Americans Buy Medicines Abroad, NPR, December 17, 2016.

consists entirely of the controlled substance, which is inaccurate here because this case involved prescription medications rather than illicitly manufactured drugs. The most serious drug involved was Tapentadol in 100-milligram tablets. Based on that dosage, the total amount of Tapentadol is 49.5 grams, less than two ounces or roughly the weight of a golf ball. Using the actual amount of Tapentadol, the Converted Drug Weight would be 14.86 kilograms, corresponding to a base offense level of 14.

Moreover, the medications involved were not fentanyl or other highly addictive drugs. In fact, 98.4 % of the lab-tested substances used to calculate the advisory range were Xanax and Ambien, Schedule IV controlled substances with a low potential for abuse or dependence. Tapentadol, which drives the guideline range, accounted for only 0.7 % of the tested samples. Although Tapentadol is classified as a Schedule II opioid, studies consistently show it has lower abuse potential, milder euphoric effects, and far lower diversion rates than opioids such as oxycodone, hydrocodone, or Morphine. Its dual mechanism of action as a moderate mu-opioid receptor agonist and norepinephrine reuptake inhibitor produces pain relief comparable to stronger opioids while blunting the euphoric effect that drives misuse. The offense was nonviolent, short-lived, involved a low-level participant, and, thankfully, no one was harmed. Mr. Agnihotri's motives were financial. He sought to support his family and to fund his daily cravings associated with severe Alcohol Abuse Disorder. Taken together, these factors strongly support the defense sentencing recommendation.

### B.    Mr. Agnihotri's personal history and characteristics

Mr. Agnihotri's personal history and characteristics are factors for the Court to consider in fashioning a fair and just sentence. *See* 18 U.S.C. § 3553(a)(1). Mr. Agnihotri is loved and supported by his family and children. *See* Def. Exb I., Defense Support Letters and Mitigation Photos. Here, several considerations are relevant with respect to Mr. Agnihotri's personal history and characteristics.

### 1.    Mr. Anihotri's severe childhood trauma

The Ninth Circuit has recognized that "[w]here a defendant's crime is attributable to a disadvantaged background or emotional or mental problems, the defendant is less culpable than one without the excuse." *Landrigan v. Schriro*, 441 F.3d 638, 648 (9th Cir. 2006); *see also Penry v.*

1   *Lynaugh*, 492 U.S. 302, 319 (1989) (defendant's background is relevant because of the belief "long

2   held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged

3   background or to emotional or mental problems may be less culpable"). And, as the Supreme Court

4   has observed, "it requires no citation to authority to assert that children who are abused in their youth

5   generally face extraordinary problems developing into responsible citizens." *Santosky v. Kramer*, 455

6   U.S. 745, 789 (1982). Consistent with this view, the Ninth Circuit has held that a defendant's lack of

7   guidance as a youth or disadvantaged background may properly be considered mitigating. *United*

8   *States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991).

9       Mr. Agnihotri's childhood was exceptionally traumatic. He was raised by an alcoholic father in

10  a home where physical and verbal abuse were common. He bears lasting physical and emotional

11  scars from that abuse, as well as from the political violence he later fled, journeying through the

12  Darién Gap to seek refuge in the United States. Although he notes that his family was "middle class,"

13  that description must be understood in the context of rural India and cannot be equated to economic

14  stability or privilege in the United States. Mr. Agnihotri was administered the Adverse Childhood

15  Experiences (ACE) questionnaire. *See* Def. Exb. J. Mr. Agnihotri scored 8 out of 10, an exceptionally

16  high score and clear evidence of a traumatic childhood. [12] His high score does not suggest that Mr.

17  Agnihotri has a general propensity for criminality or addiction, but that his conduct reflects the

18  lasting effects of severe childhood trauma. Like many survivors of such adversity, he struggles with

19  substance dependence rooted in those experiences. This history mitigates his culpability under §

20  3553(a)(1) and supports continued treatment under § 3553(a)(2)(D).

21              **2.     Mr. Agnihotri's mental health condition supports a variance**

22      The Court may grant a variance based on a defendant's "mental and emotional condition."

23  *United States v. Ameline*, 409 F.3d 1073, 1093 (9th Cir. 2007); *see also United States v. Cantu*, 12

24  _____

25  [12] A substantial body of peer-reviewed research links high Adverse Childhood Experience (ACE)
    scores to increased risks of substance use disorders and criminal justice involvement, with the risk

26  rising exponentially as adverse experiences accumulate. *See, e.g.,* Vincent J. Felitti et al.,
    *Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of*

27  *Death in Adults: The Adverse Childhood Experiences (ACE) Study*, 14 Am. J. Prev. Med. 245 (1998).
    The ACE Study, involving over 17,000 participants, found a strong, graded relationship between the

28  number of adverse experiences in childhood and the likelihood of substance use disorders, mental
    health problems, and behavioral difficulties in adulthood.

1   F.3d 1506, 1512 (9th Cir. 1993). There is factual and legal support for a departure on this basis as

2   well. *See United States v. Chritensen*, 18 F.3d 882 (9th Cir. 1994). Here, Mr. Agnihtori's mental and

3   emotional condition during the offense provides compelling support for a mitigated term. Under 18

4   U.S.C. § 3553(a), the Court must consider the history and characteristics of the defendant and the

5   need for the sentence imposed to provide needed medical care or treatment in the most effective

6   manner. Mr. Agnihotri's mental health and substance use history are central to understanding both his

7   conduct and the most appropriate sentence in this case.

8       Mr. Agnihotri underwent a forensic psychiatric evaluation by Dr. Michael Dinh, a board-

9   certified psychiatrist and forensic psychiatry fellow at Stanford University. Based on clinical

10  interviews, collateral records, and psychological testing, Dr. Dinh diagnosed Mr. Agnihotri with

11  severe Alcohol Use Disorder, Schizophrenia (multiple episodes), and Mild Cognitive Impairment.

12      Dr. Dinh concluded that Mr. Agnihotri's severe alcohol addiction and resulting cognitive

13  deficits substantially contributed to his conduct in this case. The offense occurred during a period

14  when he was drinking heavily, had lost his job as a chef due to alcohol use, and was under significant

15  financial strain. He described intense cravings, repeated unsuccessful attempts to quit drinking, and

16  an overwhelming loss of control, symptoms consistent with a severe substance use disorder.

17  Psychological testing on the Montreal Cognitive Assessment (MoCA) yielded a score of 20 out of 30,

18  reflecting mild cognitive impairment. Dr. Dinh attributed these deficits to long-term alcohol use,

19  prior head trauma, and schizophrenia, all of which affected Mr. Agnihotri's memory, concentration,

20  and judgment. At bottom, Mr. Agnihotri is cognitively impaired. The evaluation makes clear that his

21  behavior was the product of addiction and impaired executive functioning, not purely criminal intent

22  or malice. Dr. Dinh also documented a significant trauma history, including childhood physical and

23  verbal abuse, a head injury, partial deafness caused by that abuse, and political persecution in India,

24  all of which have contributed to chronic anxiety, depression, and psychiatric instability.

25      Importantly, Dr. Dinh opined that Mr. Agnihotri's conduct was driven primarily by his alcohol

26  addiction and the cognitive impairments resulting from it. These findings support the defense

27  sentencing request. Dr. Dinh's findings are highly relevant to the Court's consideration under §

28  3553(a) and USSG §§ 5H1.3 and 5H1.4. They demonstrate that his conduct occurred in the context of

DEFENDANT'S SENTENCING MEMORANDUM
*AGNIHOTRI*, CR 23–00354 PCP

1  a long-standing, treatable mental health and substance use condition.

2  ### 3.  The need to avoid an unwarranted sentencing disparity 18 U.S.C. § 3553(a)(6)[13]

3  Title 18 U.S.C. § 3553(a)(6) directs the Court to avoid unwarranted disparities among

4  defendants with similar records who have engaged in similar conduct. This principle is particularly

5  relevant when comparing Mr. Agnihotri's case to *United States v. Segovia*, No. CR 24-00459 (EKL),

6  in which the defendant received probation for more extensive conduct involving the same overseas

7  enterprise. Although the Court found the cases not related under Local Criminal Rule 8-1, in part

8  because Segovia had concluded, the government failed to disclose the connection until nearly a year

9  after the information was filed in *Segovia*, and only after the defense independently learned of the

10  case by happenstance—an extraordinary circumstance. The same Assistant U.S. Attorney handled

11  both matters. The failure to file a timely related-case notice undermines the rule's purpose of

12  promoting efficiency, preventing unwarranted disparities among similarly situated defendants, and

13  ensuring that Mr. Agnihotri received notice of the related proceeding.

14  The defense anticipates that the government will argue that comparing Mr. Agnihotri to

15  Segovia under § 3553(a)(6) is inappropriate because their backgrounds differ. However, any such

16  differences are minor, and Mr. Agnihotri's case includes additional mitigating factors that were not

17  present in Segovia. The government will presumably claim that Segovia acted under manipulation

18  and addiction and had no record, but Mr. Agnihotri also suffered from addiction, and he has only

19  three criminal history points related to misdemeanor convictions that were not trafficking offenses.

20  Additionally, both defendants engaged in the same core conduct: receiving and distributing controlled

21  substances for the Durgapura network. Mr. Agnihotri received bulk shipments from overseas

22  suppliers and delivered smaller retail quantities to customers, while Ms. Segovia received and sent

23  bulk shipments. And yet the government handled the two cases very differently in charging,

24  sentencing, and application of enhancements. Given the clear similarities between the cases and the

25

26  ────────────────

27  [13] The defense previously raised the issue of an unwarranted sentencing disparity upon learning about
    the connection of this case to *United States v. Segovia*; however, the final Presentence Investigation
28  Report does not appear to address this sentencing factor. *See* Def. Exh. K., Defense Letter to U.S.
    Probation, dated July 11, 2025.

1   fact that Mr. Agnihotri's case involved a shorter period of conduct and a smaller quantity of

2   Tapentadol, the Court should adopt a similar sentencing approach here to avoid an unwarranted

3   sentencing disparity.

4        The charging posture in the two cases is markedly different. Ms. Segovia was charged by

5   information with a single importation count under 21 U.S.C. §§ 952 and 960, tied to one shipment,

6   despite eight years of conduct, repeated supplier contact, and extensive evidence that she was part of

7   an ongoing distribution network. *See* Def. Exb L., *Segovia* Case Materials filed and submitted *under*

8   *seal*. The government did not charge Segovia with conspiracy despite years of coordinated activity

9   with her supplier, who directed shipments into the United States. The scale of Segovia's conduct

10  underscores the disparity. *See* Def. Exh. M., Segovia/Agnihotri Case Comparison Materials. From

11  2015 to 2023, Segovia repeatedly ordered 1,000 to 2,000 Tapentadol tablets at a time, received

12  dozens of international shipments at her home, and re-shipped at least several packages containing

13  controlled substances to other U.S. addresses, some from her office at the San Jose Police Officers'

14  Association. As noted in the government's own sentencing memo, Segovia shipped "hundreds and

15  hundreds of pills" to U.S.-based customers. *See* Govt. Sent. Mem. At 8:14-15. Customs and Border

16  Protection seized multiple bulk shipments, including about 2.5 kilograms of Tramadol, 3 kilograms

17  (roughly 8,000 pills) of Zolpidem, and more than 1 kilogram of Tapentadol, and the criminal

18  complaint referenced 61 additional shipments of unknown contents over eight years. By contrast, Mr.

19  Agnihotri was indicted on sixteen counts for a two-month period involving smaller quantities. And

20  yet the government structured Ms. Segovia's case for a single-count information and probation

21  recommendation while stacking charges against Mr. Agnihotri.

22       The government also relied heavily on Ms. Segovia's claimed motivation of addiction, and it is

23  striking that there, the government recognized addiction as a mitigating factor. In contrast, here, the

24  government appears unwilling to extend the same grace to Mr. Agnihotri. Indeed, the government

25  even credited Segovia's highly implausible claim that her importation was for personal use. *See* Govt.

26  Sent. Mem. in Segovia at 12:1-3. Over nearly a decade, she ordered, received, and redistributed

27  quantities of controlled substances that far exceed any plausible level of personal consumption. Her

28  communications with the Durgapura network "reflect orders amounting to some 18,000 Tapentadol

1   pills over about 17 months" and 4,860 Soma pills—roughly 35 pills per day. (*Gov't Sentencing Mem.*
2   *in Segovia* at 11:16–18.) Such quantities would have been lethal if consumed as claimed,
3   underscoring the implausibility of her personal-use narrative and the government's willingness to
4   endorse that narrative to minimize her conduct.

5       The government asserts that Ms. Segovia acted under manipulation and addiction, while
6   arguing that Mr. Agnihotri cannot make a similar showing, and it points to supposed differences in
7   their criminal histories. That distinction is unconvincing and transparently results-driven, rather than
8   grounded in a fair assessment of culpability or the objective aggravating and mitigating factors in
9   each case.

10      The sentencing treatment of Ms. Segovia highlights the disparity in how these two defendants
11  were handled. Segovia's base offense level was 24 with no specific offense characteristics applied,
12  even though she admitted to possessing 726 Tapentadol tablets, *48 percent more than the 490*
13  *attributed to Mr. Agnihotri.* The government ignored the multiple kilogram-level seizures of
14  Tapentadol, Tramadol, and Zolpidem linked to her address and applied no enhancements. Her
15  adjusted offense level was 19, Criminal History Category I, producing a range of 30 to 37 months.
16  Although the government agreed to recommend 30 months, it ultimately urged the Court to impose
17  straight probation, representing an eleven-level, 100% percent variance from the guideline minimum.
18  Based on the defense's review of available materials, the defense is reasonably informed that Segovia
19  lied to agents in two interviews, provided materially false information, and took steps to mislead
20  investigators, yet no obstruction enhancement was sought. The government also declined to seek a
21  mass-marketing enhancement, even though her home address was publicly listed on the Durgapura
22  website as a U.S. distribution hub, while seeking to apply that enhancement here on a negligible
23  record. *See* Def. Exb L, supra.

24      The Segovia sentencing outcome reflects consideration of numerous factors that should also be
25  taken into account here, including (1) both cases involve low-level participants receiving
26  pharmaceuticals from an Indian pharmacy, not trafficking in street drugs, (2) the defendants in both
27  cases were suffering from addiction and associated mental impairments, and (3) the defendants have
28  either no criminal history (Segovia) or minimal criminal history (Mr. Agnihotri). Indeed, addiction is

a common driver of drug-related offenses, yet while the government may often seek terms of imprisonment in such cases, it did not do so in Segovia's case, and Mr. Agnihotri should receive the same consideration. The government's approach to Segovia, citing her addiction, age, and lack of criminal history to justify a 100% variance, should also be followed here. Given their similarities and in light of the shorter course of conduct and smaller amount of Tapentadol in Mr. Agnihotri's case, the government's inconsistent approach is quite concerning. That inconsistency continues with how the government characterized conduct across the cases. In *Segovia*, unseized shipments were treated as *mitigating*, and evidence from Mr. Agnihotri's case was used to cast doubt on her knowledge. *See* Gov't Sentencing Mem. in *Segovia*, p. 12. In contrast, the government seeks to extrapolate drug quantities in Mr. Agnihotri's case from WhatsApp messages, apply both the mass-marketing and obstruction enhancements, and advocate a multi-year custodial sentence. In Mr. Agnihotri's case, similar evidence is treated as aggravating and conclusive. This selective charging and sentencing posture demonstrates precisely the kind of unwarranted disparity that § 3553(a)(6) was designed to prevent. The government's approach risks creating the perception of unequal justice, which § 3553(a)(6) expressly seeks to prevent.

## CONCLUSION

For the foregoing reasons, Mr. Agnihotri respectfully requests that the Court impose a sentence of no more than 12 months and 1 day, and three years of supervised release, which is more than sufficient, but not greater than necessary.

Dated:     November 6, 2025                     Respectfully submitted,

                                                JODI LINKER
                                                Federal Public Defender
                                                Northern District of California

                                                _____
                                                            /S
                                                VARELL FULLER
                                                Assistant Federal Public Defender