1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
   MARTHA A. BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  DANIEL N. KASSABIAN (CABN 215249)
   Assistant United States Attorney
5
           450 Golden Gate Avenue, Box 36055
6          San Francisco, California 94102-3495
           Telephone:    (415) 436-7034
7          Fax:          (415) 436-7234
           daniel.kassabian@usdoj.gov
8
   Attorneys for United States of America
9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                          SAN JOSE DIVISION
12
   UNITED STATES OF AMERICA,            )  CASE NO. 5:23-CR-00354-PCP
13                                       )
              Plaintiff,                 )  **UNITED STATES' SENTENCING
14                                       )  MEMORANDUM**
         v.                              )
15                                       )
   RAJIV AGNIHOTRI,                      )
16                                       )  Judge:      Hon. P. Casey Pitts
              Defendant.                 )  Date:       November 12, 2025 at 9:00 am
17  _____ )  Courtroom:  8, 4th Floor

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.    SYNOPSIS ................................................................................................1

II.    OFFENSE CONDUCT ............................................................................1

III.    PROCEDURAL HISTORY .......................................................................8

    A.    Case Initiation Through The Defendant's Guilty Plea .........................8

    B.    Sentencing Is Repeatedly Delayed For Defendant To Seek Late Discovery......................9

        1.    Sentencing Delay For Defense To Pursue Discovery About The *Segovia* Case ...........9

        2.    Sentencing Delay For The Defendant To Pursue A Safety Valve Reduction .........10

IV.    SENTENCING GUIDELINES CALCULATION ....................................10

    A.    Legal Standard ....................................................................................11

    B.    The Government's Total Offense Level Calculation............................12

    C.    Base Offense Level Based On Converted Drug Weight From Relevant Conduct ...........13

        1.    Converted Drug Weight based on pill weight, not "doses" ..........13

        2.    The appropriate comparator substance for Tapentadol is morphine............15

        3.    Converted Drug Weight from pills seized and laboratory tested.................17

        4.    Drugs sold as evidenced in Agnihotri's encrypted chat records.............18

    D.    The Defendant Maintained A Premises For Purposes Of Distribution.............19

    E.    The Defendant's Role In Mass-Marketing Of Controlled Substances .............21

    F.    The Defendant's Ineffective Safety Valve Proffer ..........................23

    G.    Mitigating role reduction Does Not Apply To The Defendant's Conduct .........26

    H.    Adjustment for Obstruction of Justice: ..............................................28

V.    GOVERNMENT'S SENTENCING RECOMMENDATION .......................29

    A.    The Defendant's Instant Offenses And Related Criminal Conduct Call For A Sentence That Will Protect The Community And Actually Deter Him ..............29

VI.    THE SENTENCING DISPARITY WITH THE *SEGOVIA* CASE IS WARRANTED................31

VII.    CONCLUSION........................................................................................36

1

# TABLE OF AUTHORITIES

2

Page(s)

3

<u>Cases</u>

4

*Gall v. United States,*
 552 U.S. 38 (2007).................................................................................................. 11, 33

5

*United States v. Berry,*
 258 F.3d 971 (9th Cir.2001) ............................................................................................. 12

6

*United States v. Booker,*
 543 U.S. 220 (2005)......................................................................................................... 11

7

*United States v. Calligan,*
 No. 1:17-CR-51-HAB, 2020 WL 2394150 (N.D. Ind. May 12, 2020) ............................ 19

8

*United States v. Carty,*
 520 F.3d 984 (9th Cir. 2008) ........................................................................................... 29

9

*United States v. Crowell,*
 9 F.3d 1452 (9th Cir. 1993) ............................................................................................. 13

10

*United States v. Dominguez-Caicedo,*
 40 F.4th 938 (9th Cir. 2022) ............................................................................................ 26

11

*United States v. Franklin,*
 18 F.4th 1105 (9th Cir. 2021) .......................................................................................... 12

12

*United States v. Gaines,*
 7 F.3d 101 (7th Cir. 1993) ............................................................................................... 14

13

*United States v. Kilby,*
 443 F.3d 1135 (9th Cir. 2006) ................................................................................... 13, 19

14

*United States v. Kimbrough,*
 522 U.S. 85 (2007).......................................................................................................... 29

15

*United States v. Littlesun,*
 444 F.3d 1196 (9th Cir. 2006) ......................................................................................... 12

16

*United States v. Lucas,*
 101 F.4th 1158 (9th Cir. 2024) ........................................................................................ 11

17

*United States v. Martz,*
 964 F.2d 787 (8th Cir. 1992) ........................................................................................... 14

18

*United States v. Mejia-Pimental,*
 477 F.3d 1100 (9th Cir. 2007) ................................................................................... 23, 24

19

*United States v. Nichol,*
 203 F. App'x 37 (9th Cir. 2006) ...................................................................................... 13

20

*United States v. Pena,*
 750 F. App'x 138 (3d Cir. 2018) ................................................................................ 26, 27

21

*United States v. Roche,*
 415 F.3d 614 (7th Cir. 2005) ........................................................................................... 13

22

*United States v. Salazar,*
 61 F.4th 723 (9th Cir. 2023) ............................................................................................ 23

23

*United States v. Shabazz,*
 933 F.2d 1029 (D.C. Cir. 1991) ...................................................................................... 14

24

*United States v. Shrestha,*
 86 F.3d 935 (9th Cir. 1996) ............................................................................................. 23

25

26

27

28

*United States v. Solano-Godines*,
  120 F.3d 957 (9th Cir. 1997) ................................................................................ 35
*United States v. Tracy*,
  989 F.2d 1279 (1st Cir. 1993) ............................................................................... 14
*United States v. Wilson*,
  No. 22-50857, 2023 WL 7312954 (5th Cir. Nov. 6, 2023) .................................. 14

<u>Statutes</u>

18 U.S.C. § 2(a) ........................................................................................................... 22
18 U.S.C. § 1001(a)(2) ................................................................................................ 24
18 U.S.C. § 3553(a) .................................................................................... 29, 31, 33, 34, 35
18 U.S.C. § 3661 .......................................................................................................... 11
21 U.S.C. 841(a)(1) ....................................................................................................... 8
21 U.S.C. 846 ................................................................................................................ 8
47 U.S.C. § 230(f)(2) ................................................................................................... 22
Cal. Penal Code § 273a(b) ........................................................................................... 30
Cal. Veh. Code § 23152(b) ........................................................................................... 31

<u>Rules</u>

Fed. R. Evid. 1101 ....................................................................................................... 11
U.S.S.G. §2D1.1 ..................................................................................................... *passim*
U.S.S.G. §3C1.1 ........................................................................................................... 35
U.S.S.G. §5C1.2 .................................................................................................. 23, 24, 26

I.    **SYNOPSIS**

Defendant Rajiv Agnihotri comes before this Court for his sentencing, having pleaded guilty to fifteen counts comprising various violations for conspiracy to distribute, distribution, conspiracy to import, and importation of various controlled substances.  Defendant Agnihotri was an insider in an India-based drug trafficking network.  He personally distributed an astonishing 215,000 pills to customers in 48 states during a period of 52 days alone in 2022, by using P.O. boxes under fake names, and storage units that he used as stash houses.  His motivation was simple: getting paid.

Agnihotri's defense will undoubtedly paint a different picture—that of a middle-aged, family man suffering from alcoholism that somehow drove him to this criminal behavior.  That narrative is belied by the sophistication of his conduct.  Nor does his alcoholism serve as an excuse given his prior criminal history that demonstrates his recidivism.

The government recommends a high-Guidelines sentence of 78 months of imprisonment.  This sentence reflects the gravity of defendant Agnihotri's conduct.  It also is just, unpersuaded by the mere fact of this defendant's alcoholism untethered to his conduct that harmed others for significant pecuniary gain.  This sentence is necessary to deter others like this defendant, from become operatives of foreign agents bringing in these harmful, illicit pills into this country to consumers who do not fully appreciate the risks because their packaging imitates domestic pharmaceuticals, which suggests legitimacy and regularly to lull their purchasers into believing they are getting the same pills.  They are not.

The government's Guidelines calculation differs slightly—by two levels—from the one by the U.S. Probation Office (USPO) as set forth in the Pre-Sentence Investigation Report (PSR).  But more significant is that the PSR recommends a downward variance without sufficient justification—maybe under the incorrect view, often touted by defense counsel, that this district uniformly sentences below the Guidelines.  This is not a case where that is appropriate.  Agnihotri's defense will undoubtedly seek an even more extreme outcome, such as time served, without any rational basis.  The Court should reject that effort out-of-hand.  Consistent with the law, a high-Guidelines sentence is sufficient but necessary to achieve the goals of sentencing in this case.

II.    **OFFENSE CONDUCT**

Investigators learned how the group worked, in part by interviewing five Bay Area customers of

1    defendant Agnihotri.  The operation in India involved a

2    telemarketing center—one witness said that he was told by his

3    Indian supplier that he, the supplier, was in a room with 150

4    others—in which his colleagues hawked prescription drugs

5    using websites, WhatsApp, or text messages.  They sold a long

6    list of abusable psychoactive drugs: Ambien, benzodiazepines,

7    opioids like Tapentadol and Tramadol, muscle relaxants.

8        Sales representatives in India would take orders, handle

9    customer service, and at times barrage customers with new

10   "offers."  They called themselves the "Durgapura" pharmacy.  A

11   WhatsApp contact relayed orders to defendant Agnihotri.  On

12   his phone, investigators found hundreds of such orders to

13   defendant Agnihotri from between August 8 and September 29,

14   2022.  The communications contained names, addresses, and pill



*A sample of orders Agnihotri received from his "Durgapura" contact.*

15   quantities.  On another of his phones, agents found

16   CashApp and Venmo accounts and images of screenshots

17   depicting payments.  Communications between defendant

18   Agnihotri and his co-conspirators were in Hindi.

19       Drugs would then be shipped internationally to

20   defendant Agnihotri in packages with false content labels

21   such as "Indian Sweet Snacks Gen Garment."  Pills were

22   hidden under food and clothing, as in the image at left.

23       But packages shipped internationally to the United

24   States are generally scanned for drugs.  That makes the



*Pills hidden amid Indian food products.*

25   destination address a target for law enforcement.  Defendant

26   Agnihotri knew this.  So he rented postal boxes in the San Jose area using fake names and addresses.  He

27   opened post office boxes and closed them within short periods.  These boxes let him, with greater

28   anonymity, receive drugs.  (He would then take them to package at his rented storage unit, then mail

them to end customers at various post offices—more on this below.)

Homeland Security Investigations (HSI) Special Agent (SA) David Vargas learned of these post office boxes in fall 2022. Specifically, that September, Customs and Border Protection (CBP) officers seized a package from Dubai found to contain 30,000 Alprazolam pills, hidden beneath food and clothing. The addressee was "Amit Kumar" at a UPS store in Sunnyvale. HSI agents interviewed the store's manager, who showed them records that "Amit Kumar" had opened an account there. "Kumar" had submitted documents giving proof of address. The information submitted was false. But one particular document, an AAA insurance claim, reflected an alerted name, phone, and address—except for the AAA claim number itself. Defendant Agnihotri neglected to alter this number. SA Vargas found that that number corresponded to a claim filed by a person who turned out to be defendant Agnihotri's wife, and shares his last name. (Defendant Agnihotri had closed that mailbox just a few days before HSI interviewed the store manager.)

SA Vargas then discovered that an individual using the name "Amit Kumar" had also rented a mailbox at another post office box facility in Sunnyvale, for about six months. It too was closed shortly before investigators learned of it. The driver license on file was the same one investigators had seen earlier. The store owner told agents that "Kumar" would retrieve packages there. Defendant Agnihotri made another mistake: the contact number he scribbled on the application was his real, personal number. Agents got subscriber information for the phone and saw the name Rajiv Agnihotri.

A few days later, on September 27, 2022, agents intercepted three more shipments, ostensibly originating from the United Kingdom, declared as "sweet cookies, chocolates, snacks, corn flakes, tea, and herbal toothpaste." The addressee was "Rajeev Sharma." The address was defendant Agnihotri's actual home. The sender's name was a real foreign company, but the return address was contrived. Inside each box officials found 10,000 Ambien pills in blister packs.

Two days later, SA Vargas conducted a controlled delivery of the 30,000 pills to defendant Agnihotri's home, posing as a DHL deliveryman. Defendant Agnihotri signed for each of the three packages and gestured for SA Vargas to place boxes near inside the residence, near the front door.

Agents moved to search the home pursuant to a search warrant they had obtained. Agents found 35 USPS receipts that reflected 653 independent parcel shipments, costing $5,245.20, between July 14,



*Pills hidden inside a package mailed to Agnihotri.*

and September 28, 2022. The destinations were to addresses in all 50 states except South Dakota and Maine. Some eleven parcels had been sent the day before. These packages had pre-written return addresses with 22 different fictitious names (e.g., "Toshi B", "Max G," "Bal Ket," "Sam F") and addresses. Agents found a notebook with shipment information, in defendant Agnihotri's bedside table, and a blue address book, on the living room coffee table, with dates, number, totals. These records referenced the post office boxes associated with "Amit Kumar." Defendant Agnihotri, interviewed for about 15 minutes, said that he worked at a restaurant and as a DoorDash delivery driver. He claimed that the packages he received did not belong to him and that he often received packages that did not belong to him.

The search led agents to two previously unidentified post office boxes—associated with invented names "Rajeev Kumar" and "Toby Joseph." The managers of these stores were interviewed. They both identified defendant Agnihotri by photo array. One box was rented for about 30 days in the Fall of 2022. The application for a unit, in Sunnyvale, opened by "Rajeev Kumar," had a fake phone, address, and driver's license but using a real picture of defendant Agnihotri. Defendant Agnihotri had also submitted, as proof of residence, an application for a PG&E Energy statement. The address and name on this statement were, once again, forged, but an image of original, unaltered document was recovered

*Agnihotri's actual PG&E bill, at left, and the doctored version he used to open a P.O. box, at right*

1    from his phone.  Agnihotri had even carefully altered the actual PG&E account number by one digit

2    (unlike with the AAA claim).

3        Agents also visited a Hallmark store that had A USPS drop-off location that defendant Agnihotri

4    used.  An employee recognized defendant Agnihotri from the prior Wednesday, September 28, 2022,

5    after defendant Agnihotri visited and mailed out some 20 or 30 packages.  He recalled that defendant

6    Agnihotri would mail packages there frequently, and in such large volume, that he would tie up the line

7    and trigger customer complaints.

8        Another manager, of a UPS store, recognized defendant Agnihotri as the man who opened an

9    account there.  The application shows that he used a fake driver license, bearing defendant Agnihotri's

10   image but a wrong address.  The application used the same forged PG&E statement.

11       An employee at yet another post office box facility, this one in Santa Clara, gave agents the

12   application for a post office box rented by "Toby Joseph."  The applicant used another fake driver

13   license.  The applicant also left a scribbled note from "Toby," in English: "My nick name Rajeev."

14



*Agnihotri's real license, and his "Toby Joseph" and "Rajiv Kumar" fake licenses.*



*Agnihotri's WhatsApp correspondence with co-conspirators, with photos verifying what he received.*

On a phone seized from defendant Agnihotri, SA Vargas found a videos of defendant Agnihotri, in his vehicle or home, opening packages address to "Amit Kumar," "Toby Joseph," or "Rajeev Kumar," and displaying the pills within.  Agents determined that defendant Agnihotri did this to verify, for his senders abroad, what he actually received.

There were also hundreds of pictures of images of domestic packages similar to those seized by HSI that were mailed by defendant Agnihotri; the altered PG&E bill and AAA claim that he used to rent post office boxes;

1    Venmo and CashApp payment screenshots; fraudulent identifications; and a CBP seizure notice.

2    According to WhatsApp conversations, on the very day of the search of his home (September

3    29), defendant Agnihotri mailed out 18 packages with those pills. Evidence show that this was, for him,

4    a typical effort. On September 28, he mailed 36 packages. On September 26, it was 33 packages. On

5    September 24, it was one. On September 23, it was 22. On September 22, it was 17. On September 21,

6    it was 16. On September 20, it was 44. 187 parcels

7    mailed in ten days.

8    Agents learned that defendant Agnihotri also

9    rented a storage unit facility in Cupertino, basically a

10   room to safeguard the pills—as opposed to the post office

11   boxes he used to receive mailings. SA Vargas, reviewing

12   USPS receipts seized from defendant Agnihotri's

13   residence, found that all were mailed from a Hallmark

14   Store in Sunnyvale. SA Vargas compared the dates to

15   activity at defendant Agnihotri's storage unit in Cupertino

16   and noticed that the USPS drop-off time shown on the

17   receipt was always about 30 minutes after defendant

18   Agnihotri's unit entry code was keyed in at the Cupertino

19   facility. The USPS store and storage unit are about two miles



*A notebook seized from Agnihotri's home in which he kept track of his fake identifiers.*

20   apart, or about seven minutes by car. A manager at the Cupertino facility showed agents surveillance

21   footage of defendant Agnihotri entering the facility in his vehicle on the morning September 30, 2022—

22   the day on which it was emptied out. This, not coincidentally, was the day after the search on defendant

23   Agnihotri's home.

24   In October 2022—after the search on his home—an employee at a Santa Clara post office box

25   store called HSI to report that the box linked to defendant Agnihotri had just received a package.

26   Agents found a USPS parcel addressed to "Toby Joseph" from a sender in Union, New Jersey. Inside

27   the package, agents found orange 90 Tapentadol pills in blister packs. Well into October, agents kept

28   intercepting parcels at ports of entry, mailed to defendant Agnihotri's post office boxes, mailed from

1   abroad, and disguised with labels like "Sample

2   Order," addressed to his fake names at the post

3   office boxes he rented.

4       Other packages were seized <u>after</u> defendant

5   Agnihotri had put them into the mail.  Specifically,

6   eight outbound parcels were intercepted by USPS

7   out of the 11 that defendant Agnihotri mailed on the

8   day his home was searched.  The parcels were

9   envelopes of the same size and color as the



*A hand-addressed package of pills sent by Agnihotri and intercepted by the investigation.*

10  envelopes found at his home; seven of eight had return addresses matching return addresses on

11  envelopes at his home.  All had handwritten marking at top, referencing the brand name of the drug

12  inside the package, such as "ICI 180," "Pfizer 90," and "R-360."  The return addresses were fake.

13      The blister packs mostly reflected Indian pharmaceutical manufacturers.  But the actual

14  ingredients, after lab testing, were sometimes different from the drug on the label.  In fact, eight parcels,

15  together containing tens of thousands of pills, were seized from him and lab tested, and a full <u>quarter</u> of

16  the drugs proved counterfeits—meaning the tablets contained different drugs altogether from their label.

17  5,000 tablets labeled as Zolpidem (Ambien) were actually alprazolam (an anti-anxiety medication).

18  Some 80 tablets labeled as Tapentadol actually contained Pregabalin, a powerful anti-anxiety and anti-

19  seizure medication with psychoactive properties[1] that caused deaths in Europe and Australia.[2]

20      Defendant Agnihotri's financial records showed deposits of tens of thousands of dollars via

21  CashApp and cash withdrawals—the evidence of his money transfers related to drug sales.

22      In his post-arrest interview, defendant Agnihotri said that he entered the country illegally,

23  sometime before 2010, through Mexico.  He denied ever mailing pills.  He claimed that his brother was

24

25  [1] *See* https://www.federalregister.gov/documents/2005/07/28/05-15036/schedules-of-controlled-

26  substances-placement-of-pregabalin-into-schedule-v.

27  [2] *See, e.g.,* https://www.bbc.com/news/uk-northern-ireland-66568460;
    https://www.channel4.com/news/exclusive-prescriptions-rising-for-anxiety-drug-linked-to-1-in-10-drug-
    deaths-in-england; https://www1.racgp.org.au/newsgp/clinical/misuse-of-popular-anti-epileptic-drug-

28  linked-to-nu.  *See also* https://pmc.ncbi.nlm.nih.gov/articles/PMC7688538/.

1  sending him "poppy seeds," not drugs, although SA Vargas observed that his brother was in jail during

2  some of defendant Agnihotri's conduct.  Defendant Agnihotri refused to offer any information about his

3  co-conspirators.  He suggested other people were on the fake IDs and that others could have made fake

4  IDs using his face.

5  **III.    PROCEDURAL HISTORY**

6      **A.    Case Initiation Through The Defendant's Guilty Plea**

7          On October 11, 2023, defendant Agnihotri was indicted on 16 counts, covering his misconduct in

8  its various phases.  Specifically, the counts covered his participation in a conspiracy to distribute

9  controlled substances, his participation in a conspiracy to import controlled substances, his importation

10  of those controlled substances, his attempted importation of controlled substances, his distribution of

11  controlled substances, and his possession with intent to distribute controlled substances.  [Dkt. 1]  On

12  October 16, 2023, Agnihotri was arraigned on those charges.  [Dkt. 5]

13          The government provided extensive discovery about defendant Agnihotri's offense conduct as

14  detailed above.  While not critical to his offenses, discovery also was provided about the government's

15  investigation into additional targets based on defendant Agnihotri's texts on his phone, including an HSI

16  investigation report[3] in the initial round of discovery on October 19, 2023 (i.e., over two years ago) that

17  included a synopsis stating the government's investigation into Joanne Segovia in no uncertain terms:

18
19          In September 2022, Homeland Security Investigations (HSI) San Jose
        Public Safety Group identified Rajiv AGNIHOTRI as the suspected
20          recipient and distributor of various pharmaceutical controlled substances
        in violation of 21 U.S.C. 841(a)(1), Distribution and Possession with
21          Intent to Distribute a Controlled Substance and 21 U.S.C. 846 Conspiracy
        to Distribute and Possess with Intent to Distribute. During this
22          investigation additional suspects were identified including Joanne Marian
        SEGOVIA and Kellie Ann HOUSTON. This report of investigation ROI
23          serves to document review of the Duragrupa [sic] WhatsApp Chat from
        AGNIHOTRI's cellular telephone.

24          Following additional discovery and discussions between the parties, a resolution by plea

25  agreement was reached, and a change of plea hearing set for March 20, 2024.  [Dkt. 14]  But defendant

26

---

27  [3] The report is Bates stamped AGNI-000045.  This was not just a one-off buried in the discovery.  Ten

28  other, later-provided reports that are Bates stamped AGNI-000647, 000649, 000653, 001411, 001414, 001417, 001421, 003710, 003713, 003716, also contained this synopsis while providing other information, such as defendant Agnihotri's arrest, and interviews of persons to whom he shipped drugs.

Agnihotri then withdrew his agreement to that plea resolution and, on May 1, 2024, the Court set a jury trial for August 19, 2024. [Dkt. 22] The government began its trial preparations.

On June 20, 2024, Agnihotri's defense informed the Court that the defendant would be submitting an application for an open plea. But on June 27, 2024, the date set for the change of plea, defendant Agnihotri failed to appear and a bench warrant was issued. [Dkt. 29] The next day, defendant Agnihotri appeared in court and the bench warrant was recalled. [Dkt. 30] On July 3, 2024, defendant Agnihotri pleaded open to Counts One through Fifteen. [Dkt. 31] On July 8, 2024, the government dismissed Count 16. [Dkt. 32]

**B.     Sentencing Is Repeatedly Delayed For Defendant To Seek Late Discovery**

After his open plea was accepted, Agnihotri committed a series of pretrial release violations, mostly related to his alcohol abuse. He again failed to appear for Court on December 19, 2024 [Dkt. 49] and, on January 27, 2025, he was finally ordered detained pending his sentencing [Dkt. 54]. As this was happening, on December 11, 2024, the Court set the matter for sentencing for March 12, 2025. [Dkt. 47] At defendant Agnihotri's request, including to pursue the two issues discussed below, sentencing was continued six times: to May 21, to July 30, to August 20, to September 3, to September 24, to November 5, and finally to November 12, 2025. [Dkt. 57, 59, 69]

**1.     Sentencing Delay For Defense To Pursue Discovery About The *Segovia* Case**

On July 14, 2025 (i.e., two weeks before the sentencing hearing scheduled for July 30), Agnihotri's defense wrote to the USPO to advise that defense "became aware of the related matter, *United States v. Joanne Marian Segovia*, Case No. CR 24-00459-EKL (hereinafter "*Segovia*"), through my office's investigation into this case earlier today." The defense then claimed the government was taking inconsistent positions in regarding defendant Agnihotri in this case and defendant Segovia in that case, and also claimed that the government failed to advise the Court of the two cases being related in order to do so. The government, in response to these unwarranted accusations, filed a Notice of Related Cases to put the issue before the Court because the USPO was not in a position to relate the two cases anyway. [Dkt. 63] In view of the parties' briefing and oral submissions, the Court declined to relate the two cases as sought by Agnihotri's defense. Regardless, the government agreed to provide the defense discovery from the *Segovia* case—subject to a protective order as it was regarding another person—

1    because the government had nothing to hide.  [Dkt. <u>71</u>]

2            **2.      Sentencing Delay For The Defendant To Pursue A Safety Valve Reduction**

3            Alongside its effort to interject the *Segovia* case into this case, on July 18, 2024 (less than two

4    weeks before the sentencing hearing scheduled for July 30), Agnihotri's defense wrote to the

5    government stating:  "I hope to get you a safety valve proffer letter after I meet with my client

6    tomorrow."  This was unexpected.  The last time Agnihotri's defense raised the prospect of a safety

7    valve proffer was a year earlier, on May 23, 2024, to which the government responded on May 26, 2024

8    that such a safety valve "debrief" would need to happen quickly so it would be factored into ongoing

9    plea discussions at the time.  But that did not happen because defendant Agnihotri did not proceed with

10   the plea agreement reached tentatively.

11           Regardless of the late timing, the government responded on July 24, 2024, stating: "I understand

12   that you intend to have Mr. Agnihotri engage in a safety valve proffer – please be advised that the case

13   agent is unavailable until August 5, so it will need to be scheduled for after that date.   I also will

14   circulate a safety valve proffer agreement to be clear on what the government can and can't do with the

15   information provided."

16           Agnihotri's defense did not raise the issue of a safety valve proffer again until October 17, 2024,

17   where it noted that the lack of a Punjabi interpreter "has delayed my ability to provide the government

18   with the defense safety valve proffer and permit Probation sufficient time to consider it."  The

19   government responded the next day, reiterating that: "The government is willing . . . to continue the

20   matter one, final time <u>on the condition</u> that the defendant agrees to an <u>in-person</u> safety valve proffer to

21   the government in two weeks. . . .   [T]he government objects to addition time for . . . a safety valve

22   proffer letter [that] is improper and will be insufficient in any event."

23           Agnihotri's defense did not relent, but instead sent a letter attached a statement that was a little

24   over 2-pages that, as discussed below, was insufficient in the government's view.  By refusing to change

25   its tack, Agnihotri's defense manufactured yet another disputed issue.

26   **IV.    SENTENCING GUIDELINES CALCULATION**

27           <u>The government's calculated Guidelines sentencing range is 63-78 months of imprisonment.</u>

28   Trial courts, "while not bound to apply the Guidelines, must consult those Guidelines and take them into

1   account when sentencing." *United States v. Booker*, 543 U.S. 220, 267 (2005).  And while the

2   Guidelines are now advisory in nature, the Guidelines sentencing range must be properly calculated

3   because failure to do so constitutes a procedural error at sentencing.  *See Gall v. United States*, 552 U.S.

4   38, 51 (2007).

5       The parties have several disputes regarding defendant Agnihotri's Guidelines sentence, driven

6   primarily by their dispute over the determination of the Base Offense Level (BOL) and enhancements.

7   The government calculates the resulting Total Offense Level (TOL) as 25.  By comparison, the USPO

8   has calculated the TOL as 23.  *See* PSR ¶¶ 60-69.  The government expects that defendant Agnihotri

9   will propose something much, much lower.  At the same time, the government anticipates that the

10  parties will agree with the USPO that defendant Agnihotri is a Criminal History Category (CHC) II

11  based on his criminal history in the PSR.  *See* PSR ¶¶ 70-79.  Below, the government sets forth the

12  appropriate legal standard, its TOL calculation, and its position on factual disputes that affect the TOL.

13      **A.**    **Legal Standard**

14      Last year, the Ninth Circuit reversed itself by holding in banc that "the preponderance of the

15  evidence standard is sufficient to satisfy due process for fact-finding under the advisory Guidelines,

16  even when a fact has an extremely disproportionate effect on the sentence."  *United States v. Lucas*, 101

17  F.4th 1158, 1162 (9th Cir. 2024) (en banc).  Thus, significant enhancements no longer needed to be

18  proven by clear and convincing evidence.  The Ninth Circuit recognized that "[t]his approach is

19  consistent with the standard in nearly every other circuit. . . ."  *Id*. at 1163.  Of course, that

20  preponderance of the evidence standard requires that the fact finder only "be persuaded by the evidence

21  that the claim is more probably true than not true."  Ninth Circuit Manual of Model Civil Jury

22  Instructions, No. 1.6. (2017 ed.; updated Mar. 2025).  It is axiomatic that standard is lower than beyond

23  a reasonable doubt.  The presumption of innocence has no role in sentencing either, as it applies to

24  finding someone guilty of a crime—at sentencing, guilt has been proven.

25      The Federal Rules of Evidence do "not apply" to "sentencing."  *See* Fed. R. Evid. 1101(d).

26  Instead, the Court may consider, without limitation, any information concerning the background,

27  character and conduct of the defendant, unless otherwise prohibited by law.  *See* 18 U.S.C. § 3661.  But,

28  in order for the Court to rely on it, the evidence presented—including any hearsay—must "be

accompanied by some minimal indicia of reliability." *United States v. Littlesun*, 444 F.3d 1196, 1199

(9th Cir. 2006) (quoting *United States v. Berry*, 258 F.3d 971, 976 (9th Cir.2001); *see also United States*

*v. Franklin*, 18 F.4th 1105, 1114 (9th Cir. 2021)

### B.    The Government's Total Offense Level Calculation

| Guideline Description | U.S.S.G. Section & Factual Bases | Lvls |
|---|---|---|
| Base Offense Level | The defendant distributed at least 80 kg but less than 100 kg of Converted Drug Weight (CDW) per §2D1.1(a)(5) & (c)(9) for total CDW of 98.78 kg for lab-tested controlled substances only, using Morphine as a comparator for Tapentadol per §2D1.1 Appl. Note 6. *See* Part IV.C below; PSR ¶ 60; Addendum ¶¶ 6-7. | 22 |
| Specific offense characteristic | The defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance per §2D1.1(b)(12) because defendant maintained a storage unit in order to store his pills. *See* Part IV.D below; PSR ¶ 61. | +2 |
| Specific offense characteristic | The defendant, or a person for whose conduct defendant is accountable under §1B1.3 (Relevant Conduct), distributed controlled substance through mass-marketing by means of an interactive computer service per § 2D1.1(b)(7) because multiple customers of Agnihotri and his co-conspirators received advertisements for the drugs though texts or websites and ordered the drugs through websites and apps.  *See* Part IV.E below; PSR ¶ 61; Addendum ¶¶ 2-3. | +2 |
| Specific offense characteristics | The defendant did not meet the criteria set forth in §5C1.2(a)(1)-(5) per §2D1.1(b)(18) because the defendant did not truthfully provide to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan per §5C1.2(a)(5).  *See* Part IV.D below.  (Not in PSR or Addendum.) | 0 |
| Adjustment for Mitigating Role in the Offense | The defendant was neither a minimal nor a minor participant in the criminal activity per §3B1.2(a)-(b). *See* Part IV.G below; PSR ¶ 63; Addendum ¶¶ 10-11. | 0 |
| Adjustment for Obstruction of Justice | The defendant willfully impeded the investigation of the instant offense of conviction per §3C1.1 because he destroyed evidence. *See* Part IV.H below; PSR ¶ 63 Addendum ¶¶ 12-13; | +2 |
| **Adjusted Offense Level** | | **28** |
| Acceptance of responsibility | The defendant accepted responsibility for the offense by pleading guilty per §3E1.1(a).  *See* PSR ¶ 67 | -2 |
| Acceptance of Responsibility | The defendant assisted authorities by timely notifying them of the intention to enter a plea of guilty per §3E1.1(b).[4]  *See* PSR ¶ 68. | -1 |
| **Total Offense Level** | | **25** |

---

[4] The government notes that defendant Agnihotri was slow to accept responsibility, and reneged on entering into a plea agreement on May 1, 2024, so the Court set the matter for jury trial commencing on August 19, 2024.  [Dkt. 22]  The government's trial preparation commenced thereafter, but had not been very significant, when defendant Agnihotri pleaded guilty open on July 3, 2024. [Dkt. 31]

C.    **Base Offense Level Based On Converted Drug Weight From Relevant Conduct**

The parties have two disputes regarding how to measure the drugs distributed that impact the calculation of the BOL.  *See* Parts IV.C.1 & 2 below.  The government has agreed to only count the drugs that were seized and tested during the investigation, *see* Part IV.C.3 below.  The government does have a strong argument, however, that the Court underlinecould use instances of drugs distributions per defendant Agnihotri's cell phone to calculate a significantly higher BOL, *see* Part IV.C.4 below, which the government sets forth to rebut any suggestion by the defense that the BOL as calculated is overstated.

1.    **Converted Drug Weight based on pill weight, not "doses"**

Because many different controlled substances are involved, the parties are in agreement that the Court should use a CDW of each substance and use that total CDW to find the appropriate BOL.  But the parties disagree on how to calculate CDW in general.  The standard way to calculate CDW is to use the weight of the entire substance or pill containing the drug, and not the weight of the active ingredients, or pure controlled substance, within:  the "weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance."  U.S.S.G. §2D1.1(c), Note A to the Drug Quantity Table (emphasis added); *see also United States v. Crowell*, 9 F.3d 1452, 1452 (9th Cir. 1993) ("district court shall use the gross weight of the dilaudid tablet, or only the net weight of the controlled substance hydromorphone, in calculating drug quantity for purposes of sentencing"); *United States v. Kilby*, 443 F.3d 1135, 1141 (9th Cir. 2006) ("With tablets or pills, the entire weight of the tablet is used in the Guidelines calculation, not just the weight of the pure controlled substance"); *United States v. Roche*, 415 F.3d 614, 619 (7th Cir. 2005) ("the defendant is responsible for the weight of the whole pill, not just the active ingredient"); *United States v. Nichol*, 203 F. App'x 37, 39 (9th Cir. 2006) ("district court correctly calculated drug quantity assessing the entire weight of the mixture containing a detectable amount of controlled substance, rather than only the weight of the actual controlled substance").

By contrast, Agnihotri's defense has previewed to the government its belief that Converted Drug Weight should be calculated by reference to the "number of doses" (as taken from manufacturer information) as opposed to the weight of controlled substance (i.e., the pill) because at issue here are "prescription medication, not street drugs."  Application Note 9 for U.S.S.G. § 2D1.1.  This is incorrect.

Application Note 9 sets out a Table and states: "If the <u>number</u> of doses, pills, or capsules but not the weight of the controlled substance is known, multiply the number of doses, pills, or capsules by the typical weight per dose in the table below to estimate the total weight of the controlled substance." (Emphasis added.) The note continues: "Do not use this table if any more reliable estimate of the total weight is available from case-specific information."

These rules are easily applied in this case: the Court needs to determine the weight of the pills that defendant Agnihotri was involved with. This is calculated easily for the pills seized and tested, as shown in Part IV.C.3 below. But the government also could proffer additional weight based on the <u>number</u> of pills distributed per defendant Agnihotri's own meticulous records, and multiply that number by the typical weight of the same type of pill—which is known from seized and tested pills—to get the total weight of the unseized pills. This produces a reliable estimate of the total from case-specific information, as shown in Part IV.C.4 below.

Courts uniformly reject the argument that Application Note 9 (or its predecessor language in Note 11) applies where the weight, as here, can be reliably estimated:

- *United States v. Wilson*, No. 22-50857, 2023 WL 7312954, at *4 (5th Cir. Nov. 6, 2023), *cert. denied*, 144 S. Ct. 869 (2024) ("application note 9 prohibits the use of the Per Unit Table "if any more reliable estimate of the total weight is available from case-specific information." U.S.S.G. §2D1.1, cmt. n.9. Our sister circuits agree that evidence of mixture weight—when available—is more reliable than an estimate from the Per Unit Table");

- *United States v. Gaines*, 7 F.3d 101, 104 (7th Cir. 1993) ("reliance on the table is not necessary because there is clearly a 'more reliable estimate of the total weight' which can be gleaned from 'case specific information.' Since LSD is regularly sold in or on a carrier medium—be it blotter paper, sugar cubes or gelatin capsules—the weight of the carrier medium effectively controls the weight of the LSD for sentencing purposes");

- *United States v. Tracy*, 989 F.2d 1279, 1287 (1st Cir. 1993) ("The district court's finding of the quantity of LSD involved…was based on the weight of the actual doses (on the same yellow paper with black airplanes) …. Where this 'case-specific information' was available, the court was warranted under note 11 in using the former in preference to the Typical Weight Per Unit Table");

- *United States v. Martz*, 964 F.2d 787, 790 (8th Cir. 1992) ("Application note 11 to U.S.S.G. § 2D1.1, itself, notes its inaccuracy and cautions that it should only be used when a more reliable estimate of weight is unavailable");

- *United States v. Shabazz*, 933 F.2d 1029, 1034 (D.C. Cir. 1991) ("application note 11 prohibits use of the per-unit estimates in the table 'if any more reliable estimate of the total weight is available from case-specific information," and the amendment promulgating this language indicates that the 'more reliable estimate' refers to a 'more reliable estimate of the weight of the mixture or substance containing the controlled substance'").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 2.    The appropriate comparator substance for Tapentadol is morphine

The parties also disagree on the factor to convert Tapentadol—by far the most potent controlled substance at issue in this case—to CDW.  For the reasons explained below, the government in this district has used morphine as the comparator for Tapentadol in other cases, with defense concurrence, USPO's agreement, and the Court's adoption.  *See United States v. Oppenheimer*, no. 3:24-cr-00170-JD, Dkt. 21; *United States v. Segovia,* 5:24-cr-00459-EKL (the *Segovia* case), Dkt. 62.

Pharmacologically and in terms of bodily effect, Tapentadol is similar to hydromorphone, oxycodone, and morphine, as the Drug Enforcement Administration (DEA) said in its decision, years ago, in listing Tapentadol under Schedule II.[5]  But recently DEA chemists have taken position that morphine is the closest comparator.  *See* Exhibit A (Carbonaro expert report).  This result is sensible in light of morphine milligram equivalency (or MME) charts—used by doctors to compare opiate or opioid drugs when switching patients between related drugs.[6]  While Tapentadol is less potent than morphine, practitioner or researcher articles also regularly find that Tapentadol is closer to morphine than other opiates or opioids.[7]  Morphine is on the low-end of the opiates that have a specific CDW, and has a lower CDW (1 GM = 0.5 KG) than hydromorphone (1 GM = 2.5 KG) and oxycodone (1 GM = 6.7 KG).  Thus, morphine is "the most closely related controlled substance referenced in this guideline."  U.S.S.G. § 2D1.1 Appl. Note 6.  That, in the end, is the inquiry for Guidelines purposes —i.e., finding the most comparable substance.

The alternative conversion factor for Tapentadol proposed by Agnihotri's defense is erroneous and self-serving.  The defense tries to find support based on a theory about "potency" to arrive at a lower conversion factor to manipulate its BOL calculation in a way that is unsupported by the Guidelines.  The methodology of the Guidelines calculation is a legal issue resolved by reference to the appropriate clear language in the Guidelines, and the defense's attempt to reframe it to a scientific one is unpersuasive.

---

[5] *See* Final Rule. "Schedules of Controlled Substances: Placement of Tapentadol Into Schedule II," May 21, 2009, *available at* https://www.federalregister.gov/documents/2009/05/21/E9-11933/schedules-of-controlled-substances-placement-of-tapentadol-into-schedule-ii.

[6] *See, e.g.,* https://fpm.ac.uk/opioids-aware-structured-approach-opioid-prescribing/dose-equivalents-and-changing-opioids.

[7] *See, e.g.*, https://pubmed.ncbi.nlm.nih.gov/23540512/

1   The approach by Agnihotri's defense appears to accept morphine as the appropriate comparator

2   substance for which there is a stated CDW—indeed, the defense has offered no better alternative.  See

3   Addendum ¶ 6.  With that scientific fact uncontested, there is no support in the Guidelines for the

4   defense's proposition that a particular drug's "potency" must then be factored separately into the

5   Guidelines offense level determination.  To be sure, this is not how Guidelines offense levels are

6   calculated in other contexts.

7           For example, a counterfeit M-30 oxycodone pill with any percentage of fentanyl in it is treated as

8   30 milligrams of fentanyl with a converted drug weight of 750 grams, even though its mimicking 30

9   milligrams of oxycodone with a converted drug weight of 201 grams.  Any argument otherwise is

10  contrary to the Guidelines as confirmed by the law of this circuit.  U.S.S.G. § 2D1.1(c) ("weight of a

11  controlled substance set forth in the table refers to the <u>entire weight of any mixture or substance</u>

12  containing a detectable amount of the controlled substance."); *see* Part IV.C.1 above (citing Ninth

13  Circuit cases).  Just like there's no inquiry into per the Guidelines into the purity of a pill, there is no

14  inquiry into "potency" in the Guidelines for calculating CDW either.  So, the Court should reject the

15  defense's invitation to manufacture a CDW for Tapentadol.  Instead, the Court should instead follow the

16  Guidelines to the letter.[8]

17          Of course, to the extent Agnihotri's defense had a legitimate concern, the Guidelines

18  acknowledges other ways to address it by stating that: "In determining the appropriate sentence, the

19  court also may consider whether the same quantity of analogue produces a greater effect on the central

20  nervous system than the controlled substance for which it is an analogue."  U.S.S.G. § 2D1.1 Appl. Note

21  6.  And, to the extent the Guidelines addresses "potency" at all, it does so as a basis to seek departures.

22  *See* U.S.S.G. § 2D1.1 Appl. Note 27(D) & (E)(ii).  The Guidelines note that a court may make similar

23  considerations about "purity" and "concentration" of certain drugs, which necessarily impact their

24  "potency."  *See* U.S.S.G. § 2D1.1 Appl. Note 27(C) & (E)(i).  Agnihotri's defense does not avail itself to

25  the solution in the Guidelines because a downward departure is unwarranted given all the other evidence

26  _____

27  [8] Any reference by Agnihotri's defense to materials outside the Guidelines, such as support by the
    Probation Officers Advisory Group, is improper.  Those materials are not facts about defendant
    Agnihotri or clarifications of the Guidelines, but instead position pieces that seek to modify the

28  Guidelines themselves.  The Guidelines are clear on this point and require no further interpretation.

of defendant Agnihotri's drug dealing per his text messages that call for an upward departure, if any departure is contemplated at all.

### 3.    Converted Drug Weight from pills seized and laboratory tested

As also set forth in the PSR at paragraph 54, below is a chart showing the calculation of CDW from the pills seized and laboratory tested from packages seized between September 13, 2022, and September 29, 2022:

| Date Seized | Advertised substance | No. of Pills | Actual substance | Lab No. | Grams -gross unless stated as net | CDW in KG |
|---|---|---|---|---|---|---|
| 9/13/2022 | Alprazolam | 30,000 | Alprazolam (Schedule IV) | SF20220661 | 7,946 | 1.8800000 |
| 10/9/2022 | Zolpidem | 5000 | Alprazolam (Schedule IV) | SF20220660 | 2176.2 | 0.3125000 |
| 10/13/2022 | Tapentadol | 40 | Pregabalin (Schedule V) | SF20220658 | 11.56 (net) / .28 grams per pill | 0.2500000 |
| 9/27/2022 | Zolpidem | 30,000 | Zolpidem (Schedule IV) | SF20220629 | 7959 | 1.8800000 |
| 10/11/2022 | Tapentadol | 90 | Tapentadol (Schedule II) | SF20220627 | 44 / .49 grams per pill | 22.0000000 |
| 10/14/2022 | Tapentadol | 40 | Pregabalin  (Schedule V) | SF20220628 | 11.5 (net) / .28 grams per pill | 0.2500000 |
| 10/19/2022 | Alprazolam | 450 | Alprazolam (Schedule IV) | SF20220676 | 54.2 | 0.5906250 |
| 10/19/2022 | Lorazepam | 179 | Lorazepam (Schedule IV) | SF20220678 | 31.9 | 0.0111875 |
| 10/19/2022 | Tapentadol | 180 | Tapentadol (Schedule II) | SF20220674 | 81 (net) / .45 grams per pill | 40.5000000 |
| 10/19/2022 | Tapentadol/ Carisoprodol | 180 | Tapentadol (Schedule II)/ Carisoprodol | SF20220677 | 62.7 (net) | 31.3300000 |
| 10/19/2022 | Tramadol | 360 | Tramadol (Schedule IV) | SF20220675 | 137.9 | 0.0225000 |
| | | | | | **TOTAL =** | **98.7800000** |

For sake of completeness, the laboratory results for each of these seized items is in Exhibit B, and the calculation of each Tapentadol seizure that make a sizeable impact on CDW are set forth below:

- 10/11/2022 seizure per lab no. SF20220627 shows that 9 pills of Tapentadol were analyzed resulting in a gross weight reduction of 4.4 grams, for a weight of 0.4888 grams of Tapentadol *per pill*. So, 90 pills seized results in 44 grams total of Tapentadol. Given morphine as a comparator—i.e., in 1 gram morphine = 500 grams CDW—results in 22 kg CDW.  In its calculation, the defense manipulates the tablet weight down to 0.48 grams of a Tapentadol *per pill*—engaging in an obvious rounding error—and then uses a CDW conversion that is self-serving and untethered to any comparator in the guidelines—i.e., 1 gram = 200 grams CDW—resulting in 8.64 kg.

- 10/19/2022 seizure per lab no. SF20220674 shows that 6 pills of Tapentadol were analyzed resulting in a gross weight reduction of 2.7 grams, for a weight of 0.45 grams of Tapentadol *per pill*.  So, 180 pills seized results in 81 grams total of Tapentadol.  Given morphine as a comparator—i.e., in 1 gram morphine = 500 grams CDW—results in 40.5 kg CDW.  In its calculation, the defense again uses a CDW conversion that is self-serving and untethered to any comparator in the guidelines—i.e., 1 gram = 200 grams CDW—resulting in 16.2 kg.

- 10/19/2022 seizure per lab no. SF20220677 shows an initial net weight of 62.6 grams of all the pills of Tapentadol.  Given morphine as a comparator—i.e., in 1 gram morphine = 500 grams CDW—results in 31.33 kg CDW.  In its calculation, the defense again uses a CDW conversion that is self-serving and untethered to any comparator in the guidelines—i.e., 1 gram = 200 grams CDW—resulting in 12.24 kg.

1          **4.    Drugs sold as evidenced in Agnihotri's encrypted chat records**

2          Per the pill sums are taken from the Report of Investigation summarizing the text messages

3    between defendant Agnihtori and the Durgapura group (Bates-stamped AGNI-000046), as shown in the

4    screenshot on page 2 above.  This would result in a BOL of 32 for "at least 3,000 KG but less than

5    10,000 KG of Converted Drug Weight" per §2D1.1(c)(4)

| Advertised Substance | No. of Pills | Sched. | Grams (net) | CDW in KG |
|---|---|---|---|---|
| Adderall | 270 | II | 1 gram amphetamine = 2 kg CW; assume 0.3 per pill = 81 grams = 162 kg | 162.00 |
| Alprazolam (Xanax) | 17,660 | IV | [Schedule IV, so measured as 1 unit = 0.0625 grams] | 1.11 |
| Ambien (Belbien, Zolpidem, Zolfimid, Zoltrate) | 55,420 | IV | [Schedule IV, so measured as 1 unit = 0.0625 grams] | 3.46 |
| Tapentadol/Aspadol | 18,140 | II | Assume .375 grams per pill [average for four different Tapentadol seizures' measurement] = 6,802 grams. 6,802 grams x 500 grams [morphine comparator] = 3,401 kg | 3,401.00 |
| Ativan/Lorazepam | 10,670 | IV | [Schedule IV, so measured as 1 unit = 0.0625 grams] | 0.66 |
| Carisoprodol | 36,860 | IV | [Schedule IV, so measured as 1 unit = 0.0625 grams] | 2.30 |
| Cialis | 1,890 | Not controlled | -- | -- |
| Clonazepam (Klonopin/Rnaze) | 2,430 | IV | [Schedule IV, so measured as 1 unit = 0.0625 grams] | 0.15 |
| Hydrocodone | 360 | II | 1 gram hydrocodone = 6700 grams CDW; assume net weight for each pill is 0.3 grams = 108 grams net x 6700 grams CDW [morphine comparator] = 724 kg | 724.00 |
| Tramadol | 4,050 | IV | [Schedule IV, so measured as 1 unit = 0.0625 grams] | 0.25 |
| Viagra | 270 | Not controlled | -- | -- |
| "Royal" (Tapentadol and Carisoprodol) | 1,170 | II/IV | Assume .34 grams per pill (as in Lab Report SF20220677] = 397.8 grams net.  1 gram morphine = 500 grams CDW, so 500 grams CDW x 397.8 grams = 198.9 kg | 198.90 |
| | | | TOTAL = | 4493.83 |

22          The Ninth Circuit has explained how, under the Guidelines, the Court must calculate converted

23    drug weight quantities in the absence, as here, of the actual seizure and testing of the actual pills:

> Approximations of drug quantity must meet three criteria.  First, the government is required
> to prove the approximate quantity by a preponderance of the evidence . . . [which means
> that t]he district court must conclude that the defendant is more likely than not actually
> responsible for a quantity greater than or equal to the quantity for which the defendant is
> being held responsible.  Second, the information which supports an approximation must
> possess sufficient indicia of reliability to support its probable accuracy.  Third, since the
> sentence depends in large part upon the amount of drugs . . . and approximation is by
> definition imprecise, the district court must err on the side of caution in approximating the
> drug quantity.

1   *United States v. Kilby*, 443 F.3d 1135, 1141 (9th Cir. 2006) (citations omitted) (cleaned up); *see also*

2   *United States v. Calligan*, No. 1:17-CR-51-HAB, 2020 WL 2394150, at *5 (N.D. Ind. May 12, 2020)

3   ("Lack of physical evidence that the defendant received the packages does not negate the fact that the

4   defendant was attempting to import a controlled substance into the United States").

5          Here, the evidence that that Agnihotri was in fact mailing out hundreds of packages containing

6   actual controlled substances is demonstrated, by a preponderance, and using multiple reliable indicia:

7   •   The Durgapura chat itself is an internal record of the shipments of pills actually made Agnihotri.
        The co-conspirators had every incentive to keep accurate records, in order to know their profits and
8       pill stock and to determine Agnihotri's profit.

9   •   The Durgapura chat's accuracy is corroborated by the fact that the chat contained the exact name,
        address, and pill order quantities matching the parcels that were seized and subsequently searched on
10      October 18, 2022.

11  •   The chat is further corroborated by the fact that at
        Agnihotri's home, agents found 352 enveloped with pre-
12      labeled returned addresses and 35 postal receipts (each
        reflecting many packages mailed), and 653 tracking
13      numbers.  The receipted showed 187 parcels paid for and
        mailed in ten days.  A typical parcel contained many
14      dozens of pills.

15  •   Agnihotri took pictures at the post office store with a
        receipt on the table, confirming that he did in fact mail
16      the parcels.  See image at right.



*Agnihotri took this picture of the mailings he had just made at the post office.*

17         Ultimately, this probably includes the seized pills

18  discussed in Part IV.C.3 below.  Given that the total CDW is

19  squarely in the range for a BOL of 32 in the Guidelines, even

20  adding those would not impact this BOL calculation.

21         The purpose in raising this is to inform the Court that, while Agnihotri's defense might claim the

22  use of morphine as a comparator to Tapentadol overstates the BOL, in reality the BOL is understated

23  because the government is not insisting on using this section's viable calculation of the BOL.

24         **D.     The Defendant Maintained A Premises For Purposes Of Distribution**

25         This enhancement applies.  As a preliminary matter, defendant Agnihotri had the possessory

26  interest: he rented the self-storage units himself.  The government seized his application and rental

27  agreements.  He rented the Cupertino unit on August 27, 2022.  He opened a Bay Area Self Storage Unit

28  on September 27, 2022.



As for control and access, it makes sense that defendant Agnihotri would need to secure such a unit for his misconduct. He received shipments of pills in huge amounts; two boxes with 30,000 pills were intercepted in one seizure alone. He had to store these bulk shipments *somewhere*. The evidence all suggests that he did so at his storage unit. At his home investigators found the Indian-made food items that concealed the shipped drugs, tossed on the ground in his garage (see image at left)—but the not any drugs themselves.

Tracker data for his vehicle confirms his modus operandi: after he would receive orders from his co-conspirators in India, he would use this information to create envelopes—found at his home—on which, in a corner, he denoted what to fill that envelope with—i.e., "AP-90" (90 Aspadol pills) or "R-360" (360 alprazolam, using the name of the manufacturer).



Defendant Agnihotri would then visit his self-storage unit to retrieve and package the pills. He visited the Cupertino Self-Storage unit almost daily before the search of his home—e.g., on September 24, 26, 28, 29, 2022 (the last day being very morning before the search that afternoon). His near daily visits were consistent with accessing pills for shipments, not checking in on, say, his property in long-term storage.

Tracker data also shows that defendant Agnihotri would go directly to the post office to ship the parcels. Specifically, GPS data from his vehicle tracker shows him going from his home, straight to the storage unit, then straight to the post office, again and again and again.

There is more: comparison of the (1) times at which he visited the unit (retrieved from the

storage company records) and (2) the times printed on USPS receipts show that the receipts were printed about 30 minutes after he visited the unit. This makes sense. He would access the unit, fill the parcels, drive seven minutes or so to the USPS office, and put the parcels into the mail. From start to finish, this took about a half hour.

It is obvious that defendant Agnihotri kept this unit for distributing pills as a primary or principal purpose. But, in any event, it doesn't matter that he might have stored <u>other</u> items there—though the government has no evidence of this—because the rule provides that distributing controlled substances need not be the "sole purpose" for maintain the unit. It just needs to be a "primary" or "principal" use, not a "incidental" or "collateral" use. The chief factor, under the Guidelines, is "how frequently" the premises were used for distributing drugs versus for lawful purposes. The evidence is that he was visiting near daily as part of his drug-shipment work. Long-term storage would not his explain his frequent visits. Lawful use is contradicted by the fact that he would travel straight from the unit to the post office box.

By way of illustration, in a case also involving a reshipper of pills from India, the government agreed that a shed structure that the defendant used to store pills was merely an incidental or collateral use. That was because the defendant gave a credible proffer that the shed where he put boxes of drugs was the only place he had room for them, and that the shed, as agents confirmed during the search, was filled with lawful personal items. *United States v. Oppenheimer*, Case 3:24-cr-00170-JD, Dkt. 21 at 7-8.

Agnihotri's defense objects claiming that the government's proof is insufficient—even though defendant Agnihotri admits this obvious fact in his safety valve proffer. *See* Part IV.F below. This sophistry aside, the defense's objection should be overruled because the evidence is sufficient on a preponderance of the evidence standard.

### E.    The Defendant's Role In Mass-Marketing Of Controlled Substances

For purposes of an enhancement pursuant to §2D1.1(b)(7), "mass-marketing by means of an interactive computer service" means the solicitation, by means of an interactive computer service, of a large number of persons to induce those persons to purchase a controlled substance. For example, subsection (b)(7) would apply to a defendant who operated a web site to promote the sale of Gamma-hydroxybutyric Acid (GHB) but would not apply to coconspirators who use an interactive computer

service only to communicate with one another in furtherance of the offense. "Interactive computer service", for purposes of subsection (b)(7) and this note, has the meaning given that term in section 230(e)(2) of the Communications Act of 1934 (47 U.S.C. § 230(f)(2)).

This enhancement applies because multiple customers of Agnihotri <u>and his co-conspirators</u> told investigators that they received advertisements for the drugs though texts or websites and ordered the drugs through websites and apps. Witnesses described being barraged with offers for drugs and that the Indian sellers that seemed to be in competition with each other. Agnihotri's defense contests the application of this enhancement because "[t]here is no evidence that Mr. Agnihotri engaged in or directed any online marketing efforts, nor that such conduct was part of his agreed upon role in the criminal activity." Addendum ¶ 3. The government agrees with the first proposition, but not the second. Defendant Agnihotri is responsible for his co-conspirators' acts per §1B1.3(a)(1)(A) for Relevant Conduct, which states a defendant is responsible for, *inter alia, "*<u>all acts</u> and omissions committed, <u>aided, abetted</u>, counseled, commanded, induced, procured, or willfully caused by the defendant." (Emphasis added.) This aiding and abetting theory—a traditional form of liability for the acts of another pursuant to 18 U.S.C. § 2(a), requires:

> First, someone else committed <u>the act</u>;
> Second, the defendant aided, counseled, commanded, induced, or procured that person with respect to at least one element of <u>the act</u>;
> Third, the defendant acted with the intent to facilitate <u>the act</u>; and
> Fourth, the defendant acted before the <u>act</u>.

<u>Ninth Circuit Manual of Model Criminal Jury Instructions</u>, No. 4 (2022 ed.; updated Sept. 2025) (substituting in "the act" for "specify crime"). Here, the preponderance of evidence shows that (1) defendant Agnihotri worked with persons in India who committed mass marketing, (2) the defendant Agnihotri aided that mass marketing by delivering the pills that were marketed—a critical function for the marketing to succeed, (3) defendant Agnihotri was aware of the mass marketing given the volumes of pills he delivered, and his own communications with those Indian sellers, and (4) defendant Agnihotri acted before the mass marketing was completed to effectuate the sale via the mass marketing.

Agnihotri's defense fails to account for aider and abettor liability, arguing instead that there has

1  been an insufficient showing under §1B1.3(a)(1)(B) for Relevant Conduct because there is no agreement

2  by him to take on the mass marketing role.  While that view too narrowly applies subsection (a)(1)(B), it

3  does not even address the straightforward application of subsection (a)(1)(A) to this conduct.

### F.    The Defendant's Ineffective Safety Valve Proffer

5        The defendant seeks a reduction for safety valve.  The government notes that defendant

6  Agnihotri would have qualified, but failed to engage in the requisite safety valve proffer per

7  §5C1.2(a)(5).  Instead, Agnihotri's defense unilaterally decided to send a "proffer letter" that draws on

8  the defense's themes and avoids admitting facts that jeopardize the defense's sentencing arguments.

9  This should not be countenanced by the Court.

10        A defendant seeking safety valve must also, by the time of sentencing, "<u>truthfully</u> provid[e] to

11  the Government <u>all information and evidence</u> the defendant has concerning the offense or offenses that

12  were part of the same course of conduct or of a common scheme or plan."  U.S.S.G. §5C1.2(a)(5)

13  (emphasis added).  "[T]he fact that the defendant has no relevant or useful other information to provide

14  or that the Government is already aware of the information shall not preclude a determination by the

15  court that the defendant has complied with this requirement."  *Id.*  This provision amounts to a "tell all

16  you can tell" requirement that obligates a defendant seeking safety valve to disclose "all information at

17  his disposal which is relevant to the offense, whether or not it is relevant or useful to the government's

18  investigation."  *United States v. Shrestha*, 86 F.3d 935, 939 (9th Cir. 1996).  "The phrase 'all

19  information and evidence' is quite broad.  There is no limit placed on the type of information that must

20  be provided."  *United States v. Salazar*, 61 F.4th 723, 727 (9th Cir. 2023).  Such information may

21  include "details concerning other parties to the crime, such as the source who provided defendant with

22  the drugs and other persons in the chain of distribution, if known."  *Id.*  The defendant has the initial

23  burden of demonstrating by a preponderance of the evidence that he is eligible for safety valve.

24  *Shrestha*, 86 F.3d at 940.  Once he has done so, "it falls to the Government to show that the information

25  he has supplied is untrue or incomplete."  *Id.*

26        Here, defendant Agnihotri provided a letter instead of engaging in the traditional, in-person

27  safety valve proffer that the government was willing to engage in.  As an initial matter, defendant

28  Agnihotri was in no position to dictate that method.  The case he offers in support, *United States v.*

1   *Mejia-Pimental*, 477 F.3d 1100 (9th Cir. 2007), is inapposite because the defendant in that case was

2   resigned to send the government a letter because the government refused to meet with him.  *Id*. at 1103.

3   To be sure, by writing a letter, defendant Agnihotri not only avoids making any statement to a

4   government agent—whereby a purposeful falsehood is a crime per 18 U.S.C. § 1001(a)(2)—but also

5   avoids the scrutiny of follow-up questions to prove that falsehood.  The problem is not unique to this

6   case, but discussed at length in the Department of Justice's letter to the United States Sentencing

7   Commission dated March 3, 2025[9] in response to a possible Guidelines amendment that enabled the use

8   of safety valve proffer letters:

> The Department does not support the proposed amendment to the Guidelines
> commentary to §5C1.2 regarding the safety valve.  By specifically underscoring the use
> of written submissions to comply with the safety valve requirements, the proposed
> amendment will greatly incentivize their use.  That outcome is problematic because, in
> our experience, such written submissions may be insufficient to demonstrate a
> defendant's truthfulness.  The proposal is thus likely to result in additional sentencing
> disputes over the applicability of the safety valve.
>
> ***
>
> Gauging whether a defendant's proffer is "complete and truthful" is often challenging
> under the best of circumstances.  An in-person, face-to-face proffer is typically the most
> effective and efficient method to assess a defendant's truthfulness.  A safety valve
> debriefing "is is a situation that cries out for straight talk; equivocations, half-truths, and
> veiled allusions will not do."  The realtime back-and-forth directly with the defendant
> allows the prosecutor and case agent to assess the internal logic of the defendant's
> statements and how well the statements comport with the known evidence in the case.
> Follow-up questions are critical.  And, oftentimes, proffers include reviewing pieces of
> evidence with the defendant, such as showing photographs of potential associates,
> playing audio or video, or reviewing the contents of a defendant's cell phone or social
> media.  Through this real-time exchange, defendants often discuss individuals and events
> related to their drug network they would otherwise withhold.  In addition, there is value
> in trained investigators being able to observe the defendant's body language and facial
> expressions, as those visual cues can spur follow-up questions or areas of inquiry.  But
> written submissions, which may be curated by counsel, deprive the government of these
> opportunities to test the defendant's candor in a meaningful way.  Moreover, even in in-
> person proffers, safety valve defendants are often loath to "name names" and specifically
> identify other wrongdoers and their contact information, at least initially.  Defendants
> will be even less likely to be forthcoming when having to commit those names or phone
> numbers to writing, which will in turn only prompt further follow-up questions from the
> government.  Additionally, requiring defendants to confer directly with investigators

---

[9] Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/2025031213/DOJ.pdf

further incentivizes truthfulness by providing an opportunity for the government to emphasize the importance of telling the truth. Making false statements to prosecutors and investigators can carry additional negative consequences for lying or minimizing, such as the loss of acceptance of responsibility credit, an enhancement for obstruction of justice, or a prosecution for making false statements. A written submission, particularly one prepared and submitted by counsel, may have the unintended consequence of serving to insulate defendants from fully appreciating the importance of being truthful and complete in their statements, thus decreasing the likelihood that defendants will be as forthcoming as they would be in an in-person proffer. The Department is sympathetic to the safety concerns of incarcerated defendants, including those who are perceived to be cooperators by dint of their being temporarily transported out of a pretrial detention facility. The proposed amendment, however, is not tailored to addressing that concern. Moreover, where a defendant faces such risks, prosecutors and defense counsel can—and frequently do—work together to craft tailored solutions to protect a particular defendant's safety. For example, because in-person safety-valve debriefings are not necessarily lengthy, the parties can conduct safety valve proffers on the same day a defendant is scheduled for court, conduct proffers at the pretrial detention facility, conduct proffers by video, or in some limited circumstances where the typical back-and-forth is unnecessary, conduct a carefully tailored proffer in writing.

*Id*. at 30-31 (citations omitted). Of note, in civil actions—where the preponderance of evidence is the main standard—the litigants and witnesses do not just get to submit self-serving declarations for the fact finder to weigh between competing versions of events. Instead, they must sit for deposition and be questioned as to their veracity. Defendant Agnihotri seeks to avoid that here through his letter.

The government now assumes that Agnihotri's defense will provide the Court with a copy of his letter because the government informed the defense that the letter was insufficient. Thus, in addition to determining whether the letter was a proper vehicle, "the district court must consider whether that final written proffer was in fact truthful and complete." *Id.* at 1109 (9th Cir. 2007). It was not.

Starting at the end of the letter, defendant Agnihotri makes the ridiculous claim that his storage unit did not have pills, even though he also could not remember going to it the day after his home was searched:

My attorney has shown me records that show someone accessed the storage unit the morning after the search. I had two shots before the raid and was drinking even more after the search in the evening. Even though I do not remember going to the storage unit the next morning, I think it must have been me. But I do not have a present memory of doing this. I do remember that I did not have any medications left in the storage unit because I had sent what I had out that morning.

In addition, the proffer is incomplete on specific details on his setup multiple post-offices boxes under

multiple different fake names, including why he did so, whether anyone counseled him in this regard, where he got the fake identification to do so, and whether the source of the identification was tied to his suppliers in India. Finally, defendant Agnihotri's claim that he made $15 per shipment lacks any corroboration in the Cash App records seized. The letter is rife with self-serving hearsay without any indicia of reliability through corroboration or otherwise. Thus, the Court should find that the defendant Agnihotri has not fulfilled the requirement of §5C1.2(a)(5) to warrant a reduction.

### G.    Mitigating role reduction Does Not Apply To The Defendant's Conduct

The defense argues for a "minor participant" reduction per §3B1.2(b). *See* Addendum ¶¶ 10-11. As an initial matter, this reduction only applies where there is information about charged or uncharged "*actual* participants in the defendant's crime" so that a real-world comparison in culpability can be made. *United States v. Dominguez-Caicedo,* 40 F.4th 938, 960 (9th Cir. 2022). But there is no co-defendant in this case to whom Agnihotri, in contrast, might be deemed minor. Furthermore, whether or not there are higher-level players in India, the Ninth Circuit has held that:

> The fact that illicit drugs are often traceable to larger drug trafficking organizations does not mean that district courts must compare the conduct of each defendant convicted of a drug crime to that of every hypothetical member of a typical drug trafficking organization. . . . Even if one can *assume* based on how drug trafficking organizations typically operate that it is likely that another unidentified person participated in the crime, the district court is not required to compare the defendant's culpability with that of the unidentified person. Indeed, without evidence of the proposed comparator's existence or participation the district court has nothing against which to compare the defendant's conduct.

*Id.* at 964-65. There is no doubt that defendant Agnihotri was part of a conspiracy, involving others, but there is insufficient information about how it worked, or the identities of those involved in it, to conduct a minor role analysis.

One Court of Appeals panel rejected the "minor participant" argument in a nearly identical context. The defendant in *United States v. Pena*, 750 F. App'x 138, 139–40 (3d Cir. 2018), chose to join forces with a network that "received internet medication orders from customers in the United States and fulfilled those orders by shipping misbranded medications from India." The defendant became a "re-shipper of medications within the United States" and to do so "opened a number of post office boxes around his home . . . thereby enabling him to receive larger shipments without arousing suspicion. Upon

1   receipt of the packages, [he] inventoried their contents, repackaged them—with false labels and

2   descriptions such as 'health products sample'—into individual orders, and shipped them to . . .

3   customers."  The panel adopted the district court's finding that the defendant "played an integral,

4   critical, significant role in receiving, storing, and reshipping these drugs" and was therefore not a minor

5   participant.  *Id.* at 140.  This is precisely what defendant Agnihotri did, too.  Once the drugs slipped

6   through customs, hundreds of domestic re-shipments were made.  Defendant Agnihotri was the (1) entry

7   point for these drugs, (2) the drug warehouser, and the (3) figure responsible to fulfilling the drugs

8   orders.  He did so with sophistication, hiding his identity in connection with the post office boxes so that

9   intercepted shipments could not be easily linked to him.

10          There is also nothing minor about the extent of the misconduct.  Defendant Agnihotri was

11  personally involved in the distribution of some 215,000 pills to customers in 48 states in a 52-day

12  period, the only period that investigators seized evidence for.

13          And, indeed, if Defendant Agnihotri's conduct was a "minor role," then everyone in his position,

14  with this offense, is minor.  Yet the willingness of people to serve as re-shippers is a *sine qua non* of

15  these highly profitable networks.  A one-off shipping event might merit a minor role, leaving aside the

16  co-defendant issue.  That's not this case.  Defendant Agnihotri was an industrious, full-time, large-scale

17  drug distributor.

18          Finally, the recent Amendment 833 to the Guidelines, effective November 1, 2025, further

19  counsels against applying this reduction given its specific language about drug trafficking by stating

20  that:

21          an adjustment under §3B1.2 is generally warranted if the defendant's primary function in the
            offense was performing a low-level trafficking function.

22
            (i) An adjustment under §3B1.2(a) is generally warranted if the defendant's primary function in
23          the offense was plainly <u>among the lowest level of drug trafficking functions</u>, such as serving as a
            courier, running errands, sending or receiving phone calls or messages, or acting as a lookout; or

24
            (ii) an adjustment under §3B1.2(b) is generally warranted if the defendant's primary function in
25          the offense was performing another low-level trafficking function, such as distributing controlled
            substances in user-level quantities <u>for little or no monetary compensation or with a primary</u>
26          <u>motivation other than profit</u> (e.g., the defendant was otherwise unlikely to commit such an
            offense and was motivated by an intimate or familial relationship, or by threats or fear to commit
27          the offense).

28  (Emphasis added.)  These further, drug-specific examples show that defendant Agnihotri's conduct was

1  much more than "low-level" that warrants a reduction.  And his drug distribution was for monetary

2  compensation and motivated only by pure profit.

3      **H.    Adjustment for Obstruction of Justice:**

4          There is also evidence of defendant Agnihotri's swift action to eliminate the evidence at his

5  storage unit upon learning of the government's investigation, resulting in an obstruction enhancement

6  pursuant to §3C1.1.  His home was searched but agents pursuant to a federal search warrant around 4:40

7  pm on September 29, 2022.  The search lasted about three hours, and defendant Agnihotri was detained

8  during that time.  The Cupertino Self Storage Unit closed for the day at 7 p.m.  So Agnihotri was unable

9  to access the unit that evening.  But sure enough, he went there the next morning at 8:33 am, which

10  agents learned about during follow-up investigation based on documents found in defendant Agnihotri's

11  home.  The storage facility's manager also confirmed the defendant Agnihotri's unit was vacant 20

12  minutes after he arrived that day.  The manager corroborated this account by providing stills of the

13  surveillance video showing that defendant Agnihotri entered the storage unit premises in his car, but

14  there was no camera facing the unit to capture what defendant Agnihotri removed.

15          So, after defendant Agnihotri watched his home being

16  searched pursuant to a search warrant, and after being interviewed

17  (and lying about) his drug shipments, he went to his storage unit at

18  the first available opportunity, and within minutes, cleared it out.

19  Emptying the unit if boxes of pills—per the records of shipments that

20  he kept at his home—would be easy.  It would be hard—and take

21  much more time—to move out furniture, overflow property, and so

22  on.  Also, there is no indication that defendant Agnihotri rented

23  another storage unit, which he presumably would have done if he

24  needed a new location to keep lawful personal property stored in the

25  unit he had emptied out.



*Agnihotri's handwritten records of his shipments, taken from his home*

26          But for defendant Agnihotri's conduct, government agents would have found his drug stash

27  location while in use.  But he should not benefit from this action to conceal his crime.

28

# V.    GOVERNMENT'S SENTENCING RECOMMENDATION

The Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a):

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established by the guidelines;

(5) any pertinent policy statement; and

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

## A.    The Defendant's Instant Offenses And Related Criminal Conduct Call For A Sentence That Will Protect The Community And Actually Deter Him

The government respectfully recommends a sentence at the high-end of the Guidelines. Defendant Agnihotri distributed immense quantity of pills across the country to people who did not have a prescription for those shipments of drugs. This is inherently dangerous. Worse yet, a quarter of the seized drugs were mislabeled and counterfeit—containing a different drug than the one advertised. This is exceedingly dangerous. A person is taking a drug that they are unaware that they are taking, in this

1  case belonging to an entirely different drug category.

2  In fact, it kills.  After this case was charged, a

3  defendant was sentenced in an Alabama federal

4  district court for the August 2022 fentanyl overdose

5  death of Dr. Louis Burgio, a renowned psychology

6  professor and Alzheimer's researcher who died from

7  a counterfeit pill that was sold by a member of an

8  Indian trafficking network. The Minnesota man who

9  actually distributed the pill—doing the same sort of

10 work that Agnihotri did—was sentenced in December

11 2024 to 20 years for causing the professor's death.[10]

12 The government has no information that any pill sent

13 by defendant Agnihotri actually led to a death,



*USPS receipts showing his near daily shipments of large number of pills.*

14 although such information would also be hard to acquire.

15  Defendant Agnihotri did this for money.  He has no excuse in drug addiction or personal use.  He

16 acted with sophistication and caution in avoiding detection.  He used crafted fake identity documents in

17 order to open post office boxes.  He kept careful tracks of shipments—by photographs of drugs or

18 receipts, in notebooks—to ensure his co-conspirators knew that he was reliable and to ensure that he was

19 paid his share.  He acted swiftly to cover up his act after his home was searched, by driving, at the first

20 opportunity, to his stash location, and disposing of the evidence.  This showed presence of mind.

21  Finally, Agnihotri has shown, beyond the facts of this case, a general contempt for the law and

22 willingness to put others at severe risk.  He illegally entered this country and took advantage of his

23 presence here by putting hundreds of other residents at risk of death and injury.  In 2016 he was

24 convicted of willful cruelty to a child under Cal. Penal Code § 273a(b) and sentenced to 49 days in jail

25 plus probation.  That was followed by three probation violations.  He was convicted in March 2019 for a

26

27  _____

[10] *United States v. Christopher Louis Bass*, Case No. 7:23-cr-00434-LSC-GMB, Dkt. 26 (U.S.'

28 Sentencing Memo).  *See also* https://www.tuscaloosanews.com/story/news/2024/12/19/case-closed-in-death-of-university-of-alabama-psychology-professor/77076186007/ .

driving under the influence under Cal. Veh. Code § 23152(b) and sentenced to 108 days in jail and probation. It appears he was arrested or detained on at least two other times for hit and run causing property damage—it appears alcohol was involved. He repeatedly missed his federal court appearances and appears to have rejected or at least failed to take advantage of the resources offered to him to manage his alcohol abuse issues.

It is anticipated that defendant Agnihotri will play up his weakness as a strength—i.e., he will claim his alcoholism was a driver of his misconduct both to engender sympathy and to argue that punishment will not effectuate the goals of sentencing. First, his alcoholism is incongruent with the sophistication of his scheme. Second, it ignores the fact that defendant Agnihotri has made a conscious decision to continue to drink—despite all the criminal conduct that corresponds with it, and despite having been given the tools through his prior state court probation terms to address it. He needs to be held accountable for his actions, including his decision to drink alcohol excessively to the point that he harms everyone from his loved ones, to his community, to society at large.

## VI. THE SENTENCING DISPARITY WITH THE *SEGOVIA* CASE IS WARRANTED

The government anticipates a collateral attack on its positions in this case by Agnihotri's defense claiming that the government is seeking to create, instead of avoid, "unwarranted sentencing disparities" pursuant to 18 U.S.C. § 3553(a)(6) by comparing Agnihotri's conduct to the defendant the *Segovia* case. That argument fails because the differences in the two persons records and conduct warrants the disparity, as set forth below:

1. While defendant Segovia has no criminal convictions, defendant Agnihotri has two prior convictions. While it is true that the total offense level calculations and CHC account for these differences to some degree, they do not completely. Defendant Agnihotri's prior offense conduct includes domestic violence against his wife, and family violence against his children. The police report contains facts that the incident was not a one-off. This is further supported by the fact that defendant Agnihotri's wife sought a domestic violence protective order against him parallel to the criminal case. *See Neetu Agnihotri vs Rajiv Agnihotri*, Santa Clara Super. Ct. no. 16DV019499. Obviously, the nature of defendant Agnihotri's prior offenses, and not just their criminal history points, can (and did) factor into the government's decision to not be lenient to defendant Agnihotri,

as compared to defendant Segovia, who is 66 years old without any arrests, let alone convictions.

2. Defendant Agnihotri has two prior criminal offenses that did not result in convictions, but the facts demonstrate that Agnihotri engaged in criminal conduct—i.e., two hit-and-run misdemeanors—recently, including one while he was on pretrial release in this federal case. In addition to engaging in the hit-and-run criminal conduct—one that, at its core, is evading responsibility for misconduct—Agnihotri also failed to take responsibility when police followed-up with him. The government, just like USPO and the Court, can take into consideration these incidents that do not affect defendant Agnihotri's Guidelines calculation, but are shown to be true on a preponderance of the evidence. One view is that, if both had resulted in convictions, defendant Agnihotri's two additional criminal history points would put him at a CHC III. Again, defendant Segovia has no comparable criminal conduct that did not result in convictions—there is no indication of any other criminal conduct than the federal offense for which she stands convicted.

3. Defendant Agnihotri performed extremely poorly while on domestic violence probation and pretrial release in his prior criminal cases. His probation following his domestic violence conviction was revoked at least once. He was found in violation of his pretrial release conditions in his DUI case twice, resulting in two pretrial stints in custody. Again, defendant Segovia has no comparable prior history.

4. Defendant Agnihotri performed poorly while on pretrial release in this case. He sustained five violations over just one year, and then the Court ordered him detained after he was arrested on a bench warrant for failing to appear for his violation hearing. By contrast, defendant Segovia had no violations while on pretrial release for 1¾ years before she was sentenced.

The offense conduct by defendants Agnihotri and Segovia both involve the distribution of counterfeit prescription pills for the Durgapura network based in India. But that similarly must be juxtaposed with the nature of each of their conduct as discussed below. While defendant Agnihotri's defense attempts to tar and feather defendant Segovia to be the same as defendant Agnihotri, the reality is much different as evidenced by the facts to which defendant Segovia admitted in her Plea Agreement [*Segovia* case, no. 5:24-cr-00459-EKL, Dkt 59], with the pertinent conduct as summarized below:

1. Defendant Segovia admitted that "I order[ed] pills for my own personal use over several years" from

the Durapura network. "[B]eginning at least by October 2015, I ordered prescription pills from a supplier who I communicated with using the messaging application WhatsApp. Eventually I learned through conversations with the supplier that he stated that he lived in India. During the 17 months between April 2, 2021 and September 23, 2022, I ordered approximately 17,460 pills containing what I believed to be Tapentadol. I did so in about 35 orders, averaging about 500 tablets per order."

2. Defendant Segovia admitted that her "supplier twice proposed that I reship pills (including the controlled substance zolpidem) to others. Pursuant to such requests, I twice agreed to receive what I understood were controlled substances not meant for me and to re-ship them to someone else in the United States. The first time I agreed to re-ship, my supplier offered to give me 360 free Tapentadol pills for the re-shipment. The second time that I agreed to re-ship, I expressed discomfort at receiving pills I did not order and my supplier promised he would not ask me to re-ship any more. [Segovia] did not receive any pills, discounts, or other compensation for [her] second re-shipment.

3. Defendant Segovia admitted that "on approximately five other occasions, I received pills that I did not want to consume either because they were not what I ordered or I had other concerns about their appearance or quality. On those five occasions, my supplier asked me to 'return' the product I did not want by shipping it to another address in the United States. I did ship the drugs to the addresses I was given." Her "returns" were tantamount to unwitting distribution on her part.

**4.** Defendant Segovia was charged initially by Criminal Complaint on March 23, 2023 [*id.* Dkt. 1], and arrested a few days later, because the government believed, at that time, that defendant Segovia was importing and importing fentanyl as detailed in that initial pleading. After the case was initiated, confirmatory tests showed that belief to be incorrect, and Segovia's defense proffered to the government additional information to provide a more complete picture of defendant Segovia's conduct and her motivations, which resulted in a Felony Information [Id. 55] that reflected the appropriate charge to which defendant Segovia promptly pleaded guilty per her Plea Agreement on October 10, 2024. [Id. Dkt. 59] There was nothing unique or special about the fact that, upon a case initiated by a criminal complaint, the parties promptly resolved the matter obviating the need to have the grand jury indict the defendant. The notion that this course of litigation was uniquely favorable to defendant Segovia is specious as many defendants, including many represented by the Public

Defender's Office with which defense counsel is a member, go through a similar resolution process.

While the *Segovia* case's Plea Agreement [Id. Dkt <u>59</u>] summarizes the key facts of the offense, the Government's Sentencing Memorandum [id. Dkt. <u>62</u>] for that case lays out, in painstaking detail, the evidence gathered by the government in that case—much as Defendant Agnihotri's conduct is set forth in detail herein. That Memorandum leads with the appropriate conclusion: "The story of Joanne Segovia is the story of years of heavy opioid addiction, drug importation, self-delusion, and some very poor choices. It is not, however, the story of a drug dealer." The government need not rehash that Memorandum in full here, as it is available to the Court, as is the PSR in that case. In sum, the points that defense raises as to how the government approached the *Segovia* case differently than this one are well-reasoned and withstand scrutiny:

- Unseized shipments in the *Segovia* case were treated as mitigating given the totality of evidence, including the circumstances that were apparent when defendant Segovia did re-ship controlled substances at the behest of the Durgapura group. She did so intentionally twice and hesitated the second time. Other times, she was manipulated into re-shipping her "returns" within the United States, which were distributions in reality. And, defendant Segovia appeared to have suffered from consuming pills received from the Durgapura group that were anti-seizure medication, Pregabalin, instead of the anesthetic medicine, Tramadol. By contrast, defendant Agnihotri acted, at all times, in full knowledge and with the full intention to distribute the controlled substances that he re-shipped without hesitation. He used clandestine methods—with fake names to open-up P.O. Boxes and use of storage units to engage in the importation and redistribution of these controlled substances—to evade detection from law enforcement and hide his conduct from his family and neighbors. Per his text messages, he saw through dozens of further distributions, which resulted in the calculations of converted drug weights set forth in Part IV.C.4 above. Moreover, two of the seized shipments destined for Agnihotri to redistribute were actually Pregabalin instead of the Tramadol as labeled. So, while both cases show the risk associated with illicit, pseudo-pharmaceutical pills, defendant Segovia suffered from that risk, while defendant Agnihotri just profited from it.
- The mass-marketing enhancement was not applied in Segovia's case because it was questionable. The facts of her few instances of re-shipping don't demonstrate a full appreciation of her role. By

contrast, the mass-marketing enhancement is applied correctly to defendant Agnihotri given the facts

of his case.  The defense's attempts to distinguish him from the persons engaging in that mass-

marketing is unavailing.  *See* Part IV.E above.

- The obstruction enhancement applies to facts present in this case that were not present in the *Segovia*

  case.  Both defendants lied to investigators when interviewed about their respective conduct.  But, in

  both instances, the lies were patently obvious and ignored by investigators.  Under those

  circumstances, neither receives an enhancement for obstruction.  That concept was laid bare in the

  Government's Sentencing Memorandum [id. Dkt. 62] in the *Segovia* case.  ("As noted, the agents

  did not credit it for a moment, which is why no Guidelines enhancement for obstruction of justice

  applies. U.S.S.G. §3C1.1, App. Note 4(G); *United States v. Solano-Godines*, 120 F.3d 957, 963 (9th

  Cir. 1997).")  Defendant Agnihotri is treated the same in that respect—his bald face lies to

  investigators were ignored for Guidelines calculations purposes.  What defendant Agnihotri did, per

  the preponderance of the evidence, was more than just lie.  He also went to his storage unit the day

  after he lied, and he emptied out the storage unit of all the evidence in there.  Agnihotri's defense is

  unable to refute those facts as drawn from rationale inference.

The government notes that, while Agnihotri's defense will engage in its own analysis of the

*Segovia* case, given the discovery it was provided by the government to defense from that case, the

defense cannot argue—not in a credible way, at least—that the government's representations about the

facts of that case (or Segovia's defense for that matter), misled that sentencing Court.  That's because

the Court was not misled in that case.

Given the full and accurate disclosure by the government to the Court in the *Segovia* case,

defense is left to complain about is the government's evaluation of the factual similarities and significant

disparities between the two cases, as a purported failure to adhere to 18 U.S.C. § 3553(a)(6).  Simply

put, the defense is second guessing the government's motivations simply because the government is not

equating the two defendants, based on the defense's self-serving premise that the two defendants are

essentially the same.  But that is simply not true.  The Court, of course, can make its own determination

as to the two defendants' similarities and differences given all the information presented by the parties.

That noted, to "avoid unwarranted sentence disparities" pursuant to § 3553(a)(6), the government

1  submits that a better comparator to this case is the *Oppenheimer* case, as is shown by the Government's

2  Sentencing Memorandum in that case.  [*United States v. Oppenheimer*, no. 3:24-cr-00170-JD, Dkt. 21]

3  That defendant had similar conduct—i.e., distributing thousands of pills of Tapentadol imported from

4  India through sophisticated means—and the similar motivations—i.e., pure profit.  That defendant also

5  had a Total Offense Level of 25, but was only a CHC I.  So, the government recommended a sentence of

6  43 months in that case.

7  Finally, Agnihotri's defense might seek to draw comparisons between defendant Agnihotri's

8  alcoholism and defendant Segovia's addiction to pain pills, to argue that defendant Agnihotri's

9  culpability is lesser than Segovia's, not greater.  That assessment is self-serving to be sure, but also

10  defies logic.  Defendant Agnihotri's alcoholism cannot be reconciled with the level of care taken by him

11  to avoid getting caught.  Was he drunk when he obtained false identification to open the P.O. Boxes

12  under false names?  Was he drunk when he opened the storage unit to engage in elicit activity?  His

13  alcoholism is more explanatory of his past crimes: violent acts against his family, driving under the

14  influence of alcohol, and hit-and-run incidents that are likely alcohol-related.  But as to those, defendant

15  Agnihotri's prior court cases make clear that his alcoholism was front and center in an effort to

16  rehabilitate him to address that issue as a cause of his misconduct.  There is no basis to reduce defendant

17  Agnihotri's punishment for this crime given that there is no logical tie between his alcoholism and his

18  conduct in this case.

19  **VII.    CONCLUSION**

20  For the foregoing reasons, the government respectfully requests a sentence of 100 months.  The

21  government agrees with the Presence Report's recommendations as to supervised release and a fine.

22  DATED:  November 6, 2025                                    Respectfully submitted,

23

24                                                                                CRAIG H. MISSAKIAN
                                                                                  United States Attorney

25                                                                                _____/s/_____

26                                                                                DANIEL N. KASSABIAN
                                                                                  Assistant United States Attorney

27

28

# EXHIBIT 1

**Rule 16 Summary of Expert Opinion and Bases**

**Report date:**  November 17, 2023

**Prepared by:**   Theresa Carbonaro, Ph.D.

**Substance at issue:**   3-[(1*R*,2*R*)-3-(dimethylamino)-1-ethyl-2-methylpropyl]phenol

monohydrochloride

**Alternate name(s):**   Tapentadol

**Opinion:**   Under United States Sentencing Commission Guidelines Manual § 2D1.1, Application Note 6: the depressant effects of tapentadol on the central nervous system are substantially similar to depressant effects of morphine on the central nervous system.

This opinion is provided for purposes of sentencing under the federal sentencing guidelines only and is based on currently available scientific data and literature.

No substances beyond those identified in the Drug Equivalency Tables have been considered for purposes of this report.

**USSG 2D1.1 Application Note 6: (B)**

**Bases and Reasons:**

1. ***Basic classification of chemicals***

   Both tapentadol and morphine are chemicals classified as opioid substances.  Tapentadol has depressant effects on the central nervous system that is substantially similar to morphine.

2. ***In vitro cellular receptor binding study findings***

   Pharmacological effects of most drugs result from their binding to the specific receptor. *In vitro* receptor binding studies are used to evaluate the affinity of a drug or substance to a specific receptor.  Data from *in vitro* receptor binding studies demonstrate that both tapentadol  and morphine bind to the μ-opioid receptor, with strong affinity (Tzschenthke et al., 2007).

3. ***In vitro cellular functional study results***

   *In vitro* functional assays are used to evaluate the activity of a drug or substance at a specific receptor.  Data from *in vitro* functional assays demonstrate that both tapentadol and morphine activate the μ-opioid receptor and thus act as agonists at the μ-opioid

receptor (Tzschenthke et al., 2007).  Agonist activation of the μ-opioid receptor leads to psychoactive and physiological actions.

4. ***Animal analgesia study results***

Tapentadol and other synthetic and naturally occurring opioid substances that act as agonists at the μ-opioid receptor produce analgesic effects in laboratory rodent animals. Tapentadol, similar to morphine, has been shown to produce a dose-dependent and a μ-opioid receptor-mediated, analgesic effect in mice and rats.  Data conclude that tapentadol had an analgesic effect and functioned as a μ-opioid receptor agonist *in vivo*. Opioid antagonists, such as naloxone and naltrexone, can block the analgesic effects of tapentadol and morphine (Tzschenthke et al., 2007).

5. ***Clinical  observation and toxicological reports***

Physiological complications (i.e., respiratory depression), severe adverse health effects, and death in human subjects following ingestion of tapentadol have been observed and reported (Vosburg et al., 2020; Stephenson et al, 2023).

6. ***Approved medical use***

Tapentadol is approved as an opioid analgesic indicated for the relief of moderate to severe acute pain in patients 18 years of age and older in the United States.

7. ***Legislative and regulatory control due to risks to the public health***

As of June 22, 2009, tapentadol is controlled as a Schedule II substance under the Controlled Substances Act (CSA) (Federal Register 2009; 74 FR 23790).

8. ***Conclusion***

Tapentadol produces depressant effects on the central nervous system that are substantially similar to that of the Schedule II opioid, morphine.

**USSG 2D1.1 Application Note 6: (C)**

A similar amount of tapentadol is needed to produce substantially similar depressant effects as that of morphine.

Theresa Carbonaro, Ph.D.
Drug Enforcement Administration                                                                                     2

**References**

1.  Stephenson L, van den Heuvel C, Humphries M, Scott T, Byard RW. Increased incidence of mixed drug toxicity deaths involving tapentadol - A forensic study. Med Sci Law. 2023 Jun 23:258024231183504. doi: 10.1177/00258024231183504. Epub ahead of print. PMID: 37350115.

2.  Tzschentke TM, Christoph T, Kögel B, Schiene K, Hennies HH, Englberger W, Haurand M, Jahnel U, Cremers TI, Friderichs E, De Vry J. (-)-(1R,2R)-3-(3-dimethylamino-1-ethyl-2-methyl-propyl)-phenol hydrochloride (tapentadol HCl): a novel mu-opioid receptor agonist/norepinephrine reuptake inhibitor with broad-spectrum analgesic properties. J Pharmacol Exp Ther. 2007 Oct;323(1):265-76. doi: 0.1124/jpet.107.126052. Epub 2007 Jul 26. PMID: 17656655.

3.  Vosburg SK, Beaumont J, Dailey-Govoni ST, Butler SF, Green JL. Evaluation of Abuse and Route of Administration of Extended-Release Tapentadol Among Treatment-Seeking Individuals, as Captured by the Addiction Severity Index-Multimedia Version (ASI-MV). Pain Med. 2020 Sep 1;21(9):1891-1901. doi: 10.1093/pm/pnz250. PMID: 31617931; PMCID: PMC7553020.

# EXHIBIT 2

**DEPARTMENT OF HOMELAND SECURITY**
U.S. CUSTOMS AND BORDER PROTECTION
LABORATORIES AND SCIENTIFIC SERVICES DIRECTORATE
San Francisco Laboratory, 630 Sansome Street, RM 1450, Room 1450 San Francisco, CA  94111

415-844-5744; 415-844-5757 (Fax)

# LABORATORY REPORT

| | | | |
|---|---|---|---|
| **Lab Report #:** | SF20220627 | **ID #:** | 6051S - 2023283400000401 GP 1 |
| **Submitted by:** | David Vargas | | |
| **Received:** | 10/14/2022 | **Reported:** | 11/16/2022 |
| **Sample Description:** | Pills in blister packs | | |
| **Sample Components:** | Blister pack labeled "Tapentadol 100mg" | | |
| **Information Requested:** | Controlled substance testing. | | |
| **Supplement Info:** | Analyse for 70% population at 95% confidence level. | | |

**Narrative:**

```
Chain of Custody: 6051S-2023283400000401 GP Group 1
Evidence bag: A295374

Line Item: 0001
Description: Sealed evidence bag with nine blister packs of 10 tablets each
(90 tablets total).  Blister packs labeled in part "TAPENTADOL TABLET 100 MG"
and "Aspadol Tab".  Tablets are round, orange with an imprinted + on one side.
Tablets appear visually the same.

Initial Weight:  81.2 ± 0.1 grams gross weight (evidence bag and blister
packs with 90 tablets)
Remaining Weight: 76.8 ± 0.1 grams gross weight (evidence bag and blister
packs with 81 tablets)

Sampling: One tablet from each of the ten blister packs used for analysis.
Nine tablets analyzed, 81 tablets not analyzed.
Substances Identified: Tapentadol, a Schedule II Controlled Substance.
Methods of analysis: CBPL FO-16R2 (GC/MS) Date of Analysis 11-2-22 to 11-4-22;
CSAMR4

Comments:
The uncertainty value represents an expanded uncertainty estimate
at the 95% level of confidence, k=2.

Sample to be returned to submitting officer.

END OF REPORT
```

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested.  The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive".  The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full.  All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

# LABORATORY REPORT

**Lab Report #:**      SF20220627                              **ID #:**    6051S - 2023283400000401 GP 1

**Analyst**                                                    **Approved By**

Sherilyn Lee                                                   George W. Odongo,
                                                               Branch Chief

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested. The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive". The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full. All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

**DEPARTMENT OF HOMELAND SECURITY**
U.S. CUSTOMS AND BORDER PROTECTION
LABORATORIES AND SCIENTIFIC SERVICES DIRECTORATE
San Francisco Laboratory, 630 Sansome Street, RM 1450, Room 1450 San Francisco, CA  94111

415-844-5744; 415-844-5757 (Fax)

# LABORATORY REPORT

| | | | |
|---|---|---|---|
| **Lab Report #:** | SF20220628 | **ID #:** | 6051S - 2023283400000501 GP 1 |
| **Submitted by:** | David Vargas | | |
| **Received:** | 10/14/2022 | **Reported:** | 11/23/2022 |
| **Sample Description:** | Pills in blister packs. | | |
| **Sample Components:** | Blister packs labeled "Tapentadol 100mg." | | |
| **Information Requested:** | Controlled substance testing | | |
| **Supplement Info:** | Analyse for 70% population at 95% confidence level. | | |

**Narrative:**

```
Chain of Custody: 6051S-2023283400000501 GP Group 1
Evidence bag: A4852002

Line Item: 0001
Description: Sealed evidence bag with four blister packs of 10 tablets each
(40 tablets total).  Blister packs labeled in part "Tapentadol Tablets 100 mg"
and "TAPEL-100".  Tablets are round, orange with no markings. Tablets appear
visually the same.

Initial Weight:   27.3 ± 0.1 grams gross weight (evidence bag and blister
packs with 40 tablets)
Remaining Weight: 24.7 ± 0.1 grams gross weight (evidence bag and blister
packs with 31 tablets)

Sampling: Two to three tablets from each of the four blister packs used for
analysis. Nine tablets analyzed, 31 tablets not analyzed.
Substances Identified: Pregabalin, a Schedule V Controlled Substance.
Methods of analysis: CBPL FO-16R2 (GC/MS) Date of Analysis 11-2-22 to 11-4-22
and 11-17-22 to 11-18-22; CSAMR4

Comments:
The uncertainty value represents an expanded uncertainty estimate
at the 95% level of confidence, k=2.

Tablets are labeled as containing tapentadol but contain pregabalin instead.

Sample to be returned to submitting officer.

END OF REPORT
```

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested.  The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive".  The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full.  All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

# LABORATORY REPORT

**Lab Report #:**      SF20220628                               **ID #:**      6051S - 2023283400000501 GP 1

**Analyst**

Sherilyn Lee

**Approved By**

George W. Odongo,
Branch Chief

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested. The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive". The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full. All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

                                         CBP Form 6416 (09/19)

**DEPARTMENT OF HOMELAND SECURITY**
U.S. CUSTOMS AND BORDER PROTECTION
LABORATORIES AND SCIENTIFIC SERVICES DIRECTORATE
San Francisco Laboratory, 630 Sansome Street, RM 1450, Room 1450 San Francisco, CA 94111

415-844-5744; 415-844-5757 (Fax)

# LABORATORY REPORT

| | | | |
|---|---|---|---|
| **Lab Report #:** | SF20220629 | **ID #:** | 6051S - 2023283400005401 GP 1 |
| **Submitted by:** | David Vargas | | |
| **Received:** | 10/14/2022 | **Reported:** | 12/01/2022 |
| **Sample Description:** | Pills in blister packs. | | |
| **Sample Components:** | Blister packs labeled "Zolpidem." | | |
| **Information Requested:** | Controlled substance testing. | | |
| **Supplement Info:** | Analyse for 70% population at 95% confidence level. | | |

**Narrative:**

```
Chain of Custody: 6051S-2022419600550001 GP Group 1
Evidence bag: X1017672

Line Item: 0001
Description: Sealed evidence bag with ~3000 blister packs of 10 tablets each
(~30000 tablets total).  Blister packs labeled in part "Belbien® 10 mg"
and "zolpidem HEMOFARM AD VRSAC".  Tablets are white, oval, with a single-
score on one side and imprinted zim single-score 10 on the reverse.  Tablets
appear visually the same.

Initial Weight: 7959.0 ± 0.7 grams gross weight (evidence bag and blister
packs)
Remaining Weight: 7956.3 ± 0.7 grams gross weight (evidence bag and blister
packs)

Sampling: One tablet from each of nine different blister packs used for
analysis. Nine tablets analyzed, remaining ~29991 tablets not analyzed.
Substances Identified: zolpidem, a Schedule IV Controlled Substance.
Methods of analysis: CBPL FO-16R2 (GC/MS) Date of Analysis 11-21-22 to 11-22-
22; CSAMR4

Comments:
The uncertainty value represents an expanded uncertainty estimate
at the 95% level of confidence, k=2.

Sample to be returned to submitting officer.

END OF REPORT
```

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested. The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive". The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full. All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

# LABORATORY REPORT

**Lab Report #:**          SF20220629                          **ID #:**      6051S - 2023283400005401 GP 1

---

**Analyst**
_____

Sherilyn Lee

**Approved By**
_____

George W. Odongo,

Branch Chief

---

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested. The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive". The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full. All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

**DEPARTMENT OF HOMELAND SECURITY**

U.S. CUSTOMS AND BORDER PROTECTION

LABORATORIES AND SCIENTIFIC SERVICES DIRECTORATE

San Francisco Laboratory, 630 Sansome Street, RM 1450, Room 1450 San Francisco, CA 94111

415-844-5744; 415-844-5757 (Fax)

# LABORATORY REPORT

| | | | |
|---|---|---|---|
| **Lab Report #:** | SF20220658 | **ID #:** | 6051S - 9189190 |
| **Submitted by:** | David Vargas | | |
| **Received:** | 10/19/2022 | **Reported:** | 11/23/2022 |
| **Sample Description:** | Tapentadol Tablets | | |
| **Sample Components:** | 4 blister packs of tablets | | |
| **Information Requested:** | Controlled Substances | | |
| **Supplement Info:** | Analyse for 70% population at 95% confidence level. | | |

**Narrative:**

```
Chain of Custody: 6051S-9189190
Evidence bag: A8871270

Line Item: 0001
Description: Sealed evidence bag with four blister packs of 10 tablets each
(40 tablets total).  Blister packs labeled in part "Tapentadol Tablets 100 mg"
and "TAPEL-100".  Tablets are round, orange with no markings. Tablets appear
visually the same.

Initial Weight:   27.2 ± 0.1 grams gross weight (evidence bag and blister
packs with 40 tablets)
Remaining Weight: 24.6 ± 0.1 grams gross weight (evidence bag and blister
packs with 31 tablets)

Sampling: Two to three tablets from each of the four blister packs used for
analysis. Nine tablets analyzed, 31 tablets not analyzed.
Substances Identified: Pregabalin, a Schedule V Controlled Substance.
Methods of analysis: CBPL FO-16R2 (GC/MS) Date of Analysis 11-2-22 to 11-4-22
and 11-17-22 to 11-18-22; CSAMR4

Comments:
The uncertainty value represents an expanded uncertainty estimate
at the 95% level of confidence, k=2.

Tablets are labeled as containing tapentadol but contain pregabalin instead.

Sample to be returned to submitting officer.

END OF REPORT
```

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested. The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive". The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full. All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

# LABORATORY REPORT

**Lab Report #:**    SF20220658    **ID #:**    6051S - 9189190

---

**Analyst**

Sherilyn Lee

**Approved By**

George W. Odongo,
Branch Chief

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested. The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive". The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full. All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

**DEPARTMENT OF HOMELAND SECURITY**
U.S. CUSTOMS AND BORDER PROTECTION
LABORATORIES AND SCIENTIFIC SERVICES DIRECTORATE
San Francisco Laboratory, 630 Sansome Street, RM 1450, Room 1450 San Francisco, CA 94111

415-844-5744; 415-844-5757 (Fax)

# LABORATORY REPORT

| | | | |
|---|---|---|---|
| **Lab Report #:** | SF20220660 | **ID #:** | 6051S - 9189346 |
| **Submitted by:** | David Vargas | | |
| **Received:** | 10/19/2022 | **Reported:** | 12/02/2022 |
| **Sample Description:** | Zolpidem Tablets | | |
| **Sample Components:** | 2.13 kg of white round tablets in blister packs | | |
| **Information Requested:** | Controlled Substances | | |
| **Supplement Info:** | Analyse for 70% population at 95% confidence level. | | |

**Narrative:**

```
Chain of Custody: 6051S-9189346
Evidence bag: L3551887

Line Item: 01
Description: Sealed evidence bag containing ~500 blister packs of 10 tablets
each (~5000 tablets total). Blister packs labeled in part "Zoltrate-10"
and "Zolpidem Tablets IP" and "Neuro Vision".  Tablets are white, caplet
shaped, with a single score on one side.  Tablets appear visually the same.

Initial Weight:  2176.2 +/- 0.7 grams gross weight (evidence bag and blister
packs)
Remaining Weight: 2172.5 +/- 0.7 grams gross weight (evidence bag and blister
packs)

Sampling: One tablet from each of nine different blister packs used for
analysis. Nine tablets analyzed, remaining tablets not analyzed.
Substances Identified: Alprazolam, a Schedule IV Controlled Substance.
Methods of analysis: CBPL FO-16R2 (GC/MS) Date of Analysis 11-21-22 to 11-22-
22; CSAMR4

Comments:
The uncertainty value represents an expanded uncertainty estimate
at the 95% level of confidence, k=2.

Tablets are labeled as containing zolpidem but contain alprazolam instead.

Sample to be returned to submitting officer.

END OF REPORT
```

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested. The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive". The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full. All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

## LABORATORY REPORT

**Lab Report #:**    SF20220660                                        **ID #:**    6051S - 9189346

**Analyst**

Sherilyn Lee

**Approved By**

George W. Odongo,
Branch Chief

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested. The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive". The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full. All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

                                   CBP Form 6416 (09/19)

**DEPARTMENT OF HOMELAND SECURITY**

U.S. CUSTOMS AND BORDER PROTECTION

LABORATORIES AND SCIENTIFIC SERVICES DIRECTORATE

San Francisco Laboratory, 630 Sansome Street, RM 1450, Room 1450 San Francisco, CA 94111

415-844-5744; 415-844-5757 (Fax)

# LABORATORY REPORT

| | | | |
|---|---|---|---|
| **Lab Report #:** | SF20220661 | **ID #:** | 6051S - 2022419600550001 GP GROUP 1 |
| **Submitted by:** | David Vargas | | |
| **Received:** | 10/19/2022 | **Reported:** | 12/02/2022 |
| **Sample Description:** | Alprazolam Tablets | | |
| **Sample Components:** | 7.8 kg of white colored tablets in blister packs | | |
| **Information Requested:** | Controlled Substances | | |

**Narrative:**

```
Chain of Custody: 6051S-202241960050001 GP Group 1
Evidence bag: X1017672

Line Item: 001
Description: Sealed evidence bag containing blister packs of 10 tablets
each. Blister packs labeled in part "Alpz-1" and "Alprazolam Tablets IP"
and "Neuro Vision".  Tablets are white, round with a single score on one
side.  Estimated number of tablets is ~30,000.  Tablets appear visually the
same.

Initial Weight:  7,946.0 +/- 0.7 grams gross weight (evidence bag and blister
packs)
Remaining Weight: 7,942.9 +/- 0.7 grams gross weight (evidence bag and blister
packs)

Sampling: One tablet from each of nine different blister packs used for
analysis. Nine tablets analyzed, remaining tablets not analyzed.
Substances Identified: Alprazolam, a Schedule IV Controlled Substance.
Methods of analysis: CBPL FO-16R2 (GC/MS) Date of Analysis 11-21-22 to 11-22-
22; CSAMR4

Comments:
The uncertainty value represents an expanded uncertainty estimate
at the 95% level of confidence, k=2.

Sample to be returned to submitting officer.

END OF REPORT
```

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested. The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive". The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full. All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

# LABORATORY REPORT

**Lab Report #:**          SF20220661                                    **ID #:**     6051S - 2022419600550001 GP
                                                                                                    GROUP 1

**Analyst**                                                                    **Approved By**

_____                                    _____

Sherilyn Lee                                                                       George W. Odongo,

                                                                                         Branch Chief

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested. The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive". The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full. All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

**DEPARTMENT OF HOMELAND SECURITY**

U.S. CUSTOMS AND BORDER PROTECTION

LABORATORIES AND SCIENTIFIC SERVICES DIRECTORATE

San Francisco Laboratory, 630 Sansome Street, RM 1450, Room 1450 San Francisco, CA  94111

415-844-5744; 415-844-5757 (Fax)

# LABORATORY REPORT

| | | | |
|---|---|---|---|
| **Lab Report #:** | SF20220674 | **ID #:** | 6051S-802938 |
| **Submitted by:** | David Vargas | | |
| **Received:** | 10/19/2022 | **Reported:** | 12/01/2022 |
| **Sample Description:** | orange colored tablets labeled Tapentadol 100 mg | | |
| **Sample Components:** | orange colored tablets labeled Tapentadol 100 mg | | |
| **Information Requested:** | Test at least one (1) tablet for controlled substances | | |

**Narrative:**

```
Chain of Custody: 6051S-8098347
Evidence bag: A8295387

Line Item: 0005
Description: Sealed evidence bag with 18 blister packs of ten(10) tablets each
(180 tablets total).  Blister packs labeled in part "TAPENTADOL TABLET 100 MG"
and "Aspodol Tab". Nine of the blister packs are labels with batch number 651-
88 and the other nine are 651-91. Tablets are round, orange
with no imprints and two crossed scores. Tablets appear visually the same.

Initial Weight:  124.1 ± 0.7 grams gross weight (evidence bag and blister
packs with 180 tablets)
Remaining Weight: 121.4 ± 0.7 grams gross weight (evidence bag and blister
packs with 174 tablets)

Sampling: One tablet from six blister packs, three packs from each batch
number used for analysis. Six tablets analyzed.
Substances Identified: tapentadol, a Schedule II Controlled Substance.
Methods of analysis: CBPL FO-16R2 (GC/MS) Date of Analysis 11-21-22 to 11-22-
22; CSAMR4

Comments:
The uncertainty value represents an expanded uncertainty estimate
at the 95% level of confidence, k=2.

Sample to be returned to submitting officer.
```

| **Analyst** | **Approved By** |
|---|---|
| Araina Hansen, Ph.D. | George W. Odongo,<br>Branch Chief |

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested.  The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive".  The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full.  All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

**DEPARTMENT OF HOMELAND SECURITY**

U.S. CUSTOMS AND BORDER PROTECTION

LABORATORIES AND SCIENTIFIC SERVICES DIRECTORATE

San Francisco Laboratory, 630 Sansome Street, RM 1450, Room 1450 San Francisco, CA 94111

415-844-5744; 415-844-5757 (Fax)

# LABORATORY REPORT

| | | | |
|---|---|---|---|
| **Lab Report #:** | SF20220675 | **ID #:** | 6051S - 809347 |
| **Submitted by:** | David Vargas | | |
| **Received:** | 10/19/2022 | **Reported:** | 12/01/2022 |
| **Sample Description:** | white colored tablets labeled Tramadol 100 mg | | |
| **Sample Components:** | white colored tablets labeled Tramadol 100 mg | | |
| **Information Requested:** | Test at least one (1) tablet for controlled substances | | |

**Narrative:**

```
Chain of Custody: 6051S-8082938
Evidence bag: A8295384

Line Item: 0002
Description: Sealed evidence bag with 36 blister packs of ten(10) tablets each
(360 tablets total).  Blister packs labeled in part "Tramadol Hydrochloride
Tablets 100 mg" and "ICIDO-100". Tablets are round, white
with no imprints. Tablets appear visually the same.

Initial Weight:  137.9 ± 0.7 grams gross weight (evidence bag and blister
packs with 360 tablets)
Remaining Weight: 137.0 ± 0.7 grams gross weight (evidence bag and blister
packs with 357 tablets)

Sampling: One tablet from three blister packs. Three tablets analyzed.
Substances Identified: tramadol, a Schedule IV Controlled Substance.

Methods of analysis: CBPL FO-16R2 (GC/MS) Date of Analysis 11-21-22 to 11-22-
22; CSAMR4

Comments:
The uncertainty value represents an expanded uncertainty estimate
at the 95% level of confidence, k=2.

Sample to be returned to submitting officer.
```

| **Analyst** | **Approved By** |
|---|---|
| Araina Hansen, Ph.D. | George W. Odongo, Branch Chief |

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested.  The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive".  The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full.  All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

**DEPARTMENT OF HOMELAND SECURITY**

U.S. CUSTOMS AND BORDER PROTECTION

LABORATORIES AND SCIENTIFIC SERVICES DIRECTORATE

San Francisco Laboratory, 630 Sansome Street, RM 1450, Room 1450 San Francisco, CA  94111

415-844-5744; 415-844-5757 (Fax)

# LABORATORY REPORT

| | | | |
|---|---|---|---|
| **Lab Report #:** | SF20220676 | **ID #:** | 6051S-8082937 |
| **Submitted by:** | David Vargas | | |
| **Received:** | 10/19/2022 | **Reported:** | 01/30/2023 |
| **Sample Description:** | Tablets in blister packs labeled Alprazolam 1 mg | | |
| **Sample Components:** | Tablets in blister packs labeled Alprazolam 1 mg | | |
| **Information Requested:** | Test at least one (1) tablet for controlled substances | | |

**Narrative:**

```
Chain of Custody: 6051S-8082937
Evidence Bag Number: A8295386
Dates of Analysis: 11/4/22 to 1/14/23

Line Item 0001
Description: 30 blister packs containing white round pills with a score mark
on one side and unmarked on the reverse. These blister packs were labeled
Alprazolam Tablets Rlam-1.
Initial Net Weight: 54.2 grams +/- 0.1 grams (450 pills)
Remaining Net Weight: grams +/- 0.1 (394 pills)
Sampling: Statistical Subsample, 56 pills out of 450 tested
Substances Identified: Alprazolam (Schedule IV)
Methods of Analysis: CSAM (Controlled Substance Manual, CBPL FO-16 (GC/MS
Analysis)

Comments:
A statistically based sampling plan was used to analyze the appropriate number
of randomly selected pills from the entire sample to give a 95% level of
confidence that at least 90% of the sample contains alprazolam. The net weight
of the sample was extrapolated from the average net weight of 25 pills. The
weight uncertainty value represents an expanded uncertainty estimate at the
95% level of confidence, k=2.
```

| **Analyst** | **Approved By** |
|---|---|
| Estela Magallanes | George W. Odongo, Branch Chief |

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested.  The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive".  The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full.  All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

**DEPARTMENT OF HOMELAND SECURITY**
U.S. CUSTOMS AND BORDER PROTECTION
LABORATORIES AND SCIENTIFIC SERVICES DIRECTORATE
San Francisco Laboratory, 630 Sansome Street, RM 1450, Room 1450 San Francisco, CA 94111

415-844-5744; 415-844-5757 (Fax)

# LABORATORY REPORT

| | | | |
|---|---|---|---|
| **Lab Report #:** | SF20220677 | **ID #:** | 6051S-8098492 |
| **Submitted by:** | David Vargas | | |
| **Received:** | 10/19/2022 | **Reported:** | 11/22/2022 |
| **Sample Description:** | Pink colored tablets labeled Tapentadol and Carisoprodol 225 | | |
| **Sample Components:** | Pink colored tablets labeled Tapentadol and Carisoprodol 225 | | |
| **Information Requested:** | Test at least one (1) tablet for controlled substances | | |

**Narrative:**

```
Chain of Custody: 6051S - 8098492
Evidence Bag #: A8295383
Analysis Date: 11/09/2022 to 11/16/2022

Line Item 0004
Description: Eighteen packets each with ten sealed, red, and round tablets
with a wide score line on one side and a "R" on the reverse side.

Initial net weight:  62.6 ± 0.1 grams (calculated)
Remaining net weight: 53.2 ± 0.1 grams (calculated)
Sampling: Twenty seven randomly selected tablets were individually crushed,
extracted, and analyzed.
Substances identified: Tapentadol Schedule II and Carisoprodol Schedule IV in
every tablet analyzed.

The weight values represent an expanded uncertainty estimate at the 95% level
of confidence, k=2.

Methods: CBPL FO-04R2; CBPL FO-16R2; CSAMR4.

The sample is to be returned to the submitting officer.

End of Report
```

| **Analyst** | **Approved By** |
|---|---|
| Jeffrey Riggs | George W. Odongo, |
| | Branch Chief |

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested. The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive". The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full. All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

**DEPARTMENT OF HOMELAND SECURITY**

U.S. CUSTOMS AND BORDER PROTECTION

LABORATORIES AND SCIENTIFIC SERVICES DIRECTORATE

San Francisco Laboratory, 630 Sansome Street, RM 1450, Room 1450 San Francisco, CA  94111

415-844-5744; 415-844-5757 (Fax)

# LABORATORY REPORT

| | | | |
|---|---|---|---|
| **Lab Report #:** | SF20220678 | **ID #:** | 6051S-8082939 |
| **Submitted by:** | David Vargas | | |
| **Received:** | 10/19/2022 | **Reported:** | 11/16/2022 |
| **Sample Description:** | orange colored tablets labeled Lorazepam 2 mg | | |
| **Sample Components:** | orange colored tablets labeled Lorazepam 2 mg | | |
| **Information Requested:** | Test at least one (1) tablet for controlled substances | | |

**Narrative:**

```
Chain of Custody: 6051S-8082939
Evidence bag: A295374

Line Item: 0003
Description: Sealed evidence bag with six blister packs of 30 tablets each
(179 tablets total, one tablet missing form one blister pack).  Blister packs
labeled in part "Lorazepam Tablets I.P. 2 mg" and "Ativan 2mg".  Tablets are
round, light orange
with no imprints. Tablets appear visually the same.

Initial Weight:  31.9 ± 0.1 grams gross weight (evidence bag and blister
packs with 179 tablets)
Remaining Weight: 31.2 ± 0.1 grams gross weight (evidence bag and blister
packs with 170 tablets)

Sampling: One to two tablets from each of the six blister packs used for
analysis. Nine tablets analyzed, 170 tablets not analyzed.
Substances Identified: lorazepam, a Schedule IV Controlled Substance.
Methods of analysis: CBPL FO-16R2 (GC/MS) Date of Analysis 11-2-22 to 11-4-22;
CSAMR4

Comments:
The uncertainty value represents an expanded uncertainty estimate
at the 95% level of confidence, k=2.

Sample to be returned to submitting officer.

END OF REPORT
```

**Analyst**                                                                       **Approved By**

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested.  The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive".  The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full.  All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)

## LABORATORY REPORT

**Lab Report #:**   SF20220678

ID #:   6051S-8082939

Sherilyn Lee

George W. Odongo,
Branch Chief

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only". Results contained in this laboratory report relate only to the items tested. The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive". The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full. All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Laboratories and Scientific Services Directorate for review and subsequent release.

CBP Form 6416 (09/19)