JODI H. LINKER
Federal Public Defender
Northern District of California
VARELL L. FULLER
Assistant Federal Public Defender
55 South Market Street, Suite 820
San Jose, CA 95113
Telephone:   (408) 291-7753
Facsimile:    (408) 291-7399
Email:         Varell_Fuller@fd.org

Counsel for Defendant AGNIHOTRI

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE  DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAJIV AGNIHOTRI,<br><br>Defendant. | Case No.  CR 23-00354 PCP<br><br>DEFENDANT'S MOTION TO SUPPLEMENT THE RECORD AND [PROPOSED] ORDER |

## **MOTION**

Mr. Agnihotri appeared for sentencing in this matter on Wednesday, November 12, 2025, at which time the Court imposed a sentence of 30 months. In relation to that proceeding, both parties referenced the government's sentencing memoranda from two cases in this district, *United States v. Oppenheimer*, No. 3:24-cr-00170-JD, and *United States v. Segovia*, No. 5:24-cr-00459-EKL, in their sentencing memoranda. *See* Def. Sent. Mem., Dkt. 78, at 7, 25-27; Gov. Amended Sent. Mem., Dkt. 81, at 15, 35-36. Mr. Agnihotri also submitted exhibits from the *Segovia* case as exhibits. *See* Def. Exh. L (*Segovia* exhibits submitted under seal). Additionally,

1   the Probation Office cited both cases in its response to defense objections in the Addendum to

2   the PSR. PSR Addendum, Dkt. 76, at 2.

3        Mr. Agnihotri did not file the sentencing memoranda themselves as exhibits. For

4   purposes of appellate review, however, Mr. Agnihotri respectfully moves the Court to

5   supplement the record to include the *Oppenheimer* and *Segovia* sentencing memoranda in order

6   to conform the record on appeal to more accurately reflect materials cited by both parties

7   during sentencing. The memoranda are submitted herewith as Exh. N and O. The government

8   will not be prejudiced by this motion because the documents were the government's own

9   sentencing memoranda, are available on the district court's docket, and were cited by both

10  parties in their briefing.

11       This Court has inherent authority to supplement the record. *See United States v. Siao*,

12  2024 WL 4906494, at *4 (N.D. Cal. 2024) (Freeman, J.). Additionally this Court presently

13  retains jurisdiction in this matter because the judgment has not yet been filed, and the defense

14  has not yet filed a notice of appeal. Accordingly, this Court retains its inherent power to

15  manage its docket "to achieve the orderly and expeditious disposition of cases," so long as the

16  action is a reasonable response to a specific problem and does not contradict any express rule

17  or statute. *Dietz v. Bouldin*, 579 U.S. 40, 45-47 (2016).

18       Following the issuance of the judgment, the filing of a notice of appeal, and the transfer

19  of jurisdiction to the Ninth Circuit Court of Appeals, this Court would retain authority to

20  supplement the record "for the purpose of aiding appellate review" under Fed. R. App. P.

21  10(e). *See Siao*, 2024 WL 4906494, at *3. Rule 10(e)(2) allows the district court to supplement

22  the record with "anything material to either party [that] is omitted from . . . the record by error

23  or accident." *Id*. The purpose of supplementation of the record is to assure that "the record

24  accurately reflects the proceedings in the trial court (thereby allowing [the appellate court] to

25  review the decision that the trial court made in light of the information that was actually before

26  it)." *Id*. (cleaned up) (noting that court could order supplementation under inherent authority,

27  and granting government's motion to supplement pursuant to Rule 10(e)(2)); *see also In re HIV*

28

1    *Antitrust Litigation*, 2024 WL 923551, at *2-3 (N.D. Cal. 2024) (Chen, J.) (granting motion to

2    supplement record to include demonstratives).

3          Accordingly, in order to conform the record to accurately reflect the materials cited by

4    both parties, but which the defense did not file on the docket through inadvertence, the

5    defense respectfully requests that the Court grant his motion and supplement the record with

6    the sentencing memoranda in the *Oppenheimer* and *Segovia* cases.

7

8    Dated:  November 18, 2025                    Respectfully submitted,

9                                                 JODI LINKER
                                                  Federal Public Defender
10

11                                               _____/s/_____
                                                 VARELL L. FULLER
12                                               Assistant Federal Public Defender

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2                           [PROPOSED] **ORDER**

3

4        GOOD CAUSE APPEARING, it is HEREBY ORDERED that Defendant Rajiv

5   Agnihotri's motion to supplement the record is GRANTED.

6        The sentencing memoranda in *United States v. Oppenheimer*, No. 3:24-cr-00170-JD, and

7   *United States v. Segovia*, No. 5:24-cr-00459-EKL, which have been submitted with

8   Defendant's motion to supplement as Exhibits N and O, are ORDERED FILED.

9        IT IS SO ORDERED.

10  Dated: November 19, 2025

11                                        _____
                                          HONORABLE P. CASEY PITTS
12                                        United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit N

ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

JOSEPH TARTAKOVSKY (CABN 282223)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7320
    FAX: (415) 436-7234
    Joseph.tartakovsky@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:24-CR-00170-JD |
| Plaintiff, | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| v. | Court: Hon. James Donato |
| JASON OPPENHEIMER, | Hearing Date: October 21, 2024 |
| Defendant. | Hearing Time: 10:30 a.m. |

      Jason Oppenheimer distributed foreign-made pharmaceutical controlled substances for a drug-trafficking network out of India. He is being sentenced on a guilty plea to one count of possession with intent to distribute Tapentadol, a morphine-like opioid, after authorities found at his home 40,280 pills of this painkiller—over 100 years' worth, for a novice user, taken in typical prescription amounts.[1]

## I.     OFFENSE CONDUCT

### A.    The scheme to possess and distribute Tapentadol and other controlled substances

      In late 2020, Oppenheimer entered into an agreement with two individuals in Mumbai, India, named Aatif Shaikh and Sufiyan Sudo (who went by "Roonie"). These Indian nationals were getting orders for prescription drugs from U.S. customers. Precisely how they got customers is unknown but

---

[1] These were 100 mg pills, a typical prescribed daily dose.

generally, in such schemes, agents of these networks, in call centers, engage in direct-marketing campaigns via text, phone, or websites, promising cheap medicines, delivered directly, from their "online pharmacy"—of course never disclosing that such conduct, for both buyer and seller, is illegal.

The Indian nationals arranged for the drugs, already smuggled into the United States by others, to be mailed to Oppenheimer. Then they sent Oppenheimer addresses and pill quantities for U.S. customers, along with handy premade labels.[1] Oppenheimer prepared the parcel of tablets from a stash at his home and fulfilled the order—taking, on a typical day, a stack of packages to a nearby mail box.

Oppenheimer, Shaikh, and Roonie communicated using Google Drive and the seized messages reveal the scale of their joint operation. For example, six orders were sent to Oppenheimer on September 29, 2021,[2] six orders on September 30,[3] 17 orders on October 1,[4] 13 orders on October 4,[5] 16 orders on October 5,[6] 16 orders on October 6,[7] 11 orders on October 7,[8] 13 orders on October 11,[9] 19 orders on October 12,[10] and 7 orders on October 13.[11] In other words, Oppenheimer was sent 124 "orders"—each resulting in a parcel mailed out by Oppenheimer—in 14 days, an average of about 9 a day.

Oppenheimer imposed conditions on his Indian partners to manage his risk. He declared that he would only receive controlled substances from domestic senders, i.e., pills that already been illegally brought into the country; he refused to be sent packages directly from abroad. The difference: packages crossing the border can be easily screened and opened but this rarely happens with domestic parcels.

Oppenheimer's co-conspirators didn't always abide by this parameter. The reprimands from Oppenheimer that followed offer a window into his thinking. An October 2021 exchange between Oppenheimer and Roonie[12] showed that, evidently, someone from the Indian network had sent Oppenheimer controlled substances directly from the United Kingdom:

> Hey Jason , Good morning . I just got to know about the whole incident and act what happened he shared the video with me . I can understand the level of anger you have for this…… [Y]ou had deal only US to US…. This shipment was just mistake from logistic as the address was in the Uk list too… I have penalized them 1000$ for mistake occur and this 1000$ would be credited to you as an apology from my end . Trust me brother it won't happen again even a single time.

Oppenheimer replied, using a Google email address that identified him as "Jason Orien":

> Ok Roonie I can't tell you how much I appreciate you reaching out to me with the sincere communication. I don't like imposing or being inflexible or complaining but the way I looked at this is that before we decided to try it thought hard about risk

factors and set certain boundaries that aatif was able to agree to…. Your note and gesture send a message that this is truly a mistake and you are serious about letting me know you are sorry and trying to repair the trust that steps have been taken to try and not have it happen again…. I know that you guys feel that the risk is much lower than I do…. [P]lease make every effort moving forward to not have controlled substances that are listed with the FDA coming through customs with my name on it that's all I ask if it comes within the United States that's fine and if its viagra or whatever that's fine. It helps to know that Aatif did not knowingly send that package that way.

Months later, in March 2022, his Indian partners screwed up again. Roonie emailed:

Hi Jason, I'm here for an apology from our end as one of the package from hungary of clonazepam [a Schedule IV controlled substance] was shipped out at your address and I know last time we had the discussion and I gave my word but as you know all the stuff comes out from enrouting overseas it's all custom clear handled packs but still as we will face the trouble even if it's arrive you can just dump it….

Oppenheimer responded:

I appreciate your note. Please please try and avoid having that happen again I have too much at risk. So I don't want to be more difficult than I already am but I didn't see your note til after I had received the package already so I have the product.

Oppenheimer rented a largely anonymous post office box to receive the pills. This way contraband wouldn't go to his home or reveal his address to customs inspectors. Those shipping to Oppenheimer took care not to use his real name on boxes; they used identifiers like "Jas" or "Jay Oppenheim."

Despite hiccups, their system worked. A Google document from January 2022 showed the total pills that Oppenheimer claimed to have distributed that month:

> Tramadol – 7,440 pills
> Diazepam – 18,150 pills
> Cenforce100 – 540 pills
> Oxy30 – 4,410 pills
> Ambien – 5,040 pills
> Lorazepam – 16,520 pills
> Aspadol – 180 pills
> Oltram – 460 pills
> Xanax – 6,750 pills
> Rakavan – 990 pills
> Ksadol – 1,080 pills

In fact, Oppenheimer was eventually moving enough parcels that he decided to get ahold of software that helps manage commercial volumes of shipments. In one message from Oppenheimer to

GOVERNMENT'S SENTENCING MEMORANDUM   3
3:24-CR-00170-JD

the software's customer support team, Oppenheimer complained that his "700 entries" of tracking numbers were overloading the interface.[13]  In another email, from December 2021, he mentioned customer support that "I have a worksheet with about 20-40 new packages per day."[14]  In January 2022, he emailed that he had "roughly 500" unique tracking numbers in his account at that moment.[15]

Oppenheimer got a commission for each parcel of pills that he mailed.  DEA investigators found spreadsheets tallying what he called his "inventory."  A June 2022 document listed his fees for each quantity of 180 pills, with prices set by drug:

> Tramadol - $20
> Diazepam [listed as Daizy] - $20
> Cenforce100 - $12
> Carisoprodol [listed as Soma500] - $15
> Ambien - $20
> Lorazepam [listed as Lori 2] - $20
> Tapentadol - $20
> Aspadol - $20
> Xanax - $20
> Rakavan - $20
> Ksadol - $20

Assuming the network was selling Tapentadol for $3 a pill (a fairly typical price), meaning $540 for 180 pills, Oppenheimer was taking essentially a 4% cut on each order.

This protocol to track orders, inventory, and commissions was apparently Oppenheimer's brainchild.  In an email exchange from January 2021, Oppenheimer wrote:

> For this to work and not run into problems as as lot of stuff will be coming and going, when there is a misunderstanding I dont want to go through asking you for details, they should be in here [i.e., the Google spreadsheet]. When you send something I need to know its coming and this is our document to track everything – you need to use it ok so it is accurate and reliablea dn reflects the status of any products from time they are shipped to me until delivered to end customer – it cant be accurate only some of the time of I get burned.

Oppenheimer added:

> ok all of my shipments out have been delivered and there is a balance of 140 commission due – you will make the payment and enter the payment info here in commission tracking box – that will zero out any balance due and demonstrate the full and accurate accounting this model offers- even with tons of outstanding orders an d supply shipments is becomes the single source of truth on everything we are doing

The co-conspirators worked out customer service issues.  For instance, in February 2022,

Oppenheimer wrote that "two of these blister packs are missing a pill – do you want those shipped as 10 packs, want me to make one tenpack complete and lower total to 2690, or consider both blister packs as a loss and change to 2680?"  Shaikh responds: "No We can use those missing pills blister. We will tell the customer and give them discount."[16]  Often Oppenheimer felt the need to demand greater rigor from his partners.  In February 2022 Oppenheimer complained:  "I'm n[o]t getting credit for orders because you are n[o]t keeping your commitment to fill in the commissions on non-standard orders."[17]  He complained in March 2022: "Come on guys, the deterioration of efforts to make this a smooth and worthwhile operation are disheartening. I still do ont have any instructions regarding these labels you sent me yesterday, and something tells me by the time you respond to my many notes requesting this info it will be too late and you will not want them sent. This is the majority of the business you had for me this week which is nearly none and you dropped the ball on it. What is going on over there?"[18]

A few days later Oppenheimer fretted that address labels had been "improperly return addressed for mailing from the west coast" and that these errors mean "every package is more likely to be scrutinized or returned to sender….  Since they have not gone out and we want to be as low profile as possible, [these] should be refunded and purchased again with a west coast return address."[19]  In April 2022 Oppenheimer complained about being on "day 7 without product."  Shaikh responded: "Hello Jas…I was busy with scheduling and here it was financial Year 31st March in India."[20]  Oppenheimer replied that he was "adding a 60 dollar expense to the worksheet" for his lost time.[21]

On May 11, 2022, Oppenheimer wrote that "Customs and border control must have something on me," informing his co-conspirators that his Global Entry status was revoked.[22]  Shaikh tried to reassure him that it was likely pandemic-related, not a result of Shaikh and Ronnie's mix-ups with foreign shipments.  "I have had this status for 8 years and I was kicked out of the program," Oppenheimer responded, "which they would never do without having committed a crime or havuing [sic] evidence that I am violatuing [sic] some customs/immigration laws."  Shaikh protested: "But now nothing is shipped from India…. We will get this within USA to USA only not any other modes."[23]  Yet despite this concern, Oppenheimer continued to participate in the scheme.



Oppenheimer received the pills in large boxes and would record a video of himself opening them to verify to the network what he in fact received. Investigators found some of these videos. In one (screenshots above and below), Oppenheimer opens three boxes and, while narrating, conducts a count of the pills within. In the first box he says he finds 49 blister packs of modafinil (a Schedule IV stimulant), for a total of 441 pills, and 100 boxes of carisoprodol pills (a Schedule IV muscle relaxant) for a total of 10,000 pills. The second box, he said, contained an additional 20,000 carisoprodol pills. The last box had yet another 30,000 carisoprodol pills. In other videos, Oppenheimer opens packages that he said contained 5,000 Rivotril (clonazepam), 2,500 Ambien, 2,340 Diazepam, and 20,000 more carisoprodol—all Schedule IV controlled substances.



Oppenheimer received his illicit profits through through PayPal. PayPal records showed 21 payments received by Oppenheimer from "Atif Shaikh," starting on January 16, 2021 and ending on July 4, 2022—a period of nearly 18 months—totaling $24,155. These were Oppenheimer's commissions for the distribution of these controlled substances to U.S.-based customers. Assuming each parcel had 180 pills, at his rate of $20 a parcel this would amount to about 1,200 parcels mailed.

**B.** <u>**Tapentadol found during search of Oppenheimer's home**</u>

In September 2022, Oppenheimer's house was searched.  In a shed outside of the main house agents found multi-thousand quantities of pills of the types he discussed in the Google records.  Specifically, agents found 40,280 Tapentadol pills, weighing 19.3 kilograms net.  They also found emptied Tapentadol boxes in the house.[24]  The packaging were typical of Indian-made Tapentadol.



Agents also seized from the shed 57,749 Carisoprodol pills (50,847.7 gross grams, lab-tested) and some 8,217 suspected Modafinil pills (not lab tested).[2]  Images from the shed show hand-labeled boxes containing the various drug types (e.g., "Aspadol," another name for Tapentadol, "Modafinil"), and individual parcels, stuffed with pills and ready for shipment[25]:

---

[2] In the home agents also found hundreds of other types of pills (e.g., 254 suspected Xanax pills, 242 suspected Clonazepam pills, 74 suspected Diazepam pills, 68 suspected Tramadol pills, 6 suspected oxycodone pills, 100 suspected Lorazepam pills).  The government assumes that these pills were left out from shipments for some reason and that Oppenheimer kept them.

GOVERNMENT'S SENTENCING MEMORANDUM   7
3:24-CR-00170-JD

1
2
3
4
5
6
7
8
9
10
11
12

 

13
14
15
16
17
18
19
20
21
22
23

 

24
25
26
27
28

     On March 19, 2024, a two-count Indictment charged Oppenheimer with violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) – Possession with Intent to Distribute Tapentadol (Count One); and 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(C) – Conspiracy to Distribute Controlled Substances (Count Two).  Doc 1. On June 24, 2024, Oppenheimer pleaded guilty to Count One of the Indictment.  Doc. 14.

## II.    GUIDELINES CALCULATION

The parties and Presentence Report agree on the following Guidelines calculations:

Base Offense Level, U.S.S.G. §2D1.1(a)(5) & (c)(4)                                    32
[19,300 grams of Tapentadol, Morphine as comparator to Tapentadol
= 19,300 grams x 500 gm CDW = 9,650 kg CDW]
[at least 3,000 kg but less than 10,000 kg of CDW]

Acceptance of Responsibility:                                                          -3

Zero-point offender:                                                                   -2

Safety valve [USSG §2D1.1(b)(18)]:                                                     -2

Total Adjusted Offense Level:                                                          25

The defendant is in Criminal History Category I.  PSR ¶ 56.  The Guidelines range is 57-71 months.  *Id*.  The government agrees with the PSR as to a fine and term of supervised release.

## III.    GOVERNMENT'S RECOMMENDATION

The government recommends a sentence of 43 months, which is 25% below the low end of the Guidelines.  On the mitigating side, Mr. Oppenheimer has no criminal history.  He retained counsel immediately after the search on his home and accepted responsibility promptly and completely.  He forfeited to the government the $24,155 he made in illicit proceeds via PayPal.  The government credits his general account, given to investigators at the safety-valve debrief, that he had been a customer of India-based drug supply networks for personal use and saw an opportunity, during the pandemic, to make extra cash.  He described himself as prone to an entrepreneurialism that, here, went far astray.

At the same time, Mr. Oppenheimer went into the work of illegally distributing foreign-made, non-FDA-approved drugs—sent by sketchy foreign rings, gathered up abroad from some unknown source—with his eyes wide open.  He knew it was legally perilous.  He said so himself.  This is why he took measures to minimize his exposure, such as by refusing to receive controlled substances sent directly from abroad and by opening post office boxes to discreetly receive packages.  He engaged in this scheme with sophistication and energy, both to avoid detection and to ensure that he was paid.  His motive was greed.  His conduct was a choice.  Oppenheimer has a master's degree in engineering from Cornell and an MBA from UC Berkeley.  Surely he could have devised lawful ways of making a buck.

His enthusiastic participation in the scheme benefited him, of course, but it also enriched shadowy criminal actors in India, whose business model requires U.S.-based co-conspirators.

Finally, Oppenheimer's conduct endangered the health and safety of the pill users (even if most of them knew better). The law in this country requires that prescription drugs be made, packaged, labeled, stored, transported, and dispensed in highly controlled ways, all to ensure that the drugs that people consume are safe and are what is expected. The foreign networks that import and mail these pills, by the millions, do so with no safeguards, no accountability, and no recourse for those who are harmed. Far too many Americans imperil their bodies by knowingly buying from these fake, fraud-ridden pharmacies. But that itself is partly a result of how cheap and easy the foreign traffickers make such purchases. Oppenheimer contributed to this illicit and dangerous commerce for 18 months.

## IV.     **CONCLUSION**

For these reasons, the government respectfully requests a sentence of 43 months.

DATED:     October 7, 2024

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

_____/s/_____
JOSEPH TARTAKOVSKY
Assistant United States Attorney

---

[1] OPPEN-002712, -2717, -2730, -3305. The government adds endnotes with citations to discovery for the benefit of new counsel, who as the government understands it will soon be retained and is presently unfamiliar with the facts.
[2] OPPEN-002720.
[3] OPPEN-002721.
[4] OPPEN-002722.
[5] OPPEN-002723.
[6] OPPEN-002724.
[7] OPPEN-002729.
[8] OPPEN-002731.
[9] OPPEN-002732.
[10] OPPEN-002733.
[11] OPPEN-02736.
[12] OPPEN-002725-28.
[13] OPPEN-002789.
[14] OPPEN-002829, -23.
[15] OPPEN-002845.
[16] OPPEN-003283.
[17] OPPEN-003285.

GOVERNMENT'S SENTENCING MEMORANDUM  10
3:24-CR-00170-JD

18 OPPEN-003307.
19 OPPEN-003309.
20 OPPEN-003315.
21 OPPEN-003319.
22 OPPEN-003345.
23 OPPEN-003345.
24 OPPEN-155184, 155192.
25 OPPEN-155214.

# Exhibit O

ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

JOSEPH TARTAKOVSKY (CABN 282223)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7320
    Fax: (415) 436-7234
    Joseph.tartakovsky@usdoj.gov

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) NO. 24-CR-00459-EKL |
| Plaintiff, | ) |
| | ) **GOVERNMENT'S SENTENCING** |
| | ) **MEMORANDUM** |
| v. | ) |
| | ) |
| JOANNE MARIAN SEGOVIA, | ) Judge: Hon. Eumi K. Lee |
| | ) Date: January 21, 2025, 10:30 a.m. |
| Defendant. | ) Court: San Jose, Courtroom 7, 4th Floor |
| | ) |

## I.    STATEMENT OF THE OFFENSE

    The story of Joanne Segovia is the story of years of heavy opioid addiction, drug importation, self-delusion, and some very poor choices. It is not, however, the story of a drug dealer.

    The government will explain how the investigation into Segovia unfolded.

### A.    Fall 2022: "Durgapura pharmacy" network and Segovia as a customer

    In fall 2022, Homeland Security agents were investigating a criminal network in India that shipped controlled substances in pill form—some made by foreign pharmaceutical companies, some counterfeited—to U.S. customers. A local operative in San Jose named Rajiv Agnihotri was arrested.[1]

---

[1] He was federally charged in October 2023 and is set to be sentenced on March 12, 2025 in San Jose, California. *United States v. Rajiv Agnihotri,* Case No. 5:23-cr-00354-PCP.

His co-conspirators in India, calling themselves the "Durgapura pharmacy," ran websites to lure consumers with the "cheapest" meds and "overnight" shipping. Once a customer was drawn in, they switched to encrypted texts or calls, often barraging the buyer with messages about "deals." This Durgapura network in effect had sales reps, perhaps dozens, who operated out of a call center.

They sold mostly abusable psychoactives. The best-selling drug by volume was Zolpidem, a Schedule IV anti-insomnia medication generally known by the trade name Ambien. Also popular were the opioids Tapentadol (Schedule II, sometimes sold as Aspadol) and Tramadol (Schedule IV), as well as Carisoprodol, a Schedule IV muscle relaxant (trade name Soma) that some users feel enhances the opioid experience. Tapentadol has become a drug of immense abuse in the U.S. Some call them "Indian M30s," using the street term for the ubiquitous counterfeit fentanyl pill.

The Durgapura crew did brisk business. Agnihotri's job was to fulfill orders taken by colleagues by text or phone. Day after day, he walked into a post office in Sunnyvale, California, with stacks of pre-addressed parcels, often jamming up the customer line. In one 52-day period in fall 2022 alone, he mailed out an astonishing 215,000 pills to some 700 customers in 48 states.

In November 2022, Homeland Security agents obtained the contents of Agnihotri's phone. They found the Durgapura organization's impressive customer list, along with some of its sales records.

One client was a Joanne Segovia of San Jose, California. Her past orders were in Agnihotri's phone, with Hindi-language notes about tracking payment. (Image at right.)



Investigators noticed something else: Segovia was the Executive Director of the San Jose Police Officers' Association (or SJPOA). She had worked there since 2003.

They soon also learned that her home address had been the intended destination, between 2019 and 2023, of five shipments that had been seized at ports of entry—packages that together contained tens of thousands of pills of Zolpidem, Tramadol, and Tapentadol. Between 2015 and 2023,

moreover, records showed that another 61 parcels had arrived to her home, originating from Canada, China, Spain, Great Britain, Hong Kong, Hungary, India, and Singapore and labeled with terms like "Gift Makeup," "Chocolate and Sweets," "Food Supplement," and "Health Product."

## B.   February 1 and March 14, 2023: Segovia interviews with Homeland Security

On February 1, 2023, two Homeland Security special agents interviewed Segovia at her home. She was told that pill orders with her name and address turned up in an investigation. She told the agents that she worked for the "police department." Then she began to lie. She claimed that she had only ordered "supplements" and "nothing out of the ordinary." She said that she only received prescription pain medications through her doctor and would never order by mail, adding "I wouldn't even know where to start." She recognized that it was unsafe to buy prescription medications on the internet and that doing so was "asking for trouble." She declared that she would never take medications from someone she had "never met" and that doing so would be "stupid." She refused to let agents see her CashApp transactions. She called the investigators' questions "ridiculous" and "crazy." She insisted, petulantly, that she had no idea why her name and address were found on the phone of a pill trafficker.

Agents didn't believe her. But the lead agent, David Vargas, at the end of the interview, politely asked her to call him if she recalled anything of use to the investigation.

Six weeks later, Segovia called, claiming she had information to offer. On March 14, 2023, she visited Homeland Security's San Jose office (with an individual who purportedly had worked for the SJPOA). Her purpose, it turned out, was to throw agents off the scent. Segovia said that it had occurred to her "like a light bulb" that her housekeeper must have used Segovia's phone to order the drugs to Segovia's house. After all, Segovia said, the woman had access to her device, home, and computer, and the familiarity needed to impersonate Segovia in chats. The woman, Segovia also disclosed, had a history of substance abuse. "It all leads to her," Segovia said, adding that it "hurts me to bring her up" and didn't want to "throw [this woman] to the wolves" but felt she had to be "honest" with agents. The agents weren't fooled. Segovia was charged on March 27, 2023. On April 4, 2023, agents interviewed the housekeeper who, by then, had seen the news of the prosecution against Segovia. "I'm just sick to my stomach," she told agents. "When someone blames you, it's just really hurtful. I'm just devastated."

**C.**     **March 14, 2023:  Segovia is linked to Indian pill network by website**

During the March 14 interview, Segovia consented to agents reviewing her phone's contents. They came upon a WhatsApp chat between Segovia and the user of an Indian phone number—whose first name, they would later learn, was "Saud."  (More on this chat below.)

Agents also found this number listed on a website that advertised prescription drugs, including Tramadol, Adderall, and Ambien.  The website's "contact us" page listed Segovia's home address.

The Indian phone number appeared, too, in an August 2022 police report from Tuscaloosa, Alabama, on the fentanyl overdose death of Dr. Louis Burgio, a renowned University of Alabama psychology professor and Alzheimer's researcher who died from a counterfeit pill that originated abroad.[2]  Dr. Burgio and Segovia had evidently independently communicated with the user of that Indian number.

**D.**     **March 15, 2023: suspected fentanyl shipment from China intercepted**

On March 15, 2023, the day after Segovia's second interview with Homeland Security, lead agent David Vargas was notified of an apparent controlled substance seizure in Kentucky.  The parcel originated in China on March 10, 2023 and was addressed to Segovia's home.  Inside was a disassembled clock kit and square and round white stickers.  Testing with a device called a Gemini™ Chemical Identification Analyzer identified "Valeryl Fentanyl Hydrochloride" on the square stickers and "Valeryl Fentanyl Hydrochloride and/or Oxycodone hydrochloride" on the round stickers.  Valeryl Fentanyl is a synthetic



---

[2] *United States v. Christopher Louis Bass,* Case No. 7:23-cr-00434-LSC-GMB, Doc. 26 (govt's sentencing memo).  *See also* https://www.tuscaloosanews.com/story/news/2024/12/19/case-closed-in-death-of-university-of-alabama-psychology-professor/77076186007/.

GOVERNMENT'S SENTENCING MEMORANDUM
Case No. 24-CR-00459-EKL                             4

fentanyl analogue and a Schedule I narcotic.  Oxycodone hydrochloride is a Schedule II narcotic.

Investigators were concerned that Segovia, cut off from her source in India by Homeland Security's detection, had pivoted and ordered drugs from a new supplier, this time in China.

Segovia was charged with importation of a controlled substance—specifically fentanyl—on March 27, 2023.  At the time that was the most recently seized shipment of suspected drugs to Segovia.

But on April 7, 2023, a Homeland Security lab analysis found no controlled substances in the clock exhibit.  The lab test superseded the field test.  Special Agent Vargas received the lab report on Saturday, April 8, 2023.  It was disclosed to counsel for Segovia that Monday.  The government believes that there was no fentanyl in the shipment from China.  The prosecution was unable to determine how the Gemini analyzer, a sophisticated device that retails for $170,000, produced two false positives.

### E.    Analysis of Segovia's chat with supplier Saud between 2020 and 2023

On March 14, when Segovia let agents examine her phone, agents found a long-running encrypted WhatsApp chat between Segovia and her sales-rep supplier, an Indian national named Saud, between January 2020 and March 2023.[3]  Many months are missing or deleted, and the relationship was clearly preexisting at the time of the first exchanges.  But the chat provides about 17 months of steady correspondence.  It provides a fairly full, revealing picture of Segovia's conduct.

First, Segovia was dependent on Saud for drugs, no doubt as one of many clients of his.  Segovia during the captured period placed approximately 35 orders, each for hundreds of pills at a time, totaling some 18,000 pills.  She ordered (1) "orange" pills, her shorthand for the round, bright orange Tapentadol tablets and (2) "soma," the muscle relaxant made of Carisoprodol.  On occasion she inquired about Saud's personal life.  She learned that he lived in India and was married.  At one point in 2022 he asked for help "buying real estate."  She agreed to forward him $2,500 and said: "I'm always needing orange pills so you [c]an pay me back with them."  "I am very excited for you," she continued, "and interested in what you're doing are you buying a house or business or am I being too nosy?"

Segovia's messages reveal a desperate appetite for drugs and for a reliable source for them.  In May 2021, for instance, she wrote Saud that she "wanted to check if there is another shipment of orange

---

[3] The government knows his identity but withholds it here under Department of Justice policy.

pills coming? I'm fine right now of course just need to keep an eye on whats coming and whAt i have so i dont run  low, cause when that happens i run out and you have to go crazy to get me some fast!!"  She added: "Speaking of getting for me fast, i realize that once again you did everything to get me them quickly! Because you are always good to me, I'd like to send you $250 (for you though, not the company) as a little tip... you can use it for you and your family."

Or on June 10, 2021: "Lets do the 540 [Tapentadol pills], its going to kill me monie wise but i hate to get low…will i get them within a couple of weeks?"  Or on June 21, 2021: "I've been miserable [for] days because i havent had them and its li[k]e a withdrawal thing… if i cant get the soma soon, I should just stop getting them!"  Weeks later she wrote: "By the way, i did want to Thank You, i know you did everything possible to get what I needed to me…I've been with you for a long time now and i trust you… in the past whoever it was would be all good and helpful in the very beginning and then after I had gotten a few orders from them, they really didn't care about what i needed."

On September 5, 2021, she wrote: "No news from anyone… im in so much pain… i hope something comes thru…soon! I know you are trying…!"

Or on May 6, 2022:  "I received 200 orange pills… I kept hoping the rest would come but they haven't…. I have the weird orange ones ready to be shipped but since I only got 200 of the good ones and i share with [redacted], so im lower than i have been in a long time and even though they are terrible, i may run out and have to use some of those…unless i can pay extra to get the good orange ones quickly…"

At times other sellers would try to poach Segovia from Saud.  Saud would tell Segovia to block them on WhatsApp.  In February 2022, Segovia admitted to Saud that she tried another seller but regretted it: "I have almost always gotten good quality stuff from you and i know you do your best for me but at some point in Nov/Dec when you were having trouble filling my order, i got a batch of orange pills that just dont work. Unfortunately, i dont know where they came from or where i got them so i don't expect you to do anything about it… just try to be sure the next batch comes from one if your good sources."

Segovia learned that the pills she ordered came, at least in part, from India.  At one point she queried Saud: "The soma is not from India though right? I thought everything was USA now?"  He replied: "Yes they are from USA but stock comes from India."  Segovia responded: "What do you mean the stock is from India but its usa? How can it be both??"  Saud: "Means we send stock from India to

usa but this time its' delayed to little delay." The blister packs containing Segovia's pills bore the names of Indian manufacturers and Indian cities and, occasionally, Hindi lettering.

### F.    Analysis of Segovia's pill redistribution for Saud

The chats also revealed that Segovia reshipped drugs, for Saud, to other customers of his or the Durgapura organization. Doing so was, under the law in Title 21 of the U.S. Code, drug distribution. It was knowing, but also, as explained below, unthinking.

Segovia admitted in her plea agreement that, on two occasions, Saud proposed that she reship for him in return for pills. On the first occasion, on June 15, 2022, he wrote: "If I send you one box for big package of bulk can you forward to me? I'll send you 360 extra orange pills for this work if you agree I'll do." "Yes, i will do that," Segovia replied. "sounds good for both of us… this is in addition to the 540 that you already sent, right? … its not dangerous for me to get it??"

She admitted to reshipping once more at Saud's direction, though this time she wasn't compensated and expressed hesitancy. Saud wrote her on September 23, 2022: "Did you get this package? Just please confirm so I'll not worry about it." It was a large package of Zolpidem (Ambien). Segovia replied: "I won't be home tonight until about 7:00 (PST) so I won't be able to send it back out until tomorrow." She continued: "So that is not my large order? Why did you send it to me. I feel funny about all this transferring money [more below], but I really would rather not have stuff coming to my house to reship out. I will do it this time of course!" That night she sent a follow-up: "The pkg is here… ill open it tomorrow or should I just send it without opening it!" Saud replied: "You can send it without opening it because that's meds you don't take those are ambiens." Saud at other times offered Segovia pills as a perk for shipping (e.g., Saud: "If you can [ship] it's very grateful and we'll adjust in soma I'll send 180 soma in $350 for you if you do this"). But it is unclear if the deal happened.

Segovia admitted that on a handful of occasions, Saud asked her to "return" pills to other addresses, after she complained that she hadn't ordered the pills or was concerned about their quality:

- 4/7/21: Segovia to Saud: "I'm so so sorry, i know. It was important and i know [] the person waiting for it really needs it... I'm on my way into work now... just the address and how you  be it shipped."

- 4/20/21: Saud: "Send package at this address via overnight please." Segovia: "Shipping is stressful... i was on hold for 25 minutes and then i told them the address was correct and they said their computers are taking it now. It will be delivered tomorrow!"

- 12/13/21: Saud: "I given you 2 address so in one address ship 360 pills and on other address ship 180 pills." Segovia: "Ok, will do. Is tomorrow ok?... I will send them when i get into work. What kind of shipping?"

- 12/23/22: Segovia: 'How do you want them sent? Ground? Faster? Also just to be sure you know, the second pkg of pills i got are not orange they are the ones that say 'Vision' something… just send them together?" Segovia (on 1/3/22): "I went to the Post Office and it was expensive but I sent it 2 day air to arrive on the 5th. i'll send a pic of it now."

- 4/26/22: Saud: "Can you return me those [Tapentadol]?? So I'll get refund and reship those 540 pills also. Ship the bad pills at this address today so I'll get money from them." Segovia (on 5/2/2022): "Im so sorry, im on a business trip because we had 2 officers that got shot! I should be home tomorrow night so ill get them shipped as soon as i can."

- 5/10/22: Saud: "Yes these 540 pills are payable and you're sending bad pills back so we are equal just let me known how many pills you're sending so I'll check." Segovia: "I am sending 440 back of the orange"

- 5/30/22: Segovia: "I still have those bad orange pills if you yiu want me ti send them somewhere? Are you going to replace those? I think you owe me an order of those correct?" Saud: "Yes 240 pills are on way. And I'll give you address for return of those bad orange pills"

Segovia's "returns" of hundreds and hundreds of pills were in fact acts of drug distribution, with Saud using her to dispatch pills to other users like her. She may not have recognized this at the time, but certainly she should have been suspicious that these "returns" were to random residential addresses across the country. The April 7, 2021 shipment was to a "Dianna" in Asheville, North Carolina. The "bad" pills on May 10, 2022 went to a "Kellie" in Redlands, California. Other pills went to "Karen" in Kewadin, Michigan; "Richard" in Stanwood, Washington; "Charlene" in Sacramento, California. This is not how people return legal online purchases, let alone medications. Segovia knew this work was illegal ("its not dangerous for me to get it?"). She knew drugs were in the parcels ("I know…the person waiting for it really needs it"). The government accepts her explanation that she mailed these packages to build rapport with Saud.

Neither Segovia nor the government knows what actual drugs were in those mailings. In one case, Saud mentions that the pills were not meant for her because they were "ambiens," but in most other instances, she was "returning" some sort of "bad" pills, which Segovia variously called "white" pills or "bad orange" or "weird orange."

Segovia sent parcels using SJPOA's UPS account.  On April 7, 2021, for example, Segovia verified a shipment she made by sending Saud a photograph (at right) of a UPS receipt with a pre-written SJPOA return address, and signed "J. Segovia."



She also received drugs at her union office.  On June 30, 2021, Saud told her: "Please get this package of soma from your office address. And if you're interested I sended you soma extra and orange pills also extra if you can pay for those that's really good because I don't have money for money myself and you don't like the orange pills you can send back."  "I did get the packet from my office today!" she replied.

On occasion Segovia was contacted by other illicit pill sellers—people like Saud—who asked her to "work" for them, just as she did for Saud.  One invited her to partner with "me too…. I will help you in every thing. In terms of money, or anything related to DEA/CUSTOM."  Segovia loyally forwarded the message to Saud, who replied: "He don't know that you're in police he's trying to scare you 🤣"  Segovia replied: "Yeah, thats exactly what i was thinking!"

She also learned that others, presumably drug users like her, were shipping to *her* at Saud's direction. For instance, on May 19, 2021, Segovia inquired about two packages she was expecting.  Saud told her that the shipper "didn't send invoice she's afraid because you're in police so I'll send you email to send payment to them via PayPal."  Segovia replied:  "Oh no, did you explain that we are not the Police, we are there I'm Union [not] the police, besides if she was sending it to home [how] did she know that??"

### G.    Analysis of Segovia's money transfers for Saud

Segovia admitted in her plea agreement that, twice, Saud sent her money on one platform and asked her to repay him through another platform.  This helped him secure profits and evade restrictions. She also received money that she forwarded to him.  She acknowledged that she knew he was making money from illegal sales of controlled substances.  She was not promised money or perks to do so but

1  acted to bolster their relationship.  On June 1, 2021, for instance, Saud wrote: "I sended you $340 more

2  via Venmo did you get it?"  "Sorry, i just saw this now," Segovia replied. "ive never had money in

3  Venmo before , how do i get the money so i can send you money thru cash or any other way!"  Later

4  Saud wrote: "You don't have any crypto wallet to send money? In United States people are mostly

5  paying through crypto."  Segovia replied: "No, that's funny because no one i know uses that or thinks

6  it's a good idea. Sorry!"  In August 2021, Segovia was sent a few hundred dollars from Saud and wrote:

7  "You want me to go in to my Venmo account and from there, take that money and deposit it into My



8  paypal account to send it out? Obviously, I've never done this

9  before. I want to help you though!"  On April 27, 2022, Saud

10  wrote: "Because i can only trust you if you say I'll send you

11  via Venmo and you can pay that via PayPal."

12       CashApp became a platform of choice.  Agents

13  identified 127 CashApp transactions with five people from

14  whom Segovia would receive money and then transfer it to

15  Saud.  Saud asked Segovia to lie to PayPal, such as when he

16  wrote: "Hey PayPal email for you asking the payment for tell

17  them the payment is for cosmetics products so please do this

18  otherwise my money is on hold."  Venmo transactions,

19  similarly, were often disguised with labels like "makeup" (see

20  image at left).

21       Segovia knew that Saud needed her help because he

22  was being thwarted by account freezes due to his platform policy violations.  For instance, on May 11,

23  2022, Saud asked her to send him money on CashApp because "PayPal blocked my around $18000 and

24  I don't know they'll give me back or not but if I take payment through these they will not get on hold."

25  He added: "Thank you so much it's very grateful you help me in this time."

26

27

28

1   She moved money for Saud from her SJPOA
2   office.  On June 14, 2021, Saud pressed Segovia to
3   send $200 to someone else. She replied: "Sorry, i
4   had 50 new officers starting today so if I've been
5   tied up all morning. I'll be back on the office within
6   an hour and I'll take care of all of it!"  Later
7   Segovia, to prove the remittance, sent Saud a
8   screenshot of a PayPal receipt, for $999.99, on her
9   desktop—inadvertently leaving visible SJPOA
10  network passwords on a notepad (redacted at right).



### H.   Analysis of Segovia's drug orders, consumption, and spending

The government's investigation focused on
whether Segovia was receiving these huge quantities
of pills for her own use, or for distribution to others,
or some mix of both.



The Saud-Segovia chat reflects orders amounting to
some 18,000 Tapentadol pills over about 17 months.
That's about 1,058 pills a month, or 35 a day.  She also
ordered about 4,860 carisoprodol (or "soma") pills.  In
2022, in particular, she ordered 7,740 Tapentadol pills—or
645 a month, or 21.5 a day.  She told the government that
she took around 20 "orange" pills a day.  At least some
orders were intercepted by customs (see image at left of a
parcel seized in 2021) or never shipped.  Some parcels
arrived with fewer pills than expected.  Some pills were
"bad" and she ordered new batches.  She shared significant
quantities of pills with two people she knew.

But the bottom line is that, so far as the government can ascertain from careful scrutiny of financial, WhatsApp, and shipping records, Segovia was ordering almost entirely for personal use.

Moreover, she was not profiting from her redistribution or money movements (aside from the one time when she was clearly remunerated with pills). To the contrary, her Tapentadol habit cost her at least $20,000 a year. On June 30, 2021, she wrote Saud: "I'm kind of broke from these orders."

### I.    The 726 Tapentadol pills that form the basis for the Guidelines calculation

Tapentadol is a prescription opioid comparable in strength to morphine.[4] A sample of the blister pack of "orange" pills that she typically received is at right. A total of 726 Tapentadol pills were seized from Segovia. Specifically, on March 24, 2023, Homeland Security agents searched her home, finding 73, and her SJPOA office, finding another 283 (some pictured below).



Another 370 were intercepted on April 3, 2023 in parcels that she ordered in late March. These pills were all lab-confirmed as Tapentadol. They are the only Tapentadol pills that the prosecution had in its possession to test. The Guidelines calculation in the plea agreement and Presentence Report is based on



these seized, lab-tested quantities. Nevertheless, the government has shared with the Court the full information showing the scope of Segovia's importation and use.

When dealing with fraud-infected foreign pill merchants, testing is important. Neither Segovia, nor a customs inspector, nor any operative handling the drugs, actually knows for sure what was in any particular batch of untested pills. This was demonstrated dramatically in the seizures from Rajiv

---

[4] *See, e.g.*, https://www.federalregister.gov/documents/2009/02/17/E9-3150/schedules-of-controlled-substances-placement-of-tapentadol-into-schedule-ii.

Agnihotri.  Eight parcels, together containing tens of thousands of pills, were seized from him and lab tested.  A full *quarter* of the drugs proved, dangerously, to be counterfeits—in fact, the tablets contained different drugs altogether.  5,000 tablets labeled as Zolpidem (Ambien) were actually alprazolam (an anti-anxiety medication).  Some 80 tablets labeled as Tapentadol actually contained Pregabalin, a powerful anti-anxiety and anti-seizure medication that has psychoactive properties[5] and has led to deaths particularly in Europe and Australia.[6]  The peril here is acute: someone is taking a drug that they are unaware that they are taking, indeed a drug belonging to an entirely different drug class.

There is evidence that Segovia herself received mislabeled counterfeits.  On June 30, 2021, Segovia wrote Saud: "ive been off work for 2 days. I was really bad, after taking pills on the day after they got there, i felt really, really strange… like they altered my mind instead of the pain… im hoping that it was all a coincidence or maybe i took something too soon on between doses. I was really worried that it was something in the pills themselves… so now i guess i will just try a pill from each pkg i got and see if it happens again."  Later in the day she wrote:  "You don't think the pills were tainted, do you?"  "Yes may be," Saud replied, "but this time you'll get the same pills like always."  Segovia wrote: "Yes maybe they are tainted, that's scary because almost everything i received was the odd ones!!"

A few days later, on July 4, 2021, she placed another order, still rattled by the "tainted" pills: "Sorry, my phone was on silent (grandkids) i would like 360 of the good orange ones… can they get here within a week? Don't just tell me yes, if you can't….  i dont want to have to use the other kind… they made me feel really weird for like even like 12 hours After i took them, terrible feeling!"

It's impossible to know for certain, but Segovia may have consumed Pregabalin, which, taken at high doses, can produce dizziness, disorientation, and cognitive impairment.  But Saud, whether by design or incompetence, kept sending the wrong pills.  In November 2021, she complained about bad pills again: "Yes, I'll order… just crawling out of bed… give [m]e an hour or so, please… also we need to talk because i got those weird orange pills yesterday. Ill send a picture!"

---

[5] *See* https://www.federalregister.gov/documents/2005/07/28/05-15036/schedules-of-controlled-substances-placement-of-pregabalin-into-schedule-v.

[6] *See, e.g.,* https://www.bbc.com/news/uk-northern-ireland-66568460; https://www.channel4.com/news/exclusive-prescriptions-rising-for-anxiety-drug-linked-to-1-in-10-drug-deaths-in-england; https://www1.racgp.org.au/newsgp/clinical/misuse-of-popular-anti-epileptic-drug-linked-to-nu.  *See also* https://pmc.ncbi.nlm.nih.gov/articles/PMC7688538/.

Sometimes Segovia's fear, alternately, was that the pills were inert.  On January 5, 2022, she wrote: "i got a batch if orange pills that were really bad quality and didnt work at all, but i had no way of knowing where they came from. Ok, i dont want to worry about running out so go ahead and order 540 more orange, and 180 500 soma!"  On May 6, 2022, she wrote: "If i get the 340 of the good orange, then I want to send the bad ones back…. i don't think there is anything in those damn things!"  Saud tried to placate his customer:  "Yes after you said that you don't want to get return the bad pills we are equal on that money for 540 orange pills and i paid them and after that I shipped total 540 more pills than you received 200 pills last week and 360 pills today…. But because you taken bad pills so i given you $300 discount you need to pay me $1100 instead of $1400."

**J.    Segovia's Customs and Border Protection notices between 2019 and 2023**

Segovia received multiple notices from U.S. Customs and Border Protection that informed her that inspectors had seized packages sent to her because they appeared to contain controlled substances. The letters even cited the very anti-importation prohibition that she has now pleaded guilty to violating: 21 U.S.C. § 952.  At right, for instance, is a letter dated August 5, 2020 that advised her of the impoundment of 1.4 kilograms grams of suspected Tramadol, valued at around $700.  She got another letter, in July 2019, when more Tramadol was detained.  That time she even hand-signed and mailed back a form in which she abandoned the seized items.



When agents interviewed her in March 2023, Segovia had in her home yet another seizure letter from Customs and Border Protection.  It stated that officials at Los Angeles International Airport seized a package, addressed to her, that contained 1.55 kilograms of

Zolpidem, appraised at $1,920.  The basis for the seizure, once more, was "21 USC 952 - Importation of Schedule IV Controlled Substances."  The letter noted that the parcel, originating in the U.K., declared its contents as "Toys."  She showed agents the letter—and the empty box from which the suspected drugs had been removed by customs officials.

## II.    PROCEDURAL HISTORY

On March 27, 2023, Segovia was charged by a Criminal Complaint with one violation of Unlawful Importation of a Schedule II Controlled Substance (fentanyl) in violation of 21 U.S.C. § 952(a)(2) and § 960(a)(1).  Doc. 1.  On March 31, 2023, she surrendered to Homeland Security agents outside of the San Jose federal courthouse and was arraigned that morning.  Doc. 6.  On August 12, 2024, she was charged by an Information, after waiving her right to grand jury indictment, with Unlawful Importation of a Schedule II Controlled Substance (Tapentadol) in violation of 21 U.S.C. § 952(a)(2) and § 960(a)(1).  Doc. 55.  On October 10, 2024, she pleaded guilty to that count.  Doc. 59.

## III.    GUIDELINES CALCULATION

The parties and Probation agree on the following Guidelines calculation:

| | |
|---|---|
| Base Offense Level, U.S.S.G. § 2D1.1(a)(5) & (c)(8) | 24 |
| Lab-tested Tapentadol pills, with morphine as comparator; 1 gram morphine = 500 grams CDW; 361.8 grams lab-tested Tapentadol pills = 180.9 kg CDW | |
| Acceptance of Responsibility | - 3 |
| Zero-point offender (U.S.S.G. § 4C1.1) | - 2 |
| Safety valve relief (U.S.S.G. § 2D1.1(b)(18)) | - 2 |
| Total Adjusted Offense Level | 17 |

Ms. Segovia's criminal history is I, with zero points.  The Guidelines range is 24-30 months.

## IV.    SENTENCING RECOMMENDATION

The government recommends a sentence of probation.

This is an unusual case.  It began as an investigation into whether Ms. Segovia was engaged in distributing controlled substances in concert with foreign criminals.  Suspicion arose from the immense quantities of pills she was receiving.  It was aggravated by her efforts at deception.  But the government after extensive investigation is convinced that Ms. Segovia was in fact largely a heavy consumer of

Tapentadol and Soma pills.  She certainly assisted a criminal group by transferring money and by redistributing drug parcels for one of its operatives.  But her preeminent crime is the one she was originally charged with: unlawful importation of controlled substances, albeit Tapentadol instead of fentanyl.

Ms. Segovia is a 66-year-old grandmother with no criminal history.  She began using hydrocodone under prescription.  This became an addiction.  When she could no longer acquire the pills from a doctor, she turned to the internet.  She ordered online for years.  Eventually she reached the point of ordering, in 2022, about 7,740 Tapentadol pills.  She took them all day long.  She recalls using 20 a day in 2022.  That would be 7,300 a year.  This is an extraordinarily large amount to consume.  But her consumption tracks the number of pills she ordered.  In light of all the information that the government has, Segovia did not order quantities of Tapentadol significantly in excess of personal use.  It was in part to get to the bottom of this—to satisfy itself that nothing more was afoot—that the government required extended time to conclude the matter.

So Segovia has pleaded guilty to being an importer of drugs.  In doing so she pumped tens of thousands of dollars over the years into the coffers of these unscrupulous networks (whose representatives were eager to ship mislabeled "bad" pills to others).  But she was an importer because she was a user.

Over time Segovia was drawn into more than merely ordering.  She distributed pills.  She did so at Saud's bequest, usually under his pretense of having her "return" pills.  She admitted that she was once compensated with pills for reshipping.



It should have been clear to her that she was also sending "bad" pills to unwitting others.  For instance, here is Segovia in December 2021: "Let me know where to send the weird pills and the other orange ones and ill do my best to get them out tomorrow."  Saud: "Ship all wrong

orange pills at this address [a residence in Southaven, Mississippi]." Or here is Saud on April 26, 2022: "Ship the bad pills at this address [an apartment in Spencer, Iowa] today so I'll get money from them." These "wrong" and "bad" pills had made her sick.

The government also confirmed, through a search warrant executed on a person in Redlands, California, who distributed for Saud *to* Segovia, and to whom Segovia sent money for Saud, that it was a Durgapura tactic to have one American ship to another (see the "US to US" in the screenshot on page 2). That's because the chief obstacle for the network is getting the substances into the U.S. Packages crossing into ports are scanned and a percentage interdicted. So the network used domestic customers as shipping agents, in addition to insiders like Rajiv Agnihotri (who received pills directly from foreign co-conspirators). Segovia performed this reshipping work for the Indian group. She did so even though she asked Saud if it was "dangerous" for her to do. That said, she expressed discomfort with it and stopped agreeing to reship for Saud (excepting in the "return" scenario) after doing it twice.

She knew her conduct was unlawful. She admits that. Indeed, she had the unusual experience of receiving letters from a branch of the very agency that later investigated her, letters that informed her that receipt of pills from foreign sources was quite possibly a federal offense. It cited the statute that she was later charged with. She even signed and returned one letter to disclaim ownership of the drugs.

But one central fact distinguishes Segovia from the "drug dealers" usually targeted for prosecution: drug dealers get into the business to make money. Segovia was losing money. In fact, she was hemorrhaging tens of thousands a year on her habit. The price varied but Saud charged her between $2.50 and $3.50 per Tapentadol pill. That would mean she spent between around $19,450 and $27,000 on Tapentadol in 2022 alone. She was a good customer, which is why Saud sent a flurry of distressed messages when she stopped texting with him: "Did I do something wrong?" "If you say I'll place your order very good offer available 540 orange pills in just $1400," "We are like family i care about you and your family," "I am very upset you're not texting me back," "Hey are you okay? I'll give good offer for you on soma 500 mg," "If you say I'll send one free package to you." That said, the WhatsApp chat was not the end of her relationship with Saud. He finally emailed her using her SJPOA email. In her last exchange with him, on March 23, 2023, the day before her home and office were searched, she responded: " I want to send the rest of your money through cashapp, do i still send to [redacted]?"

1        Why Segovia's address appeared on a website advertising illegal pill sales remains a mystery.

2   The government's guess is that an Indian operative put it there, not Segovia.

3        The prosecution interviewed a half-dozen other customers of the Durgapura network in the Bay

4   Area who had received pills from Agnihotri or others.  The diversity of the customers was surprising but

5   perhaps should not have been, because drug abuse touches all segments of American life.  The group

6   included a nurse, a flight attendant, a successful patent-holding drug researcher, a grade-school teacher,

7   and a filmmaker.  Their stories helped put Segovia's conduct into context.

8        All readily admitted (unlike, initially, Segovia) that they understood that getting prescription

9   drugs off the internet or by phone from illegitimate sellers, without a doctor in sight, was illegal.  They

10  acknowledged dependencies that they could not satisfy lawfully.  Some recalled being asked to "return"

11  pills, to a new address, once or twice.  This was distribution, though none of them thought of it as such.

12       But Segovia went further than they did in a few respects.  No other customer recalled shipping

13  for bonus pills.  (These individuals were all deemed credible.)  No one else exchanged money on digital

14  currency platforms for a supplier.  The government believes that Segovia's conduct separates her from

15  these and many other thousands of clients of foreign pill conspiracies.

16       The government believes that this conduct justifies a criminal conviction, but not a custodial

17  sentence.

18       Another fact that ultimately cuts two ways: she was Executive Director of the San Jose Police

19  Officers' Association at the time of the offense.  On the one hand, she served in a law enforcement

20  adjacent position.  The SJPOA regularly issued messaging to condemn drug abuse and drug distribution.

21  Segovia's conduct was thus hypocritical.  On the other hand, neither Segovia nor SJPOA had

22  operational control over law enforcement.  Segovia was not sworn nor part of any command structure.

23  Her actual work duties amounted to being an office manager of a staff of three or four.  She booked

24  banquet halls, planned social events, and coordinated fallen officer memorials.  The government

25  corroborated this understanding from a review of her emails obtained from her SJPOA email account.

26

27

28

GOVERNMENT'S SENTENCING MEMORANDUM
Case No. 24-CR-00459-EKL                    18

1    Segovia engaged in illegal
2  importation and distribution using
3  union resources. She kept pills at her
4  office (pictured at right on the day of
5  the search). She paid Saud or moved
6  money for him at her office. She
7  mailed packages using the SJPOA's
8  UPS account, thus making the SJPOA
9  subsidize foreign drug distribution.



10    The government has no
11  evidence that the SJPOA was aware
12  of her misconduct. At the same
13  time, the SJPOA announced publicly after the search of Segovia's office that it wished to cooperate with
14  this investigation. Yet counsel for the SJPOA engaged in stonewalling, even threatening to "seek
15  judicial intervention" to stop the prosecution from reviewing Segovia's SJPOA email contents, though
16  the SJPOA never followed through on its threat.

17                    *                    *                    *

18    Ms. Segovia's decision to lie to special agents, while purporting to advance their interests, was
19  reprehensible. This was not just the normal blundering dissimulation blurted out when a target is first
20  surprised and confronted by law enforcement. Segovia took six weeks to ponder her predicament,
21  concocted a story ("it all leads to" the housekeeper) that she sought accounted for the evidence that she
22  knew agents would find, then voluntarily approached agents to relay that story. As noted, the agents did
23  not credit it for a moment, which is why no Guidelines enhancement for obstruction of justice applies.
24  U.S.S.G. § 3C1.1, App. Note 4(G); *United States v. Solano-Godines*, 120 F.3d 957, 963 (9th Cir. 1997).
25    The government at the same time acknowledges that she willingly offered her phone to agents.
26  She was evidently trying both to deflect blame and to give agents the information to pursue, she thought,
27  the culpable foreign principals. Plainly she wasn't thinking clearly. This was not the behavior of a
28  "mastermind," but a scared, confused, and addicted woman who saw the walls collapsing around her.

The government also credits her for a truthful proffer and for fully accepting responsibility.

Finally, there is the issue of rehabilitation. Ms. Segovia seems to have achieved something extraordinary here: she liberated herself from a drug habit built up over decades. Since March 2023, as a condition of pretrial release, she has been subjected to 45 random urinalysis tests. She has tested negative for illicit drug use every single time. That is altogether atypical.

\*          \*          \*

A sentence must be sufficient but not greater than necessary. The government has tried to show that Segovia's case is an uncommon one: her behavior was that of a person who was a user, not a dealer. She held a position that should have instilled her with firmer respect for the law and for her obligation to be truthful with law enforcement. But the price she paid for her choices has been steep: termination from her job and the upending of her life as she knew it—even if this chapter now includes sobriety. The government believes that her contrition is sincere and that she poses little risk of reoffending.

\*          \*          \*

A final element of this tragedy is that Segovia, like so many, was introduced to opioids through lawful prescriptions before being cut off and turning to the underworld to meet her needs. In this she is no different than many thousands of Americans illegally ordering prescription drugs each day. Segovia, after all, was just one of 700 people, in 48 states, who got received from Rajiv Agnihotri. These pill-stuffed parcels crisscross the country, sent by one citizen to another, all at the direction of a faceless profiteer abroad.

The government hopes that more Americans will recognize that websites that offer discreetly shipped "medications," are, despite professional-looking homepages, usually fronts for unethical foreign criminal networks. They hawk pills of doubtful safety with no quality control. They ship under false labels. (See below for a seizure from Agnihotri, with drugs hidden in snacks.) They do not care about anyone's bodily integrity. They often escape accountability due to residence on foreign soil. The active ingredient in these pills is never more than a guess. Once the pill is ingested, the evidence vanishes. There are larger issues beyond the scope of this case—regarding prescribing practice, drug prices, insurance, treatment for mental health or substance abuse—that lead so many Americans to seek drugs outside of lawful channels. But as this case shows, the unlawful channels are unsafe, legally and physiologically.

GOVERNMENT'S SENTENCING MEMORANDUM
Case No. 24-CR-00459-EKL                    20



*Seizure from Agnihotri, with drugs hidden in snacks*

One recipient of Agnihotri's packages told investigators that he scrutinized his pills and packaging to detect counterfeits. That may work sometimes. But counterfeits seized from Agnihotri—tablets with different active ingredients from those on the label—were visually indistinguishable. Segovia was lucky to escape the fate of Dr. Burgio, the pioneering Alzheimer's professor in Alabama who died from a counterfeit fentanyl pill—he and Segovia shared Saud as a supplier. She is also lucky that she didn't end up like the Minnesota man who, redistributing for a foreign network in the same way as Segovia, mailed Dr. Burgio his fatal pill. In December 2024 that man received 20 years in federal prison for causing the professor's death.

But more will die because of these pill schemes. Those who participate in making this business more lucrative play a small but indispensable part in imperiling the lives of fellow citizens. That is one last reason that the government has undertaken to tell the Court, at length, the story of Ms. Segovia.

## V.   **CONCLUSION**

For these reasons, the government respectfully recommends a sentence of probation and three years of supervised release. The government joins Probation's recommendations as to a fine and restitution.

DATED:  January 14, 2025

/s/
JOSEPH TARTAKOVSKY
Assistant United States Attorney